IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 90,044

STATE OF KANSAS,
*Appellee*,

v.

REGINALD DEXTER CARR JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Whether a statute is constitutional is a question of law.

2.

Section 1 of the Kansas Constitution Bill of Rights states, "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." The rights guaranteed under section 1 are judicially enforceable against governmental action that does not meet constitutional standards.

3.

The court applies a two-part framework to determine whether an asserted right or declared interest under section 1 of the Kansas Constitution Bill of Rights is judicially enforceable. First, the court determines whether the asserted right or declared interest is included within the guarantees or protections of section 1. Under this step, the court begins by carefully describing the asserted right. Then, it determines whether that asserted right or declared interest is protected under section 1 by looking to the language of the Kansas Constitution. When the words themselves do not make the drafters' intent

clear, courts look to the historical record, remembering the polestar is the intention of the makers and adopters. If the asserted right or declared interest is established under section 1, the court proceeds to the second part of the framework—exploring whether the governmental action impairs the right and, if so, whether such governmental action satisfies constitutional scrutiny.

4.

The historical record reflects the framers did not intend the term "inalienable" in section 1 of the Kansas Constitution Bill of Rights to be construed as "absolute" and "nonforfeitable." Instead, a careful reading of section 1, coupled with the transcripts of the convention debate, demonstrates that the term "inalienable" refers only to one's ability to transfer his or her right or interest to another person. Though inalienable, the framers viewed the natural rights guaranteed within this section to be forfeitable in civil society. So construed, the framers did not intend for section 1 to impede or limit the State's authority to punish individuals for their criminal conduct.

5.

Section 1 of the Kansas Constitution Bill of Rights acknowledges a person's inalienable right to life, but that right is not absolute or nonforfeitable. Once a defendant has been convicted of capital murder beyond reasonable doubt, the defendant forfeits his or her natural rights under section 1 ("among which are life, liberty, and the pursuit of happiness") and the state may impose punishment for that crime pursuant to the provisions of Kansas' capital sentencing scheme.

6.

Once a defendant has been lawfully convicted of capital murder, the imposition of a capital sentence does not implicate section 1. However, other constitutional guarantees, including those contained in sections 9 and 10 of the Kansas Constitution Bill of Rights,

2

continue to regulate the state's authority to punish and guard against arbitrary applications of such authority.

7.

Section 5 of the Kansas Constitution Bill of Rights, which provides that "[t]he right of trial by jury shall be inviolate," preserves the jury trial right as it historically existed at common law when our state's Constitution came into existence.

8.

In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers and adopters of that provision. A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to persons of common understanding.

9.

As used in section 5 of the Kansas Constitution Bill of Rights, the term "jury" denotes a legally selected group of persons sworn to determine issues of fact and return a decision based on the evidence and in accordance with the law as instructed.

10.

The process of death qualification under K.S.A. 22-3410 removes only those prospective jurors who are excluded from the constitutional definition of a "jury," and therefore neither the statute nor the process of death qualifying the jury implicate any right protected under section 5 of the Kansas Constitution Bill of Rights.

3

11.

Section 5 of the Kansas Constitution Bill of Rights does not require that juror qualification or selection standards enacted by the Legislature be affirmatively authorized by the common law. Rather, that provision merely preserves the right to jury trial as it existed at common law when the Kansas Constitution was adopted.

12.

When reviewing the legal propriety of penalty phase instructions addressing mitigating circumstances, the court must consider whether the instructions, considered together as a whole, fairly and accurately state the applicable law, and whether a jury could have been misled into not considering certain mitigating circumstances that, by law, should have been considered.

13.

K.S.A. 21-4624(e), now codified as K.S.A. 2020 Supp. 21-6617(e), does not require a jury to be instructed on the burden of proof for mitigating circumstances in the penalty phase of capital sentencing proceedings, overturning the holding in *State v. Cheever*, 306 Kan. 760, Syl. ¶ 5, 402 P.3d 1126 (2017).

14.

Under the law of the case doctrine, when a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.

15.

State law error during the penalty phase of a capital murder trial may be deemed harmless where the party benefitting from the error shows there is no reasonable probability the error affected the jury's ultimate conclusion regarding the death sentence verdict.

16.

The avoidance-of-arrest statutory aggravating circumstance, K.S.A. 2020 Supp. 21-6624(e), effectively channels the discretion of the sentencer and is not facially overbroad.

17.

In Kansas capital sentencing proceedings, the Confrontation Clause in the Sixth Amendment to the United States Constitution applies only to testimonial hearsay relevant to the jury's eligibility decision, i.e., evidence relevant to the existence of one or more statutory aggravating circumstances. A defendant's confrontation rights do not extend to, and are not implicated by, testimonial hearsay offered to impeach or rebut defendant's mitigation witnesses.

18.

An expert's reliance on testimonial hearsay does not constitute a violation of the Confrontation Clause in the Sixth Amendment to the United States Constitution per se. Instead, the controlling question is whether the expert is testifying as a witness in his or her own right or testifying as a mere "conduit" for the testimonial hearsay. The Confrontation Clause forecloses the expert's opinion testimony only in the latter situation. The problem of expert-as-conduit is not the amplification of multiple experts' opinions but the fact that the so-called expert is not actually giving expert testimony.

19.

Under the facts of the case, the State's expert witness was not a mere conduit for the opinions of others and thus his testimony did not violate the Confrontation Clause in the Sixth Amendment to the United States Constitution; although the expert witness vaguely asserted that other experts agreed with him, he offered an independent opinion and interpretation of PET (positron emission tomography) scans based on his own synthesis of the evidence.

20.

During the penalty phase of a capital murder trial, any error that arises solely under state law may be deemed harmless if the court is persuaded there is no reasonable probability the error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict.

21.

The court applies a four-step analysis to review jury instruction challenges. It first considers the reviewability of the issue, which is then followed by reviewing whether the instruction was legally and factually appropriate. If the court concludes there is error, it then turns to reversibility. Where a death penalty defendant fails to request or object to an instruction, the court applies the clearly erroneous standard of review and determines whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.

22.

Under the facts of the case, the jury instructions and verdict forms, viewed together as a whole, made clear that "the crime" referenced in the aggravating circumstances instruction was capital murder.

23.

Under the facts of the case, the jury instruction describing the verdict forms, which improperly used a double negative in the grammatical structure of the sentence describing the statutory weighing equation under Kansas' capital sentencing scheme, was not clearly erroneous because the error was not readily noticeable and the jury's use of Verdict Form 1 on all counts indicated that jurors employed the proper statutory weighing equation and determined beyond reasonable doubt that aggravating circumstances existed and outweighed mitigating circumstances, thereby warranting a sentence of death.

24.

The district court's failure to instruct the jury that it must find the defendant was at least 18 years old at the time of the offense, as a condition precedent to imposing the death penalty, constitutes error. But such error is subject to a harmless error analysis.

25.

Under the facts of the case, the district court's failure to instruct the jury that it must find defendant was at least 18 years old at the time of the offense in order to impose capital punishment was harmless because the issue was not contested and the undisputed evidence established that the defendant was 23 years old when the crime occurred.

26.

The district court's refusal to instruct the jury that "[y]ou must not draw any inference of guilt from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict," as requested by the defendant, was not erroneous; although the requested instruction was appropriate for the guilt phase, it was not legally appropriate in the penalty phase after guilt had been adjudicated.

27.

The court applies a two-step framework in analyzing claims of prosecutorial error. Under the first step, the court considers whether prosecutorial error occurred by determining whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to argue the State's case and attempt to obtain a verdict in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the court advances to the second step and determines whether the error prejudiced the defendant's due process right to a fair trial.

28.

When analyzing prosecutorial error claims that implicate both constitutional and nonconstitutional claims of error, the court need only address the more demanding federal constitutional error standard. Under the federal constitutional error standard, prosecutorial error is harmless if the State demonstrates beyond a reasonable doubt the error complained of did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict.

29.

In analyzing claims of prosecutorial error in the penalty phase of capital proceedings, the overwhelming nature of evidence is to be considered, but its impact is limited. To the extent there was constitutional error, the question is not what effect the error might generally be expected to have upon a reasonable jury but what effect it had upon the actual verdict in the case at hand. The inquiry, in other words, is not whether, in a trial that occurred without the error, a verdict for death would surely have been rendered, but whether the death verdict actually rendered in this trial was surely unattributable to the error. If more than one prosecutorial error occurred in the proceedings, the court considers the net prejudicial effect of those errors using the same federal constitutional error standard applied to the individual errors.

8

30.

The Eighth Amendment to the United States Constitution guarantees a capital defendant a right to an individualized sentencing determination, meaning the sentencer may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. It does not matter whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by a trial court's evidentiary ruling, by jury instructions, or by prosecutorial argument.

31.

A capital sentencing jury must consider all relevant mitigating evidence, and such evidence need not excuse or justify the crime or in fact relate to the defendant's culpability as long as it serves as a basis for a sentence less than death. But the State has a competing interest in challenging whether a circumstance is mitigating at all and to contest the weight the jury should give to a mitigating circumstance.

32.

It is improper for a prosecutor to argue that certain circumstances should not be considered as mitigating circumstances because they do not excuse or justify the crime. Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense. A prosecutor who argues that mitigating circumstances must excuse or justify the crime improperly states the law.

33.

A prosecutor's argument concerning mitigation evidence violates requirements under the Eighth Amendment to the United States Constitution when the State cuts off in

an absolute manner the sentencer's consideration of such evidence. But comments that the defendant's mitigating evidence is entitled to little or no weight based on the circumstances of the case are constitutionally permissible.

34.

A prosecutor may properly argue a defendant is undeserving of mercy, so long as there is no contention the jury's exercise of mercy is prohibited.

35.

Under the facts of the case, the prosecutors' argument did not misstate the law concerning mitigating circumstances where the prosecutor never argued or implied the jury could not consider the mitigation evidence unless it excused or justified the murders; while the prosecutor questioned whether that mitigation justified the defendant's conduct, this was consistently argued in the context of whether the circumstance reduced the defendants' moral culpability or blame in a way that supported a sentence less than death; and the defendants first suggested a relationship between the crimes and the mitigation evidence by arguing a variety of medical, genetic, familial, environmental, societal, and situational circumstances caused the defendants to commit the crime.

36.

Generally, a prosecutor is precluded from offering personal opinions about witness credibility, and the court has applied the same rule in capital sentencing proceedings.

37.

Under the facts of the case, the prosecutor's statement "when the truth comes out" was an impermissible expression of opinion intended to bolster the credibility of the State's expert witness, but the death penalty verdict was surely unattributable to this

isolated comment, which was a clumsy effort to turn a phrase more than a definitive statement about the "truth."

38.

In the penalty phase of a capital murder trial, a prosecutor may argue that a defendant deserves no mercy because he or she showed none to the victims, as long as the prosecutor does not argue the jury is precluded from considering mercy in its sentencing decision.

39.

Generally, a prosecutor has wide latitude in crafting arguments. Nevertheless, the arguments must accurately reflect the evidence, accurately state the law, and cannot be intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.

40.

A "golden rule" argument is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members. Such arguments are generally improper and may constitute reversible error. The reason "golden rule" arguments are not permitted is because they encourage the jury to depart from neutrality and to decide the case on the improper basis of personal interest and bias.

41.

Under the facts of the case, the prosecutor did not make an improper "golden rule" argument by referencing the murder victims' inability to form relationships where the argument did not place the jury in the victims' shoes, but instead responded directly to the defendant's argument about his ability to form relationships or attachments if sentenced to life imprisonment and implied that the jury should give little weight to this evidence.

11

42.

The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle. It is not opening statement; it is not confined to a dry recitation of the evidence presented.

43.

Generally, a prosecutor's argument that implies the jury may violate its sworn oath has more force and carries greater potential for unfair prejudice than an argument that the facts and applicable law compel a death sentence.

44.

Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such that they cannot be determined to be harmless, even though individually those errors are harmless. In assessing cumulative error in the penalty phase of a capital trial, the errors aggregated include any errors in the guilt-phase proceedings the court determines must be considered in conjunction with the penalty-phase errors. In addition, the errors aggregated include those penalty-phase errors assumed by the court. And they include penalty-phase jury instruction errors not raised in the district court that are not clearly erroneous standing alone.

45.

When reviewing cumulative error in a capital penalty-phase proceeding, the court's focus is on the errors' cumulative effect on the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. In other words, we are looking for the errors' effect in their aggregate, recognizing errors can differ in their individual or cumulative effect. This task is undoubtedly more subtle than simply

counting up the number of errors discovered. Ultimately, the court must determine whether the errors' cumulative effect, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's conclusion. When any errors being aggregated in a cumulative error analysis are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt.

Appeal from Sedgwick District Court; PAUL W. CLARK, judge. Opinion on remand filed January 21, 2022. Affirmed.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause, and *Reid T. Nelson*, of the same office, was with her on the briefs for appellant.

*David Lowden*, special appointed prosecutor, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

*Sharon Brett*, of ACLU Foundation of Kansas, of Overland Park, and *Cassandra Stubbs*, pro hac vice*,* and *Brian W. Stull*, pro hac vice, of American Civil Liberties Union Foundation, of Durham, North Carolina, were on the brief for amici curiae Concerned Conservatives About the Death Penalty, Kansas Coalition Against the Death Penalty, Dalton Glasscock, Steve Becker, Al Terwelp, Bob Weeks, Carolyn Zimmerman, Celeste Dixon, Bill Lucero, Msgr. Stuart Swetland, Catholic Mobilizing Network, Dominican Sisters and Associates of Peace of the Roman Catholic Church, Mount St. Scholastica, Sisters of Charity of Leavenworth Office of Justice, Peace, and Integrity of Creation, Sister Christina Meyer, Bishop Ruben Saenz Jr., Robert Sanders, Michael Birzer, and the American Civil Liberties Union and ACLU of Kansas.

*Alice Craig*, of Lawrence, was on the brief for amicus curiae Midwest Innocence Project, joined by Witness to Innocence and Floyd Bledsoe.

*Elizabeth Cateforis*, Clinical Professor of Law, University of Kansas School of Law, of Lawrence, and *Alexis J. Hoag*, pro hac vice, Lecturer and Associate Research Scholar, Columbia Law School, of New York, New York, were on the brief for amici curiae group of law professors and scholars.

The opinion of the court was delivered by

WALL, J.: In *State v. Carr*, 300 Kan. 1, 331 P.3d 544 (2014) (*R. Carr*), *rev'd and remanded sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (*Carr*), our court affirmed one of Reginald Dexter Carr Jr.'s capital murder convictions but vacated the death sentence after concluding the failure to sever the penalty phase violated R. Carr's right to an individualized sentencing determination under the Eighth Amendment to the United States Constitution. However, in *Carr*, the United States Supreme Court held the failure to sever the defendants' penalty phase neither implicated the Eighth Amendment nor offended protections afforded to R. Carr under the Due Process Clause.

On remand, we now turn our attention to the penalty phase issues that remain unresolved following the decision of the United States Supreme Court. In analyzing these issues, we remain mindful that "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-09, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983); see *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). While some of R. Carr's remaining issues demonstrate that his trial was less than perfect, none suggest he received anything other than a fair trial. Accordingly, we affirm Reginald Carr Jr.'s death sentence and hold this sentence was not "imposed under the influence of passion, prejudice or any other arbitrary factor." K.S.A. 2020 Supp. 21-6619(c)(1).

14

FACTUAL AND PROCEDURAL BACKGROUND

As noted, in its previous decision, our court affirmed one of R. Carr's capital murder convictions but vacated his death sentence, concluding his Eighth Amendment right to an individualized sentencing determination was violated when the district court refused to sever the penalty phase from that of his codefendant brother, Jonathan Carr. See *R. Carr*, 300 Kan. at 315. In a companion decision, this court also vacated J. Carr's death sentence for failure to sever the penalty phase. *State v. Carr*, 300 Kan. 340, 371, 329 P.3d 1195 (2014) (*J. Carr*), *rev'd and remanded Carr*, 577 U.S. 108.

The court's disposition at that time made it unnecessary to complete a full review of the alleged penalty phase errors, although it considered some for guidance on remand. Among those considered, the court noted the same Eighth Amendment individualized sentencing concerns were implicated when the district court failed to instruct the jury that mitigating circumstances need not be proved beyond a reasonable doubt. That question proved dispositive in this court's decision to vacate the death sentence imposed in another death penalty case. See *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014) (*Gleason I*), *rev'd and remanded sub nom. Carr*, 577 U.S. 108.

The United States Supreme Court granted the State's petition for writ of certiorari on the two Eighth Amendment issues in *R. Carr*, *J. Carr*, and *Gleason I*. It disagreed with our court's Eighth Amendment analysis on both issues. The Court held the joint sentencing proceedings neither implicated the Carrs' Eighth Amendment rights nor violated their rights under the Due Process Clause. It also concluded that the Eighth Amendment does not require Kansas penalty-phase juries to be instructed that mitigating factors need not be proved beyond a reasonable doubt. *Carr*, 577 U.S. at 122, 126.

15

Shortly after that decision, but before the United States Supreme Court issued its mandate, R. Carr filed a motion with our court arguing that the alleged instructional error (the district court's failure to instruct jurors that the existence of mitigating factors need not be proved beyond a reasonable doubt) required his death sentence to be vacated under state law. After the high Court issued its mandate, R. Carr filed another motion arguing that cumulative error required this court to vacate his death sentence. In his separate appeal, J. Carr also requested this court rule on the instructional issue as a matter of state law. On the same day, he asked for additional briefing on penalty phase issues left undecided in our prior decision. The State filed responses.

Our court ordered supplemental briefing addressing the remaining penalty phase issues, including cumulative error. Two extensions to the briefing schedule occurred at the State's request and were granted pursuant to Supreme Court Rule 5.02 (2021 Kan. S. Ct. R. 32). The parties' supplemental briefs were filed simultaneously on November 7, 2016. The court heard oral argument in both cases on May 4, 2017.

In April 2019, this court filed its opinion in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 638, 440 P.3d 461 (2019), holding that "section 1 [of the Kansas Constitution Bill of Rights] establishes the judicial enforceability of rights that are broader than and distinct from the rights described in the Fourteenth Amendment." In response to that legal development, the defendants in all the then-pending capital appeals sought leave to raise and brief a new issue challenging the constitutionality of the death penalty under section 1 of the Kansas Constitution Bill of Rights. R. Carr and J. Carr each made this request in motions filed on May 7, 2019.

On June 19, 2019, after having received responses from the State, we granted the defendants, including R. Carr and J. Carr, leave to file supplemental briefing to address "what effect, if any, the decision in *Hodes & Nauser v. Schmidt* . . . has on the issue of

whether the Kansas death penalty is unconstitutional under § 1 of the Kansas Constitution Bill of Rights."

R. Carr and J. Carr each filed supplemental briefs on August 16, 2019. In each case, the State filed its brief in response on October 15, 2019. J. Carr filed a reply brief on November 7, 2019, and R. Carr followed suit the next day.

On February 18, 2021, we scheduled both R. Carr's and J. Carr's cases for oral argument on the May 24, 2021 docket. Various amici curiae sought and were granted permission to file briefs.

In addition, the NAACP Legal Defense and Educational Fund, Inc. (LDF) sought leave to participate in J. Carr's oral argument as a separately represented amicus curiae. In its amicus brief, the LDF argued Kansas' death-sentencing scheme violates the right to trial by jury under section 5 of the Kansas Constitution Bill of Rights. We denied the LDF's motion to participate in oral argument but ordered the parties in J. Carr's case to be prepared to address the issue at oral argument. On July 29, 2021, after oral argument had concluded, R. Carr filed a motion requesting the court consider the same section 5 challenge in his appeal.

As with our previous decisions, this case necessarily covers many issues we must also decide in J. Carr's case. We provide the reasoning for our decisions here. To the extent possible, we retain the numbering applied to the issues in our previous decision, although some are taken up in different order. See *R. Carr*, 300 Kan. at 255-58.

The facts were set forth fully in this court's original decision. 300 Kan. at 17-44, 258-75. In the "Discussion" section to follow, we highlight those facts as necessary to resolve the issues we consider today.

17

For purposes of clarity and organization, we first address the constitutional challenges R. Carr and J. Carr asserted under section 1 and section 5 of the Kansas Constitution Bill of Rights. Then, we address R. Carr's motion to apply state law to the burden-of-proof instruction for mitigating circumstances. Finally, we examine the remaining claims of penalty phase error, including cumulative error.

## I. Kansas' Capital Sentencing Scheme Does Not Violate Section 1 of the Kansas Constitution Bill of Rights

While R. Carr's and J. Carr's appeals were pending, this court released its decision in *Hodes*. In *Hodes*, the court held that section 1 of the Kansas Constitution Bill of Rights protects a broader range of rights than the United States Constitution. 309 Kan. 610, Syl. ¶ 6. Based on that decision, R. Carr and J. Carr claim that Kansas' statutory scheme authorizing capital punishment is unconstitutional under section 1. More specifically, R. Carr and J. Carr contend section 1 protects the right to life, and Kansas' capital sentencing scheme unconstitutionally infringes upon this right.

### A. Legal Framework and Standard of Review

"'Whether a statute is constitutional is a question of law.'" *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1132, 442 P.3d 509 (2019). Historically, this court presumed statutes to be constitutional and required alleged constitutional violations to be clearly established in order to overcome this presumption. 309 Kan. at 1132 (quoting *Board of Johnson County Comm'rs v. Jordan*, 303 Kan. 844, 858, 370 P.3d 1170 [2016]). But in *Hodes*, a majority of the court rejected this presumption of constitutionality when the interests protected by the Kansas Constitution are deemed "fundamental interests." 309

18

Kan. at 673-74 ("Section 1 protects an inalienable natural right of personal autonomy, which [is] fundamental. Presuming that any state action alleged to infringe that right is constitutional dilutes the protections established by our Constitution."). Other members of our court have repudiated the presumption altogether. See *In re A.B.*, 313 Kan. 135, 147-48, 484 P.3d 226 (2021) (Stegall, J., concurring; Wall, J., joining concurring opinion). Regardless, based on established precedent, we apply no such presumption to this section 1 challenge.

Section 1 of the Kansas Constitution Bill of Rights states, "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." The rights guaranteed under section 1 are "judicially enforceable against governmental action that does not meet constitutional standards." *Hodes*, 309 Kan. 610, Syl. ¶ 7.

We apply a two-part framework to determine whether an asserted right or declared interest is judicially enforceable under section 1—exploring whether the right itself is protected by the constitutional provision and, if so, determining whether governmental action unconstitutionally infringes upon that right. 309 Kan. at 620. Under the first part of this analysis, we determine whether the asserted right or declared interest falls within the purview of rights protected by section 1. 309 Kan. at 620. "'[T]he doctrine of judicial self-restraint'" requires us to begin with "'a careful description of the asserted right.'" *Reno v. Flores*, 507 U.S. 292, 302, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993) (in substantive due process analysis the court carefully defines the nature of the interest to determine whether it is properly characterized as fundamental). Doing so ensures a proper nexus exists between the asserted right or declared interest and its constitutional foundation within section 1. Once properly defined, we examine whether that asserted right or declared interest is protected under section 1 by looking to the language of the Kansas Constitution. *State v. Albano*, 313 Kan. 638, 644-45, 487 P.3d 750 (2021).

When the words themselves do not make the drafters' intent clear, we look to the historical record, remembering """the polestar . . . is the *intention* of the *makers* and *adopters*.""" 313 Kan. at 645 (quoting *Hunt v. Eddy*, 150 Kan. 1, 5, 90 P.2d 747 [1939]).

Second, if the asserted right or declared interest is protected under section 1, we determine whether the challenged governmental action unconstitutionally infringes upon it. See *Hodes*, 309 Kan. at 660. This requires the court to first determine whether the governmental action impairs the right. See 309 Kan. at 672. If so, the court scrutinizes the governmental action to determine whether it passes constitutional muster. See 309 Kan. at 662-63.

Ultimately, we conclude that R. Carr's and J. Carr's section 1 challenge fails at the first step of this two-part framework. Their asserted right to, or declared interest in, an absolute, nonforfeitable right to life is not included in or part of the guarantees or protections of section 1. Instead, the natural right to life is forfeitable, and the state's imposition of the death penalty under Kansas' capital sentencing scheme does not infringe upon the "inalienable" right to life protected under section 1. To reach this conclusion, we first construe the meaning of an "inalienable" right to life under section 1. Then, we demonstrate how this construction forecloses defendants' section 1 challenge.

> B. *The Framers Intended the Inalienable Right to Life to Be Forfeitable, Not Absolute*

R. Carr argues section 1 guarantees a right to life that necessarily precludes the state from imposing capital punishment. We have no hesitation recognizing a right to life under section 1. Unlike the implicit right to personal autonomy recognized in *Hodes*, which found its source in the explicit rights of liberty and the pursuit of happiness, a natural right to life is explicitly enumerated as one of the natural rights protected by section 1.

20

But R. Carr defines this right broadly to preclude capital punishment, even where a jury has convicted a defendant of capital murder and determined beyond reasonable doubt that one or more statutory aggravating circumstances exist and outweigh mitigating circumstances, as prescribed under Kansas' capital sentencing scheme. R. Carr's argument is premised on the assumption that the right to life guaranteed within section 1 is absolute, meaning the law cannot limit or infringe upon this right in any circumstance. See *Merriam-Webster.com Legal Dictionary*, Merriam-Webster, https://www.merriam-webster.com/legal/absolute%20right (defining "absolute right" as "a legally enforceable right to take some action or to refrain from acting at the sole discretion of the person having the right").

Whether the framers intended the right to life to be absolute cannot be ascertained solely from the text of section 1 because the plain language does not define the scope and contours of the natural rights guaranteed therein. As such, we must also turn to the historical record to glean insight into the scope of this right as intended by the framers. See *Hunt*, 150 Kan. at 5. We do so by first exploring the comments and remarks of the framers during the Wyandotte Constitutional Convention debates. Additionally, we analyze the theory of natural rights as developed through the writings of John Locke and William Blackstone, given their historic significance in the development of American constitutional frameworks and jurisprudence. Cf. *Hodes*, 309 Kan. at 639-41 (discussing Locke's and Blackstone's influence on Kansas' founding documents).

### 1. *The Wyandotte Convention Debates*

"[T]he territorial legislature of 1859 approved a fourth and final constitutional convention" for the Kansas Territory. See Kansapedia, Kansas Historical Society, "Wyandotte Constitutional Convention," https://www.kshs.org/kansapedia/wyandotte-

constitutional-convention/17884. On June 17, 1859, 52 delegates were elected to gather in Wyandotte, Kansas, on July 5 for this constitutional convention. See Simpson, *The Wyandotte Constitutional Convention*, *reprinted in* Kansas Constitutional Convention 652 (1920) (hereinafter Convention).

While vigorous debate over specific language was the exception, delegates did engage in extensive discussions regarding section 1. See Perdue, Address Before the Kansas State Historical Society:  The Sources of the Constitution of Kansas, *in* 7 Kansas Historical Collections 130, 134 (1902). The initial proposal for section 1, developed by the Preamble and Bill of Rights Committee, provided:

> "'SECTION 1. All men are by nature equally free and independent, and have certain inalienable rights, among which are those of enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and of seeking and obtaining happiness and safety, and the right of all men to the control of their persons, exists prior to law and is inalienable.'" Convention, at 271.

After initial proposed amendments to this section were soundly rejected, including one disreputable attempt to exclude "negroes and mulattoes" from the phrase "all men," one of the proslavery delegates challenged the use of the term "inalienable" in section 1. Convention, at 271. Delegate William McDowell suggested the language in proposed section 1 created a hierarchy of laws that rendered natural rights absolute and subject to no limitation under the law:

> "MR. MCDOWELL. I think the language of this section is an enunciation of the higher law principle, that 'the control of a man's person is above and prior to all law and inalienable.' It is a provision I do not want to see go into any Constitution which we shall adopt; for if this doctrine is correct, *you cannot make a man amenable to any criminal law*." (Emphasis added.) Convention, at 272.

Another proslavery delegate, Benjamin Wrigley, professed similar concern:

> "I believe that this section, as it now reads, as remarked by the gentleman from Leavenworth (Mr. McDowell) does embrace the 'higher law' doctrine, and is mischievous in its character. I believe it was intended to set at defiance, and that it does in fact set at defiance, the fugitive slave law as a law of the land." Convention, at 274.

As Wrigley's comment illustrated, the subtext of the discussion was primarily motivated by proslavery delegates' concern that characterizing natural rights as "inalienable" could preclude enforcement of criminal law, particularly the fugitive slave law, within Kansas. Therefore, one of the first proposed amendments to section 1—offered by Wrigley—included the following clause to address concerns that section 1's text created a hierarchy of law with "absolute" natural rights at the apex.

> "'Provided that nothing herein contained shall be construed to apply to any person lawfully held to or owing service under the Constitution of the United States or the Constitution and Laws of any other State, or to any person under indictment, or lawfully under arrest or in custody, or lawfully imprisoned.'" Convention, at 273.

Without this clarifying language, Wrigley claimed section 1 would ensure that "no person can forfeit his right to liberty under any circumstances." Convention, at 274.

> "It matters not how great a criminal a man may be, or how lawfully he may have been arrested, retained in custody, or arraigned under indictment for a grave offense, you propose to have here an organic declaration, that this criminal's right to control of his person is above all law, prior to all law, and inalienable. Now, sir, I contend, that the right to the control of a man's person is not above the law, prior to law and inalienable. He may forfeit that right by the commission of crime—and all must agree, that, under such circumstances, he may be lawfully held in custody, and the control of his person rightfully and legally taken away from him. *Adopt this declaration here, and at once you abolish the criminal law, and open all your jails.*" (Emphasis added.) Convention, at 274.

23

McDowell added to the objection, believing the original proposal could lead to an absurd result—impairing the State's authority to punish crimes:

"[I]f adopted as it now stands, [the original proposal] will simply place us in the attitude of the commission of this solecism; recognizing somewhere the right and power to punish crime, yet in the Bill of Rights doing away with every provision of that kind, by asserting that the control of the person is above, beyond, [and] anterior to all law. . . . Whatever their notions may be on these questions in relation to the fugitive slave law, let us be careful, at least, to avoid placing ourselves in an absurd position." Convention, at 276.

Another delegate also offered support for language to avoid this result. See Convention, at 275.

Consistent with these remarks, Dr. James Blunt offered the following substitute amendment to modify the natural rights preserved within section 1: "'Except in cases where the party is charged with crime, or has been convicted thereof.'" Convention, at 276. According to Blunt, the substitute amendment would "remove all doubtful and dangerous construction that might be put upon the section," though he acknowledged this would not appease those seeking to protect the fugitive slave law. Convention, at 276-77.

After Blunt's speech, other delegates weighed in on the issue. Delegate William Griffith explained the term "inalienable" means only that the right cannot be transferred or assigned, and that the language did *not* create a hierarchy of law that prevented punishment for criminal conduct. Griffith explained:

"It seems to me, sir, that this discussion and both amendments are unnecessary, and that they result from a misconception of the clause in question. I see nothing of any higher-law doctrine in this section. If it is there, I confess that I have not penetration enough to discover it. The proposition is, 'that the right of all men to the control of their persons

24

exists prior to law, and is inalienable.' It does not propose that the authority of the State shall not hold the persons of men if they have committed crime, but simply that this right exists prior to law, and is inalienable by the person holding it—that is, *he cannot sell it or dispossess himself of it*. But, sir, the law of the land regulates this matter entirely." (Emphasis added.) Convention, at 279-80.

The discussion continued with delegates expressing opposing views as to the nature and scope of natural rights as set forth in proposed section 1. Convention, at 280-82. Eventually, Wrigley's proposed amendment was put to a vote and approved. But immediately thereafter, President James Winchell offered the following substitute:

> "'All men are by nature free and equal and possessed of certain rights inalienable by law, except for the commission of crime, among which rights are life, liberty, the pursuit of happiness and the acquirement, possession and protection of property.'" Convention, at 282.

Winchell offered the substitute provision as a compromise, believing "there is some foundation for the arguments . . . if we declare in the fundamental law, that men have certain rights that are inalienable, we must mean that those rights are inalienable by law." Convention, at 282.

At this juncture, Samuel Austin Kingman, a delegate who later served as one of the original members of the Kansas Supreme Court following statehood in 1861 and Chief Justice from 1867 to 1876, offered the version of section 1 ultimately adopted by the convention and ratified by electors. See Convention, at 282-85; see also *Samuel Austin Kingman*, Kansapedia: Kansas Historical Society, https://www.kshs.org/kansapedia/samuel-austin-kingman/17072 (professional biography of Kingman). In advancing what would become the final version of section 1, Kingman made clear the term "inalienable" has an established legal meaning—referring to a right or interest that cannot be disposed of by sale or assignment to another but which can be

25

forfeited. In this regard, Kingman explained that inalienable natural rights would not impair the State's ability to punish individuals for criminal conduct:

"Mr. President, I do not propose to argue this question. I would be willing to vote for the section as it stands, but I prefer the language of the substitute just offered. But I hold in my hand a section which I prefer to both of them. I do not propose at this time to offer it. *But I hold that this use of the word 'inalienable,' is misunderstood and misinterpreted in this House*. A man's right to his life is inalienable in law under all circumstances. He has no right to sell or give it away—no right to dispose of it at all. But the word 'inalienable' has a fixed meaning in law. *And when in the common use of the word we say, that a man cannot alienate his property, none would suppose we mean to say, he cannot forfeit his property*. We propose, at the proper time, to propose in this Constitution, that there shall be a homestead set apart to each settler in the State, which shall be inalienable, *but we do not propose to ordain that it shall not be forfeited for debts due to the State*, and so on. I do not like to see this doctrine impinged. I do not like to depart from old, established usage. Therefore I hope the section which I hold in my hand will be adopted. By the leave of the Convention I will read it:

'All men are possessed of equal and inalienable natural rights, among which are those of life, liberty and the pursuit of happiness.'

"These terms, Mr. President, are fixed in the minds of the American people— they have become traditional. And I offer to strike out and insert this, that the American feeling might appear in this section. We all cling to old truths, and I love the very forms of expression in which old truths have been presented. I dislike to change any old truth from the forms of language to which I have been accustomed. I dislike to see them taken from the habiliments in which I have so often seen them clothed and put into new and doubtful phraseology; and our national Declaration of Independence is of this class of truth. That Declaration of Rights forms a part of our political creed, from which no man can extricate himself; and I do not wish to change the clothing of these ideas. It is this feeling that makes a man who has long read one book—as the Bible or Blackstone— value it a hundred fold above its intrinsic value. This makes a man like to read the sentiments he cherishes in their original style of expression—makes him like to dwell on

26

the very words that cover the principles he holds closest to his heart. And we should express these sentiments in few words—sufficient to cover their views and carry their original force, and whatever goes beyond that is injurious to the sense. I say again, sir, I love these old forms. They are, it seems to me, as the political Bible of every citizen of the United States. If you change their language, you mar their beauties—carry the mind away from the sense, and send it off into reflections on the phraseology and meaning of these new terms. I think the amendment I have read, in these old terms, is broad enough. It will show no man's prejudices, and it is broad enough for all to stand upon." (Emphases added.) Convention, at 282-83.

Kingman's explanation proved to be persuasive, and the convention passed his substitute proposal by a margin of 42 to 6. Convention, at 285.

This historical record indicates the drafters of section 1 never intended the term "inalienable" to be construed as "absolute" or "nonforfeitable." Instead, a careful reading of section 1, coupled with the transcripts of the convention debate, establishes that the term "inalienable" refers only to one's ability to transfer his or her right or interest to another person. This construction is consistent with the legal meaning ascribed to the term "inalienable." See Black's Law Dictionary 683 (5th ed. 1978) (defining "inalienable" as "[n]ot subject to alienation; the characteristic of those things which cannot be bought or sold or transferred from one person to another, such as rivers and public highways, and certain personal rights; e.g., liberty"). Though inalienable, the framers viewed these natural rights as forfeitable in civil society. So construed, the framers were confident section 1 could not be used as a device to impede or limit the state's authority to punish individuals for their criminal conduct.

2. *Natural Rights Theory According to Locke and Blackstone*

During the Wyandotte Convention debates, the chairman of the Preamble and Bill of Rights Committee, William Hutchinson, explained that section 1 is designed to declare

27

and protect the "natural rights" of all persons. See Convention, at 281-82. Based on the established historical record, we have held the framers intended section 1 to incorporate the "broad concept of natural rights." *Hodes*, 309 Kan. at 629 ("In short, the drafters . . . incorporated the broad concept of natural rights" in adopting section 1.).

### a.   John Locke

The theory of "natural rights" traces its lineage from the writings of John Locke through the Declaration of Independence, written by Thomas Jefferson, and the Virginia Declaration of Rights of 1776, written by George Mason. 309 Kan. at 639. Thus, "Locke's views on natural rights are significant" and offer insight into the framers' intent in adopting section 1. 309 Kan. at 639.

Locke's theory describes the inherent rights of persons in nature before consenting to civil governance. According to Locke, in nature all persons are in "a State of perfect Freedom to order their Actions, and dispose of their Possessions, and Persons as they think fit, within the bounds of the Law of Nature, without asking leave, or depending upon the Will of any other Man." Locke, Two Treatises of Government, Bk. II, § 4 (1698). And consistent with such uninhibited personal freedom, the state of nature is also a state of "Equality, wherein all the Power and Jurisdiction is reciprocal, no one having more than another." Locke, Bk II, § 4.

In this perfect state of nature, these inherent rights are to be exercised according to each person's free will and should not be impaired, *unless* the exercise of these rights would place another's natural rights in peril:

> "The State of Nature, has a Law of Nature to govern it which obliges every one, and Reason, which is that Law, teaches all Mankind, who will but consult it; That being all equal and independent, no one ought to harm another in his Life, Health, Liberty,

28

or Possessions; . . . [E]very one as he is bound to preserve himself, and not to quit his Station wilfully, so by the like reason when his own Preservation comes not in competition, ought he as much as he can to preserve the rest of Mankind, and not unless it be to do Justice on an Offender, take away, or impair the life, or what tends to the Preservation of the Life, the Liberty, Health, Limb or Goods of another." Locke, Bk. II, § 6.

"Locke's contention that man is endowed with free will means, however, that the law of nature, though known by reason, is not necessarily universally obeyed." Suess, *Punishment in the State of Nature:  John Locke and Criminal Punishment in the United States of America*, 7 Wash. U. Jur. Rev. 367, 377 (2015). Given this reality, "to uphold natural law . . . the rational man has the right to punish criminals. For if no one had such a right the law of nature would be in vain." 7 Wash. U. Jur. Rev. at 377.

Locke's justification for punishment in nature was that the offender, by infringing the natural rights of another, had "declare[d] himself to live by another Rule, than that of reason and common Equity." Locke, Bk. II, § 8. Such transgressions are "a trespass against the whole Species." Locke, Bk. II, § 8. Thus, all persons "may restrain, or where it is necessary, destroy things noxious to them, and so may bring such evil on any one, who hath transgressed that Law, as may make him repent the doing of it, and thereby deter him, and by his Example others, from doing the like mischief." Locke, Bk. II, § 8.

Without question Locke viewed the act of murder as a transgression of natural law, warranting punishment up to and including capital punishment.

"The damnified Person has this Power of appropriating to himself, the Goods or Service of the Offender, by Right of Self-preservation, as every Man has a Power to punish the Crime, to prevent its being committed again, by the Right he has of Preserving all Mankind, and doing all reasonable things he can in order to that end:  And thus it is, that every Man in the State of Nature, has a Power to kill a Murderer, both to deter others

from doing the like Injury, which no Reparation can compensate, by the Example of the punishment that attends it from every body, and also to secure Men from the attempts of a Criminal, who having renounced Reason, the common Rule and Measure God hath given to Mankind, hath by the unjust Violence and Slaughter he hath committed upon one, declared War against all Mankind, and therefore may be destroyed as a *Lion* or a *Tyger*, one of those wild Savage Beasts, with whom Men can have no Society nor Security." Locke, Bk. II, § 11.

According to Locke, individuals who commit capital offenses forfeit their own natural rights, including the right to life, through their offensive conduct.

"Indeed having, by his fault, *forfeited his own Life*, by some Act that deserves Death; he, to whom he has forfeited it, may (when he has him in his Power) delay to take it, and make use of him to his own Service, and he does him no injury by it. For, whenever he finds the hardship of his Slavery out-weigh the value of his Life, 'tis in his Power, by resisting the Will of his Master, to draw on himself the Death he desires." (Emphasis added.) Locke, Bk. II, § 23.

This concept of "forfeiture" enables Locke to philosophically justify notions of punishment that result in the deprivation of the perpetrator's own rights as they would have existed in nature.

Interestingly, for Locke, the right to life gave rise to a reciprocal duty for a person to preserve his or her own life. Notwithstanding the vast freedom enjoyed by individuals in nature, Locke did not believe such freedom granted individuals the power to end one's own life. Locke, Bk. II, § 23. As a corollary, a person could not alienate that right to another person because a person did not "hav[e] the Power of his own Life" in the first place. Locke, Bk. II, § 23. Thus, a person "cannot, by Compact, or his own Consent, enslave himself to any one, nor put himself under the Absolute, Arbitrary Power of another, to take away his Life, when he pleases." Locke, Bk. II, § 23. "No body can give

30

more Power than he has himself; and he that cannot take away his own Life, cannot give another power over it." Locke, Bk. II, § 23.

Consistent with delegate Kingman's commentary regarding the intended scope of section 1, Locke's natural rights theory recognizes the right to life to be inalienable, meaning it cannot be sold, transferred, or assigned to another. But the right is not absolute, as it may be forfeited through acts of criminal conduct that give rise to the power of punishment.

Even so, Locke's philosophical justification for punishment based on notions of forfeiture leads to an obvious question: who should impose punishment? Locke observed "it is unreasonable for Men to be Judges in their own Cases, that Self-love will make Men partial to themselves and their Friends. And on the other side, that Ill Nature, Passion and Revenge will carry them to far in punishing others." Locke, Bk. II, § 13. Therefore, Locke concluded that "Civil Government is the proper Remedy for the Inconveniences of the State of Nature." Locke, Bk. II, § 13.

According to Locke, individuals do not relinquish their natural rights of life, liberty, and property merely by entering civil society. Locke, Bk. II, § 87. Instead, they consent to the same power of punishment that existed in nature. But instead of being meted out by the victim, punishment (including the death penalty) as it exists in the state of nature is transferred to, and imposed by, the civil society itself. Locke, Bk. II, § 87.

> "Man being born, as has been proved, with a Title to perfect Freedom, and an uncontrouled enjoyment of all the Rights and Privileges of the Law of Nature, equally with any other Man, or Number of Men in the World, hath by Nature a Power, not only to preserve his Property, that is, his Life, Liberty and Estate, against the Injuries and Attempts of other Men; but to judge of, and punish the breaches of that Law in others, as he is persuaded the Offence deserves, *even with Death it self, in Crimes where the heinousness of the Fact, in his Opinion, requires it*. But because no Political Society can

31

be, nor subsist without having in it self the Power to preserve the Property, and in order thereunto punish the Offences of all those of that Society: There, and there only is Political Society, where every one of the Members hath quitted this natural Power, resign'd it up into the hands of the Community in all cases that exclude him not from appealing for Protection to the Law established by it. And thus all private judgement of every particular Member being excluded, the Community comes to be Umpire, by settled standing Rules; indifferent, and the same to all Parties: And by Men having Authority from the Community for the execution of those Rules, decides all the differences that may happen between any Members of that Society, concerning any matter of right, and punishes those Offences, which any Member hath committed against the Society with such Penalties as the Law has established; whereby it is easie to discern who are, and who are not, in Political Society together." (Emphasis added.) Locke, Bk. II, § 87.

### b. *William Blackstone*

Though philosophically consistent with Locke, William Blackstone provided a more complete description of the contours of natural rights, particularly the right to life, in his *Commentaries on the Laws of England*. See Bedau, *The Right to Life*, 52(4) The Monist 550, 553 (1968) ("If we were to look for the one thinker from the past whose writings, in virtue of their antiquity, detail, and influence, have no peer as a source of the classic doctrine of the right to life, we would have to choose, not Hobbes, Locke, Rousseau, or Paine, but Sir William Blackstone.").

The United States Supreme Court has recognized Blackstone's influence on the framers of the United States Constitution:

"Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution, it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England; so that undoubtedly, the framers of the

Constitution were familiar with it." *Schick v. United States*, 195 U.S. 65, 69, 24 S. Ct. 826, 49 L. Ed. 99 (1904).

Likewise, members of the early state constitutional conventions were so immersed in the common law as expounded by Blackstone that the language of these constitutions cannot be well understood without reference to his teachings. See Bader, *Some Thoughts on Blackstone, Precedent, and Originalism*, 19 Vt. L. Rev. 5, 7-8 (1994).

Blackstone divided individual rights into two categories:  absolute and relative. 1 Blackstone, Commentaries on the Laws of England at 119 (1765). It is important to recognize Blackstone did not define "absolute" rights in a way that established a higher order of law (where "absolute" rights would be free from any limitation or infringement, thereby limiting the authority of the government to exercise the power of criminal punishment). Instead, his definition of "absolute" rights was consistent with Locke's characterization of natural rights—those that "appertain and belong to particular men, merely as individuals or single persons," whereas relative rights "are incident to them as members of society, and standing in various relations to each other." 1 Blackstone, at 119. "For the most part, the purpose of 'relative' rights (including the right of access to the courts, the right to petition for the redress of grievances and the right to bear arms) was to preserve or implement 'absolute' rights in organized communities." Alschuler, *Rediscovering Blackstone*, 145 U. Pa. L. Rev. 1, 28 (1996).

In other words, under Blackstone's terminology, absolute rights are those naturally endowed to persons by the creator:

"The absolute rights of man, considered as a free agent, endowed with discernment to know good from evil, and with power of choosing those measures which appear to him to be most desirable, are usually summed up in one general appellation, and denominated the natural liberty of mankind. This natural liberty consists properly in a power of acting as one thinks fit, without any restraint or control, unless by the law of

33

nature; being a right inherent in us by birth, and one of the gifts of God to man at his creation, when he endued him with the faculty of freewill." 1 Blackstone, at 121.

For Blackstone, political or civil liberty—"which is that of a member of society"—"is no other than natural liberty so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the public." 1 Blackstone, at 121. Moreover, the purpose of society, and thus government, "is to protect individuals in the enjoyment of those absolute rights, which were vested in them by the immutable laws of nature; but which could not be preserved in peace without that mutual assistance and intercourse which is gained by the institution of friendly and social communities." 1 Blackstone, at 120.

Blackstone "reduced" these natural rights "to three principal or primary articles; the right of personal security, the right of personal liberty, and the right of private property." 1 Blackstone, at 125. He included the right to life under the umbrella of the right of personal security:  "The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." 1 Blackstone, at 125.

Indeed, foremost in Blackstone's right of personal security was the right to life. 1 Blackstone, at 125. A person's life and limbs were "of such high value," "that it pardons even homicide if committed *se defendendo*, or in order to preserve them." 1 Blackstone, at 126. Whatever a person might do to save life or limb, "is looked upon as done upon the highest necessity and compulsion." 1 Blackstone, at 126.

Like Locke, and consistent with delegate Kingman's interpretation of section 1, Blackstone recognized the right to life is not alienable, meaning it cannot be assigned or transferred to another, but it can be forfeited when a person's criminal conduct necessitates punishment, up to and including capital punishment, in civil society.

34

"This natural life, being, as was before observed, the immediate donation of the great creator, cannot legally be disposed of or destroyed by any individual, neither by the person himself nor by any other of his fellow-creatures, merely upon their own authority. Yet nevertheless it may, by the divine permission, be frequently *forfeited* for the breach of those laws of society, which are enforced by the sanction of capital punishments; of the nature, restrictions, expedience, and legality of which, we may hereafter more conveniently enquire in the concluding book of these commentaries. At present, I shall only observe, that whenever the *constitution* of a state vests in any man, or body of men, a power of destroying at pleasure, without the direction of laws, the lives or members of the subject, such constitution is in the highest degree tyrannical: and that, whenever any *laws* direct such destruction for light and trivial causes, such laws are likewise tyrannical, though in an inferior degree; because here the subject is aware of the danger he is exposed to, and may by prudent caution provide against it. The statute law of England does therefore very seldom, and the common law does never, inflict any punishment extending to life or limb, unless upon the highest necessity; and the constitution is an utter stranger to any arbitrary power of killing or maiming the subject without the express warrant of law." (Emphasis added.) 1 Blackstone, at 129.

Commentators interpreting Blackstone and, by extension, Locke have confirmed this interpretation of inalienable natural rights, i.e., recognizing that inalienable natural rights may still be forfeited through criminal conduct warranting punishment:

"(a) If punishments of death are necessary for social defense, then the plea of absolute individual rights will not bar the justifiable imposition of death penalties. But the death penalty may be justifiably imposed only if the criminal's (right to) life is forfeit for his crime (*sc.* one is excused for killing in self-defense because the aggressor forfeits his right to life). (b) Whenever a person commits a crime, he violates the rights of another. This in turn entails forfeiture by the criminal of those rights which he violated in his victim. '[T]he offender, by violating the life or liberty or property of another, has lost his own right to have his life, liberty, or property respected . . .' The result of (a) and (b) is a justification of the forfeiture of the absolute right to life." 52(4) The Monist at 568.

While Bedau critiques this conclusion, it is, nonetheless, the conclusion that both Blackstone and Locke reached in formulating their concept of natural rights.

In his discussion of crimes and punishments in Book IV, Blackstone reasons that in the state of nature, the power or right of punishment is vested in every individual. See 4 Blackstone, at 7.

> "It is clear, that the right of punishing crimes against the law of nature, as murder and the like, is, in a state of mere nature vested in every individual. For it must be vested in somebody; otherwise the laws of nature would be vain and fruitless, if none were empowered to put them in execution:  and if that power is vested in any *one*, it must also be vested in *all* mankind, since all are by nature equal." 4 Blackstone, at 7.

Blackstone, like Locke, concludes that upon entering civil society, "this right is transferred from individuals to the sovereign power." 4 Blackstone, at 8.

Blackstone also recognized a distinction between crimes that are *mala in se*—wrong or evil in itself—and those that are *mala prohibita*—"offences of human institution." 4 Blackstone, at 9. For Blackstone, it was apparent that civil society could impose capital punishment for crimes that are mala in se.

> "With regard to offences *mala in se*, capital punishments are in some instances inflicted by the immediate *command* of God himself to all mankind; as, in the case of murder, by the precept delivered to Noah, their common ancestor and representative, 'whoso sheddeth man's blood, by man shall his blood be shed.'" 4 Blackstone, at 9.

36

But for crimes *mala prohibita*, capital punishment is only justified

> "'when offences grow enormous, frequent, and dangerous to a kingdom or state, destructive or highly pernicious to civil societies, and to the great insecurity and danger of the kingdom or its inhabitants, severe punishment and even death itself is necessary to be annexed to laws in many cases by the prudence of lawgivers.'" 4 Blackstone, at 9.

It was not only the frequency or difficulty in preventing a particular *mala prohibita* crime that might warrant a penalty of capital punishment, but also its "enormity, or dangerous tendency" that "alone" might warrant putting the offender to death. 4 Blackstone, at 9.

In sum, both Locke and Blackstone characterized inalienable natural rights, including the right to life, as forfeitable when criminal conduct warrants punishment, up to and including death, in civil society. See Locke, Bk. II, § 23; 1 Blackstone, at 129. This conclusion is consistent with the record of the Wyandotte Convention debates, where the framers made clear that the natural rights in section 1 are forfeitable in civil society and cannot impair the state's ability to punish individuals for their criminal conduct. And both (the teachings of Locke/Blackstone and the record of the Wyandotte Convention debates) are consistent with the legal definition of the term "inalienable" as used in section 1.

C. *Kansas' Capital Sentencing Scheme Does Not Infringe Upon the Inalienable Right to Life in Section 1*

As noted above, R. Carr claims that section 1 affords him an absolute, nonforfeitable right to life that precludes capital punishment. However, as discussed more fully below, our construction of section 1 forecloses this argument. The text and relevant historical record demonstrate the framers intended section 1's inalienable right to life to be subject to forfeiture through criminal conduct. Accordingly, R. Carr's and J. Carr's asserted right to or declared interest in an absolute, nonforfeitable right to life does not

fall within the purview of rights protected by section 1. Instead, when a person is convicted of capital murder beyond reasonable doubt, he or she forfeits the inalienable right to life under section 1 and the state may impose lawful punishment for that crime.

We adopted a similar rationale in *Kleypas I*, albeit under a substantially different legal framework that predated this court's decision in *Hodes*. See *State v. Kleypas,* 272 Kan. 894, 136, 40 P.3d 139 (2001) (*Kleypas I*), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). There, Kleypas attempted to distinguish section 1 from the Fourteenth Amendment by highlighting the fact that the text of section 1 does not contain any limiting language or exception authorizing governmental infringement of natural rights upon satisfaction of due process requirements. *Kleypas I*, 272 Kan. at 1051.

"Kleypas argues that, unlike the federal version which does not allow the taking of life without due process of law, the above language in our state constitution simply does not contemplate the taking of a life by the State under any circumstances. He contends that the Kansas Constitution confers upon him an absolute right to life." 272 Kan. at 1051.

The court rejected Kleypas' argument without much discussion. It quoted from the same constitutional convention debates discussed above in concluding that the right to life under section 1 does not limit the state's power to impose punishments for crimes. 272 Kan. at 1051-52. The court characterized the argument as "somewhat novel" but listed a variety of cases from other state courts that had "soundly rejected" similar challenges. 272 Kan. at 1052 (citing *Ruiz v. Arkansas*, 299 Ark. 144, 152-53, 772 S.W.2d 297 [1989]; *Missouri v. Newlon*, 627 S.W.2d 606, 612-13 [Mo. 1982]; *Slaughter v. Oklahoma*, 950 P.2d 839, 861-62 [Okla. Crim. App. 1997]). Ultimately, the court decided Kleypas' argument stretched "the meaning of the venerable words in § 1 of the state Bill

of Rights far beyond their intended purpose. This we decline to do." *Kleypas I*, 272 Kan. at 1052.

It is no surprise the *Kleypas I* court focused on the framers' discussion of "inalienability" in rejecting the section 1 challenge. The delegates' remarks reflect the framers' intent to construe the term "inalienable" within section 1 consistent with its legal meaning—a right or interest that cannot be transferred or assigned to another person. Though inalienable, i.e., nontransferable, an individual may forfeit his or her natural rights by engaging in criminal conduct that is subject to punishment in civil society. Therefore, delegate Kingman believed his proposed language for section 1 (which was ultimately adopted by the convention) would establish the existence of natural rights that were forfeitable, thereby authorizing the state to impose punishment for criminal conduct without offense to section 1.

Locke and Blackstone, whose teachings greatly influenced the development of both federal and state constitutions alike, recognized a similar construction of "inalienable" natural rights, i.e., that they were subject to forfeiture. Natural rights theorists generally posited a state of nature that included within it a set of rights that every individual possessed in that state of nature. But when humans enter civil society, they relinquish certain powers and rights to the sovereign or government. As discussed above, the right to impose punishment, up to and including capital punishment, was one of the rights transferred from the individual to the sovereign. Thus, according to Locke, Blackstone, and the drafters of the Kansas Constitution, an individual who commits a crime warranting punishment in civil society forfeits his or her natural rights, thereby enabling the state to impose just punishment.

After careful examination of the text of section 1, the historical record, and the documents and writings that inspired the drafters of the Kansas Constitution, we conclude

that section 1 recognizes an *inalienable* right to life, but that right is not absolute or nonforfeitable. We hold that once a defendant has been convicted of capital murder beyond a reasonable doubt, the defendant forfeits his or her natural rights under section 1 ("among which are life, liberty, and the pursuit of happiness") and the state may impose punishment for that crime pursuant to Kansas' capital sentencing scheme.

In so holding, we do not mean to suggest the state's power to punish is unabated upon a defendant's forfeiture of natural rights under section 1. To the contrary, a defendant is entitled to due process of law throughout the penalty phase proceedings. See, e.g., Kan. Const. Bill of Rights, § 10. Additionally, the punishment imposed may not be "cruel or unusual." See, e.g., Kan. Const. Bill of Rights, § 9. But these protections do not arise under section 1. In fact, where a defendant has been lawfully convicted of capital murder, the imposition of the capital sentence no longer implicates his or her inalienable natural rights under section 1. However, other constitutional guarantees, including but not limited to those contained in sections 9 and 10, continue to regulate the state's authority to punish and guard against arbitrary applications of such authority. Cf. *Chapman v. United States*, 500 U.S. 453, 465, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991) (fundamental right to liberty limits government power to punish prior to jury's verdict of guilt; thereafter a person "is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual").

For these reasons, R. Carr's and J. Carr's asserted right to, or declared interest in, an absolute, nonforfeitable right to life is not included within or part of the guarantees or protections of section 1. Instead, the natural right to life is forfeitable, and the government's imposition of the death penalty pursuant to Kansas' capital sentencing scheme does not impair the "inalienable" right to life protected under section 1. Accordingly, the jury's capital sentencing verdicts in R. Carr's and J. Carr's cases do not implicate section 1 of the Kansas Constitution Bill of Rights.

40

*II. Death Qualification of Jurors Under K.S.A. 22-3410 Does Not Violate Section 5 of the Kansas Constitution Bill of Rights*

In an amicus brief filed in J. Carr's case, the NAACP Legal Defense and Educational Fund, Inc. (LDF) raises a state constitutional challenge to the practice of "death qualifying" juries in Kansas—the process of removing prospective jurors for cause, pursuant to K.S.A. 22-3410, when their conscientious objection to capital punishment substantially impairs their ability to fulfill the oath and obligations of a juror. Though not raised by R. Carr, the LDF and the State briefed the issue to the court, and we advised J. Carr and the State to be prepared to address the issue at oral argument.

After oral argument concluded, R. Carr filed a motion requesting the court consider this section 5 challenge in his appeal. We deny R. Carr's motion because it is an improper procedural vehicle for advancing this new, state constitutional challenge. See *State v. Cheever*, 306 Kan. 760, 774, 402 P.3d 1126 (2017) (*Cheever II*) (denying similar motion on instruction issue); *State v. Gleason*, 305 Kan. 794, 798, 388 P.3d 101 (2017) (*Gleason II*) (same). Nevertheless, we address the merits of the claim given our statutory obligation in capital appeals to both consider "the question of sentence" and "notice unassigned errors appearing of record if the ends of justice would be served thereby." K.S.A. 2020 Supp. 21-6619(b); *Cheever II*, 306 Kan. at 774 (electing to reach merits of similar issue "[u]nder the unique circumstances of [the] case and in the interest of judicial economy"); *Gleason II*, 305 Kan. at 798-99 (same).

Kansas statute authorizes a district judge to remove prospective jurors for cause where their "state of mind with reference to the case or any of the parties is such that the court determines there is doubt that [the prospective juror] can act impartially and without prejudice to the substantial rights of any party." K.S.A. 22-3410(2)(i). Under this provision, parties in a capital case may successfully challenge prospective jurors for

41

cause if their views on the death penalty prevent or substantially impair the performance of their duties as jurors. See *R. Carr*, 300 Kan. at 113-14. The statute is designed to balance a defendant's due process and jury trial rights with the State's strong interest in seating jurors who can apply the sentence of capital punishment according to the framework provided by law. 300 Kan. at 113. Nevertheless, the LDF contends the State's removal of prospective jurors under this statute violates the right to trial by jury preserved in section 5 of the Kansas Constitution Bill of Rights.

### A. Standard of Review and Legal Framework

As previously noted, constitutional challenges raise questions of law over which appellate courts have unlimited review. *State v. Coleman*, 312 Kan. 114, 117, 472 P.3d 85 (2020). To the extent resolution of this issue requires us to interpret the language of section 5, our review is likewise unlimited. 312 Kan. at 117.

Section 5 of the Kansas Constitution Bill of Rights provides that "[t]he right of trial by jury shall be inviolate." This court has consistently held that section 5 "'"preserves the jury trial right as it historically existed at common law when our state's constitution came into existence"'" in 1859. *Albano*, 313 Kan. at 641. A section 5 analysis generally involves two inquiries: (1) "In what types of cases is a party entitled to a jury as a matter of right?" and (2) "[W]hen such a right exists, what does the right protect?" *State v. Love*, 305 Kan. 716, 735, 387 P.3d 820 (2017). "Prosecutions for violations of state criminal statutes unquestionably implicate Section 5." 305 Kan. at 736. Therefore, our analysis focuses on the scope of that right—that is, does section 5 foreclose death qualification of jurors under K.S.A. 22-3410?

B. *The Plain Meaning of the Term "Jury" and the Historical Record Demonstrate that "Death-Qualification" Under K.S.A. 22-3410 Is Beyond the Scope of Section 5*

To determine the scope of the jury trial right under the Kansas Constitution, it is first instructive to explore the meaning of the term "jury" as used in section 5. In doing so, we rely on established rules of constitutional construction:

"In ascertaining the meaning of a constitutional provision, the primary duty of the courts is to look to the intention of the makers . . . and the adopters . . . of that provision. A constitutional provision is not to be narrowly or technically construed, but its language should be interpreted to mean what the words imply to persons of common understanding. Words in common usage are to be given their natural and ordinary meaning in arriving at a proper construction. [Citations omitted.]" *Board of Leavenworth County Com'rs v. McGraw Fertilizer Serv., Inc.*, 261 Kan. 901, 905, 933 P.2d 698 (1997).

When the words themselves do not make the drafters' intent clear, courts look to the historical record, remembering "'the polestar . . . is the *intention* of the *makers* and *adopters*.'" *Hunt*, 150 Kan. at 5; see *State ex rel. Stephan v. Finney*, 254 Kan. 632, 655, 867 P.2d 1034 (1994). Here, both the plain meaning of the term "jury" and the historical record each undermine this section 5 challenge.

To ascertain the meaning of the term "jury" under section 5, we first look to the common, ordinary meaning of this term. Dictionary definitions provide a reliable source for that meaning. *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017). Black's Law Dictionary defines a "jury" as "[a] group of persons selected according to law and given the power to decide questions of fact and return a verdict in the case submitted to them." Black's Law Dictionary 1024 (11th ed. 2019). Similarly, the American Heritage Dictionary of the English Language defines "jury" as "[a] body of persons selected to decide a verdict in a legal case, based

43

upon the evidence presented, after being given instructions on the applicable law." The American Heritage Dictionary of the English Language 953 (5th ed. 2011); see also Webster's New World College Dictionary 790 (5th ed. 2014) (defining "jury" as "a group of people sworn to hear the evidence and inquire into the facts in a law case, and to give a decision in accordance with their findings").

Thus, we construe the term "jury," as used in section 5, to denote a legally selected group of persons sworn to determine issues of fact and return a verdict based on the evidence and the law as instructed. This construction is also in accord with our precedent defining the traditional function and duty of a Kansas jury. See *State v. McClanahan*, 212 Kan. 208, 217, 510 P.2d 153 (1973) ("[I]t is the proper function and duty of a jury to accept the rules of law given to it in the instructions by the court, apply those rules of law in determining what facts are proven and render a verdict based thereon."); see also *State v. Boeschling*, 311 Kan. 124, 130, 458 P.3d 234 (2020) (recognizing same traditional functions and duties of jury).

Under this plain meaning interpretation, section 5's right to trial by jury does not prohibit the state from death qualifying juries. Importantly, K.S.A. 22-3410 does not permit the removal of any or all prospective jurors who have conscientious objections to the death penalty. The death qualification process is constrained by the Eighth Amendment to the United States Constitution, which prohibits the state from excluding jurors in capital trials "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). Instead, the State may only remove those prospective jurors whose opposition to the death penalty "would 'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath[s].'" *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985).

In other words, death qualification eliminates only those prospective jurors who cannot decide issues of fact and reach a decision based on the evidence presented and the law as instructed—i.e., those persons who are unable to fulfill the traditional functions and duties of a Kansas jury. And, as established above, the plain meaning of the term "jury," as used in section 5, excludes these types of prospective jurors from its definition. In this regard, the process of death qualification under K.S.A. 22-3410 facilitates the very trial by "jury" that section 5 guarantees.

### C. Death Qualification Does Not Implicate Section 5 Because the Common Law Did Not Prohibit the Practice When the Kansas Constitution Was Adopted in 1859

Furthermore, the LDF concedes that when our state Constitution was adopted, the common law permitted a trial judge to remove individuals whose conscientious scruples against the death penalty would substantially impair their ability to perform the oath and duties of a juror. However, the LDF asserts this common-law rule arose from circumstances peculiar to the structure of capital trials at the time.

Historically, neither the jury nor the trial judge possessed sentencing discretion in capital trials—once convicted, a judge sentenced the defendant to death as a matter of law. See Novak, *The Role of Legal Advocates in Transnational Judicial Dialogue: The Abolition of the Mandatory Death Penalty and the Evolution of International Law*, 25 Cardozo J. Int'l & Comp. L. 179, 210 (2017) ("At common law, the mandatory death penalty shifted sentencing discretion from a trial judge to a clemency authority."). Thus, a death-scrupled juror could only circumvent the death penalty by acquitting a defendant, regardless of what the evidence established or the law required. The LDF speculates that death-scrupled jurors were thus disqualified at common law for a very narrow reason— the need to ensure the fair adjudication of the defendant's guilt. The LDF contends this

45

rationale no longer applies to Kansas' modern capital sentencing scheme, which requires a bifurcated trial with separate guilt and sentencing phases. As such, the LDF concludes that section 5 no longer *authorizes* death qualification under K.S.A. 22-3410.

We question the LDF's narrow characterization of the rationale behind the common-law rule and the dubious assertion it has no application to Kansas' current capital sentencing scheme. More fundamentally, however, the LDF's argument fails to demonstrate how death qualification under K.S.A. 22-3410 offends any jury trial right protected under section 5. Instead, the LDF's argument is founded on the mistaken premise that section 5 authorizes the Legislature to create or modify juror qualification and selection standards only if such legislation is affirmatively *authorized* by common law (and the original rationale underlying it). But there is no support for this proposition. In fact, the premise is simply incorrect.

Section 5 does not define the constitutional scope of legislative power. Instead, such powers are defined in article 2 of the Kansas Constitution. *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 898, 179 P.3d 366 (2008) ("Article 2 of the Kansas Constitution gives the legislature the exclusive power to pass, amend, and repeal statutes."). Section 5 limits the Legislature's exercise of article 2 powers only when an act conflicts with or limits a jury trial right that existed at common law when the Kansas Constitution was adopted in 1859. See *Jansky v. Baldwin*, 120 Kan. 332, 334, 243 P. 302 (1926) ("Since the people have all governmental power, and exercise it through the legislative branch of the government, the legislature is free to act except as it is restricted by the state constitution."); *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 665, 3 P. 284 (1884) (Kansas Constitution Bill of Rights limits legislative power where act "trenches upon the rights guaranteed by them, or which conflicts with any limitation expressed in them."); see also *Love*, 305 Kan. at 735 (rejecting defendant's argument that "because

46

juries were instructed on lesser included offenses at common law, the practice was frozen for all time" as "an overbroad interpretation of Section 5 and its protections").

As established above, the parties agree that the prevailing common law in 1859 permitted death qualification, and Kansas' territorial laws were consistent with this common-law rule. Kan. Terr. Stat. 1859, ch. 27, § 179. The LDF fails to identify any common-law rule in Kansas that prohibited death qualification at the time our Constitution was adopted in 1859. See *Prouty v. Stover*, 11 Kan. 235, 256 (1873) ("The mere silence of the constitution on any subject cannot be turned into a prohibition."). Therefore, death qualification under K.S.A. 22-3410 does not violate section 5. See *Kimball and others v. Connor, Starks and others*, 3 Kan. 414, 432 (1866) ("Trial by jury is guaranteed only in those cases where that right existed at common law.").

Quoting *State v. Peterson*, No. 116,931, 2018 WL 4840468, at *1 (Kan. App. 2018) (unpublished opinion), the LDF asserts that "'citizens called for jury duty have a constitutional right to serve *if they are otherwise qualified*.'" (Emphasis added.) This unpublished Court of Appeals decision fails to advance the LDF's section 5 claim. *Peterson* addressed a challenge brought under the Equal Protection Clause of the United States Constitution, not section 5. Also, *Peterson* does not identify any common-law right incorporated into section 5 that would prohibit death qualification pursuant to K.S.A. 22-3410. Moreover, *Peterson* acknowledges that potential jurors must still be qualified to serve—that is, jurors must be able to fulfill the traditional functions and duties of a Kansas jury. 2018 WL 4840468, at *1. And, as established above, the term "jury," as used in section 5, excludes potential jurors who cannot fulfill these traditional functions due to their conscientious objection to the death penalty.

47

*D. The Lack of Factual Findings Forecloses Our Review of the Disparate Impact Challenge*

Finally, the LDF claims death qualification disparately impacts the racial composition and biases of juries in capital sentencing proceedings, contrary to R. Carr's section 5 right to trial by jury. Specifically, the LDF argues death qualification disproportionately excludes Black venirepersons and produces a jury with higher levels of implicit and explicit racial bias; and such juries are "'disproportionately guilt-prone and death-prone.'"

These allegations most certainly warrant careful analysis and scrutiny. But the issue—whether death qualification disparately impacts the racial composition of the jury or its propensity to convict and sentence a defendant—raises a question of fact. Indeed, the LDF cites several empirical studies to support its claims.

However, the issue was not raised or developed at trial. As a result, the district court made no factual findings related to the LDF's claim. "'[A]ppellate courts do not make factual findings but review those made by district courts.'" *State v. Reed*, 300 Kan. 494, 513, 332 P.3d 172 (2014). And the absence of such findings precludes us from conducting any meaningful review of this issue. See *State v. Wright*, 305 Kan. 1176, 1179, 390 P.3d 899 (2017) (lack of factual findings precluded meaningful review of harmless error analysis of constitutional challenge).

This holding is bolstered by our previous decision in *R. Carr*, where we affirmed the district court's rulings on the for-cause challenges R. Carr had raised on appeal. In other words, we previously determined that substantial competent evidence supported the district court's conclusion that the individuals empaneled as members of R. Carr's jury were impartial and qualified. *R. Carr*, 300 Kan. at 114-24. This holding, which is now the law of the case, further suggests the sentence of death was not imposed under the

influence of passion, prejudice, or any other arbitrary factor, including the State's ability to death qualify jurors under K.S.A. 22-3140. See K.S.A. 2020 Supp. 21-6619(c)(1) (requiring court to determine whether sentence was imposed under such improper circumstances).

In sum, both the plain meaning and historical record confirm that a "jury" is defined as a group comprised of persons who will determine issues of fact and return a decision based on the evidence and in accordance with the law as instructed. Death qualification under K.S.A. 22-3410, as limited by the Eighth Amendment to the United States Constitution, removes only those prospective jurors who cannot fulfill these obligations due to conscientious objection to the death penalty, i.e., the statute authorizes removal of those prospective jurors excluded from the constitutional definition of a "jury." Thus, death qualification facilitates the very jury trial right guaranteed by section 5. Moreover, when the Kansas Constitution was adopted in 1859, the common law did not preclude, and in fact authorized, this procedure. For these reasons, we hold that death qualification under K.S.A. 22-3410 does not violate section 5.

III. *The Motion and State Law Challenge to the Mitigating Circumstances Instruction*

Having resolved the challenges raised under the Kansas Constitution, we next address R. Carr's pending motion to apply state law to the burden-of-proof jury instruction for mitigating circumstances. This equivalent federal constitutional issue was designated P10 in our earlier decision. *R. Carr*, 300 Kan. at 256, 302-03.

We deny the motion but reach the claim's merits. We hold that an instruction on the burden of proof for mitigating circumstances is not required under state law, overturning the holding in *Cheever II*, 306 Kan. 760, Syl. ¶ 5, that K.S.A. 21-4624(e), now codified as K.S.A. 2020 Supp. 21-6617(e), requires such an instruction.

*A. Standard of Review and Legal Framework*

We apply a four-step analysis to review jury instruction challenges:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v. ]Ward*." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

To the extent the legal appropriateness of the instruction requires statutory interpretation of K.S.A. 21-4624(e), we review that issue de novo. See *State v. Harris*, 311 Kan. 816, 821, 467 P.3d 504 (2020).

*B. Discussion of the Motion and Underlying Merits*

In its earlier decision, the court relied on *Gleason I,* 299 Kan. at 1196-98, to provide guidance for the burden-of-proof instruction issue on remand. The court advised that a district judge in Kansas must instruct a penalty-phase jury that the existence of mitigating factors need not be proved beyond a reasonable doubt. *R. Carr*, 300 Kan. at 302-03. The court noted further that the failure to give this instruction would have required it to vacate R. Carr's death sentence on Eighth Amendment grounds, were it not already doing so because of the failure to sever. 300 Kan. at 303.

In *Kansas v. Carr*, the United States Supreme Court held the Eighth Amendment does not require the instruction. 577 U.S. at 122. Thereafter, R. Carr filed his motion with our court, arguing the instruction is compulsory under state law and the district court's failure to give it was reversible error. R. Carr claimed we had effectively made that state law determination in *Gleason I* and nothing in the United States Supreme Court's opinion prevented this holding under state law. He also argued the instructions created a "reasonable likelihood" the jurors applied a beyond-a-reasonable-doubt standard to his proffered mitigation evidence when considered as a whole.

We deny R. Carr's motion because it is an inappropriate procedural vehicle to advance this new, state-law instructional issue. See *Cheever II*, 306 Kan. at 774 (denying similar motion on same instruction issue); *Gleason II*, 305 Kan. at 798 (same). Nevertheless, we address the merits of the claim given our statutory obligation in capital appeals to both consider "the question of sentence" and "notice unassigned errors appearing of record if the ends of justice would be served thereby." K.S.A. 2020 Supp. 21-6619(b); *Cheever II*, 306 Kan. at 774 (electing to reach merits of similar issue "[u]nder the unique circumstances of [the] case and in the interest of judicial economy"); *Gleason II*, 305 Kan. at 798-99 (same).

Turning to the merits, we conclude the failure to give the instruction was not error under Kansas law. Granted, under the first component of the four-part framework, both R. Carr and J. Carr preserved this challenge by requesting the mitigating circumstances burden-of-proof instruction at trial. See *State v. Perez*, 306 Kan. 655, 667-68, 396 P.3d 78 (2017) (holding first step satisfied when defendant challenged on appeal district court's failure to give requested instruction).

But our resolution of the issue turns on whether step two is also satisfied—i.e., whether the instruction as given is legally appropriate. *State v. Pabst*, 273 Kan. 658, 659, 44 P.3d 1230 (2002) (focusing analysis on whether instruction given fairly and accurately stated the law as applied to the facts of the case where requested instruction denied). In *Cheever II*, a majority of the court held that K.S.A. 21-4624(e) "provides greater protection to a death-eligible defendant than required by the federal Constitution. In Kansas, a capital jury must be instructed that mitigating circumstances need not be proved beyond a reasonable doubt." 306 Kan. 760, Syl. ¶ 5. Although this court had not previously addressed the burden-of-proof issue as a matter of state law, the *Cheever II* court concluded that pronouncements in *Kleypas I*, although dicta, had recognized a construction of the statute that requires a capital sentencing jury be instructed that mitigating circumstances need not be proven beyond a reasonable doubt. *Cheever II*, 306 Kan. at 784; see *Kleypas I*, 272 Kan. at 1078. The court acknowledged that the earlier rulings had been framed in the context of federal constitutional claims (claims that were subsequently rejected by the *Kansas v. Carr* Court), but nonetheless concluded that state statute independently required such an instruction. The court reiterated this position in *Gleason II*, 305 Kan. at 798-806.

Despite this court's previous pronouncements, we revisit the issue today, and we conclude that the district judge's instructions to R. Carr and J. Carr's jury correctly stated the law. We recognize "[t]he doctrine of stare decisis provides that 'points of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised.'" *State v. Clark*, 313 Kan. 556, 565, 486 P.3d 591 (2021). Application of the doctrine promotes stability within the legal system, and "'we do not lightly disapprove of precedent.'" 313 Kan. at 565. But ""'stare decisis is not an inexorable command.'"" 313 Kan. at 565 (quoting *State v. Hambright*, 310 Kan. 408, 416, 447 P.3d 972 [2019]). Where, as here, we are convinced that the original holding is neither sound nor firmly entrenched, it is incumbent on the court to

52

correct it. See *McCullough v. Wilson*, 308 Kan. 1025, 1036, 426 P.3d 494 (2018) (acknowledging this court's authority to overturn precedent where rule of law erroneous or no longer sound).

The challenged instruction provides:

"The State has the burden to prove beyond a reasonable doubt that there are one or more aggravating circumstances and that they outweigh mitigating circumstances found to exist."

The jury was also instructed that each member can decide what circumstances are mitigating and that unanimity is not required in that regard:

"The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of the case. Mitigating circumstances are to be determined by each individual juror when deciding whether the State has proved beyond a reasonable doubt that the death penalty should be imposed. The same mitigating circumstances do not need to be found by all members of the jury in order to be considered by an individual juror in arriving at his or her sentencing decision."

Similarly, the instruction describing the verdict forms reiterated these basic points.

"When considering an individual defendant, if you find unanimously beyond a reasonable doubt that there are one or more aggravating circumstances and that they outweigh mitigating circumstances found to exist, then you shall impose a sentence of death. If you sentence the particular defendant to death, you must designate upon the appropriate verdict form with particularity the aggravating circumstances which you unanimously find beyond a reasonable doubt. That is Verdict Form (1).

"If you find that the evidence does not prove any of the claimed aggravating circumstances beyond a reasonable doubt, your presiding juror should mark the appropriate verdict form. That is Verdict Form (2). The court will fix a proper sentence for the particular defendant.

"If one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances exist or that those found to exist do not outweigh mitigating circumstances, then you should sign the appropriate alternative verdict form indicating the jury is unable to reach a unanimous verdict sentencing the defendant to death. That is Verdict Form (3). In that event, the court will fix a proper sentence for the particular defendant."

When reviewing the legal propriety of penalty phase instructions addressing mitigating circumstances, we must consider whether the instructions, considered together as a whole, fairly and accurately state the applicable law and "whether a jury could have been misled into not considering certain mitigating circumstances that, by law, should have been considered." *Gleason II*, 305 Kan. at 820 (Stegall, J., concurring); see also *In re Care and Treatment of Quillen*, 312 Kan. 841, 849, 481 P.3d 791 (2021) ("When reviewing jury instruction challenges, we consider "'jury instructions as a whole . . . to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury."'").

K.S.A. 21-4624(e) establishes the law governing the jury's consideration of aggravating and mitigating circumstances during the penalty phase:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced to life without the possibility of parole. The jury, if its verdict is a unanimous recommendation of a sentence

54

of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. If, after a reasonable time for deliberation, the jury is unable to reach a verdict, the judge shall dismiss the jury and impose a sentence of imprisonment of life without the possibility of parole and shall commit the defendant to the custody of the secretary of corrections. In nonjury cases, the court shall follow the requirements of this subsection in determining the sentence to be imposed." K.S.A. 21-4624(e); see also K.S.A. 2020 Supp. 21-6617(e) (same).

The challenged instruction was patterned after this court's then-controlling interpretation of K.S.A. 21-4624(e). See *Kleypas I*, 272 Kan. 894, Syl. ¶¶ 45-58 (holding equipoise weighing equation favoring State unconstitutional, reformulating language to require aggravating circumstances outweigh mitigating circumstances), *overruled by Marsh*, 278 Kan. at 544-45. Thus, the instruction properly and fairly stated the law governing mitigating circumstances in Kansas. Cf. *State v. Woods*, 222 Kan. 179, 183, 563 P.2d 1061 (1977) (generally, "an instruction patterned after the statute is valid").

Furthermore, there is no reasonable likelihood the instruction misled jurors and prevented them from considering relevant mitigating evidence as required under K.S.A. 21-4624(e). As the United States Supreme Court observed:

"The instruction makes clear that both the existence of aggravating circumstances and the conclusion that they outweigh mitigating circumstances must be proved beyond a reasonable doubt; mitigating circumstances themselves, on the other hand, must merely be 'found to exist.' . . . 'Found to exist' certainly does not suggest proof beyond a reasonable doubt. . . . Not once do the instructions say that defense counsel bears the burden of proving the facts constituting a mitigating circumstance beyond a reasonable doubt—nor would that make much sense, since one of the mitigating circumstances is (curiously) 'mercy,' which simply is not a factual determination." *Carr*, 577 U.S. at 121.

55

For these reasons, "no juror would reasonably have speculated that mitigating circumstances must be proved by any particular standard, let alone beyond a reasonable doubt." 577 U.S. at 122. Under the same logic, the challenged instruction did not impede jurors from considering appropriate mitigation under K.S.A. 21-4624(e). Although R. Carr's proposed instruction might also be legally correct, it is not an indispensable part of communicating to the jury the process by which it should carry out its deliberations under state law.

The instructions viewed together as a whole correctly and clearly informed the jurors of the law governing their consideration of mitigating circumstances. Accordingly, we find no error in the instructions as given. See *State v. McDaniel*, 306 Kan. 595, 616, 395 P.3d 429 (2017) ("The trial court did not err by failing to instruct the jury with the additional language [defendant] request[ed] because the instruction given fairly and accurately stated the law and accordingly was legally appropriate.").

## IV. *The Remaining Penalty Phase Issues*

Having resolved R. Carr's state constitutional challenge and his motion to consider the instructional challenge under state law, our analysis turns to the remaining penalty phase issues raised by the defendants.

### A. *P1/21—Severance*

In the court's previous decision, it considered whether the district court should have severed the trial's guilt phase under Kansas law. *R. Carr*, 300 Kan. at 93-94 (citing K.S.A. 22-3202[3]; K.S.A. 22-3204; *State v. Davis,* 277 Kan. 231, 239, 83 P.3d 182 [2004] [listing five factors employed to determine whether prejudice sufficient to mandate severance]). It concluded the district court erred in denying defendants' repeated

56

requests to sever. *R. Carr*, 300 Kan. at 95-97 (defendants had antagonistic defenses; evidence in favor of one defendant admissible in separate trial not allowed in joint trial). But a majority held the error was harmless in the guilt phase due to the overwhelming strength of the evidence against the defendants. 300 Kan. at 100-01; *J. Carr*, 300 Kan. at 356.

The court separately analyzed whether the failure to sever penalty-phase proceedings violated R. Carr's right to an individualized capital sentencing determination under the Eighth Amendment to the United States Constitution. *R. Carr*, 300 Kan. at 275-82. Utilizing factors similar to those relied on for the guilt-phase severance analysis (antagonistic nature of mitigation cases, admission of evidence by one defendant not likely to have been admitted in severed trial), it concluded that the failure to sever the penalty-phase proceedings violated the Eighth Amendment. The court vacated the death sentences and remanded the case to the district court because it was unable to find beyond a reasonable doubt that the error had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, in light of the record as a whole. 300 Kan. at 281-82; *J. Carr*, 300 Kan. at 371.

The United States Supreme Court rejected our court's Eighth Amendment analysis in favor of a due process framework:

> "As we held in *Romano v. Oklahoma,* 512 U.S. 1 (1994), it is not the role of the Eighth Amendment to establish a special 'federal code of evidence' governing 'the admissibility of evidence at capital sentencing proceedings.' *Id.,* at 11-12. Rather, it is the Due Process Clause that wards off the introduction of 'unduly prejudicial' evidence that would 'rende[r] the trial fundamentally unfair.' *Payne v. Tennessee,* 501 U.S. 808, 825 (1991); see also *Brown v. Sanders,* 546 U.S. 212 (2006)." *Carr,* 577 U.S. at 123.

57

And it concluded without reservation that the district court's failure to sever did not violate the defendants' constitutional protections under the Due Process Clause:

> "In light of all the evidence presented at the guilt and penalty phases relevant to the jury's sentencing determination, the contention that the admission of mitigating evidence by one brother could have 'so infected' the jury's consideration of the other's sentence as to amount to a denial of due process is beyond the pale." 577 U.S. at 124.

With the federal question answered, on remand we invited the parties to address whether state law required the district court to sever the penalty-phase proceedings. We directed them to designate the severance issue as P21, even though it was designated P1 in our previous decision.

R. Carr contends this court already decided the penalty-phase severance issue under state law by applying the state-law severance standard to reach its Eighth Amendment conclusion. The State urges us to reevaluate that conclusion in light of the United States Supreme Court's unequivocal assessment that "[o]nly the most extravagant speculation would lead to the conclusion that the supposedly prejudicial evidence rendered the Carr brothers' joint sentencing proceeding fundamentally unfair." 577 U.S. at 126. The State submits the same logic applies under state law. Like R. Carr, the State treats the state-law penalty phase severance question as an issue distinct from the guilt-phase severance issue.

J. Carr takes a different tack and suggests the question on remand is whether the state law-based failure to sever during the guilt phase resulted in prejudice in the sentencing phase. Or, as J. Carr puts it, "there is no basis in state law for this Court to hold that the district court's failure to sever the trials ceased to be an error once the sentencing phase of trial began."

We agree with J. Carr's framing of the issue. This court previously held that the trial court's refusal to sever the defendants' trials during the guilt phase constituted error under Kansas law. *R. Carr*, 300 Kan. at 97. This holding was not disturbed by the United States Supreme Court's subsequent opinion in *Kansas v. Carr*. As such, this holding is now the law of the case for purposes of this appeal. *State v. Cheeks*, 313 Kan. 60, 66, 482 P.3d 1129 (2021) (Under the law of the case doctrine, when a second appeal is brought to this court in the same case, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions.). The improper joinder of the defendants did not cease to be error at the commencement of the penalty phase.

Accordingly, we hold today that this error continued into the penalty phase. That said, the error does not require reversal of R. Carr's death sentence. We conclude there is no reasonable probability this error affected the death sentence verdict. *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011).

As an error carried over from the trial's guilt phase, our penalty-phase harmless error analysis necessarily begins with reviewing what circumstances caused us to conclude there was error. In *R. Carr*, we held a state-law error occurred when the district judge abused his discretion by refusing to sever the guilt phase trials. Reviewing the factors supporting severance, we noted only two cut in defendants' favors. The first was the defendants' antagonistic defenses that emphasized the strength of the evidence against the other. We described this as "[e]ach . . . [doing] his best to deflect attention from himself on the Birchwood crimes by assisting in the prosecution of the other." *R. Carr*, 300 Kan. at 95. The second was the conclusion that the joint trial resulted in the exclusion of evidence each defendant could have used to bolster his antagonistic identity defense. See 300 Kan. at 97.

In deciding the district judge abused his discretion in denying severance, our court cited two mistakes of law: failing to perform the necessary analysis when ruling on the issue at a pretrial hearing; and ruling based on an incorrect view that defendants' incriminating statements, inadmissible during the joint guilt-phase trial, would also be inadmissible during separate trials. 300 Kan. at 97-98. We also observed

"an abuse of discretion in the dearth of record support for Judge Clark's virtually indistinguishable, nearly completely unexplained rulings over time, even though the conflict between the defendant's theories became more and more clear and the pile of evidence that would be excluded because of the joint trial grew ever taller. Given Judge Clark's continuing duty to carefully consider severance to avoid prejudice to a defendant, and the overriding status of the defendant's right to fair trial, Judge Clark's decisions were progressively unreasonable." 300 Kan. at 98.

But we held the error did not require reversal. "Although its path to R. Carr's convictions was made somewhat smoother and straighter by the judge's related guilt phase errors on severance and on third-party evidence and hearsay, the State presented compelling evidence of R. Carr's guilt, all of which would have been admissible in a severed trial." 300 Kan. at 100-01. Like the finding of error itself, this court's holding—that the failure to sever did not contribute to the jury's guilt-phase verdict—is also settled law for purposes of this appeal under the law of the case doctrine.

Therefore, today, we must determine whether this error, which was harmless in the guilt phase, so prejudiced defendants in the penalty phase that we must vacate their capital sentences. We place the burden of demonstrating harmlessness on the party benefitting from the error, i.e., the State. 300 Kan. at 95 (evolving caselaw generally places burden demonstrating harmlessness on party benefitting from error). Because the error arises under state law, the State's burden is to show there is no reasonable probability the error affected the jury's ultimate conclusion regarding the death sentence verdict. See K.S.A. 2020 Supp. 60-261; *Ward*, 292 Kan. at 569.

Though we now consider the severance issue under state law, the United States Supreme Court's assessment of this issue under federal law remains instructive and continues to inform our reversibility analysis. The higher Court concluded that the brothers did not even raise an Eighth Amendment problem by arguing they were prejudiced by mitigation evidence that would have been inadmissible in severed proceedings. Instead, their argument is subject to due process analysis because "it is the Due Process Clause that wards off the introduction of 'unduly prejudicial' evidence that would 'rende[r] the trial fundamentally unfair.'" *Carr*, 577 U.S. at 123. Thus, the proper question was not whether the "right to an individualized sentencing determination was fatally impaired" by the failure to sever, but "whether the evidence 'so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process.'" 577 U.S. at 123-24; see *R. Carr*, 300 Kan. at 281.

Notably, "[t]he mere admission of evidence that might not otherwise have been admitted in a severed proceeding does not demand the automatic vacatur of a death sentence." *Carr*, 577 U.S. at 124. Although the higher Court focused on the question of error rather than harmlessness, its analysis leaves little room to conclude the failure to sever requires reversal now as a state-law error. The higher Court rejected all notion that the failure to sever had any impact on the jury's penalty-phase verdict. See 577 U.S. at 126 (holding "[i]t is beyond reason to think that the jury's death verdicts were caused by" allegedly prejudicial evidence in light of the evidence of the "almost inconceivable cruelty and depravity" of the defendants' acts). Indeed, it essentially concluded the defendants' argument was so weak that even assuming witness statements found in police reports had been erroneously admitted without opportunity for confrontation, "We are confident that [allowing defendants] cross-examination regarding these police reports would not have had the slightest effect upon the sentences." 577 U.S. at 126. For us to conclude that there is a reasonable *probability* the antagonistic evidence affected the

jury's death sentence verdict, we would have to reject the higher Court's assessment that even such a *possibility* was "beyond reason." Neither the record nor the parties briefing offer any basis for our court to question the conclusion of the United States Supreme Court.

The United States Supreme Court's assessment, coupled with the strength of the State's penalty-phase evidence (discussed more fully below in our cumulative error analysis), demonstrates that the state-law severance error was harmless.

## B. P2—Notice of Aggravating Circumstances

R. Carr next alleges the State failed to give him constitutionally sufficient notice of the aggravating factors it intended to rely on to seek the death penalty, despite complying with K.S.A. 21-4624(a)'s notice requirements. In its previous decision, the court rejected the argument under its established precedent. *R. Carr*, 300 Kan. at 282; see *State v. Scott,* 286 Kan. 54, 101-02, 183 P.3d 801 (2008) (holding statutorily compliant notice of intent to seek death penalty is sufficient to give defendant meaningful opportunity to respond to statutory aggravating factors).

Neither R. Carr nor J. Carr submit any additional authority causing us to reconsider that decision. Under the law of the case, we continue to hold that R. Carr had constitutionally sufficient notice of the aggravating factors the State intended to pursue. See *Cheeks*, 313 Kan. at 66.

## C. P3—Channeling of Jury's Discretion

J. Carr originally challenged whether the four aggravating circumstances asserted by the State adequately channeled the jury's discretion in arriving at the death sentence.

The constitutional overbreadth challenge was noticed as an unassigned error in R. Carr's appeal under K.S.A. 2020 Supp. 21-6619(b).

We rejected the challenge, explaining:

"We have rejected the defense arguments advanced here on each of the four aggravators, when those arguments were made on behalf of other death penalty defendants. See *State v. Scott*, 286 Kan. at 108-10 (rejecting argument on multiple murder, monetary gain); *State v. Kleypas*, 272 Kan. at 1025 (rejecting argument on avoidance of arrest; especially heinous, atrocious, cruel). The defense has not given us cause to revisit these holdings in this case." *R. Carr*, 300 Kan. at 283.

The parties submitted no new authority addressing any of the four aggravators. Thus, we affirm this holding as the law of the case. See *Cheeks*, 313 Kan. at 66.

However, one point of clarification is in order. In its earlier decision, the court correctly observed that our precedent had previously rejected overbreadth challenges to the "multiple murder," "monetary gain," and "especially heinous, atrocious, or cruel" aggravators. *R. Carr*, 300 Kan. at 282-83. However, the statement about the "avoidance of arrest" aggravator warrants additional discussion based on the original holding in *Kleypas I*.

The *Kleypas I* court recognized the defendant had challenged this aggravator for vagueness and overbreadth. 272 Kan. at 1019 (noting arguments on sufficiency of evidence to support aggravator, aggravator's violation of federal and state constitutional provisions by failure to narrow class of persons eligible for death penalty). It maintained "[o]ther courts have determined that the avoid arrest aggravator on its face is not unconstitutionally vague or overbroad." 272 Kan. at 1023. And it concluded there was

sufficient evidence to support the jury's finding of the aggravating circumstance. However, it did not expressly rule on the constitutional challenge. 272 Kan. at 1024-25.

Today we take the step not quite articulated in *Kleypas I* by simply stating the avoidance-of-arrest aggravator, K.S.A. 2020 Supp. 21-6624(e), effectively channels the discretion of the sentencer and is not facially overbroad. Cf. *Coulter v. State*, 304 Ark. 527, 533, 804 S.W.2d 348 (1991); *Wiley v. State*, 750 So. 2d 1193, 1207 (Miss. 1999); *Castro v. State*, 844 P.2d 159, 175 (Okla. Crim. App. 1992). With today's clarification and additional holding, we reject this challenge.

### D. *P4—Unavailability of Transcript of Jury View*

In its earlier decision, this court concluded R. Carr failed to establish that a constitutional violation arose from the failure to have a court reporter present at the jury view. R. Carr was provided a reasonably accurate and complete record of the proceedings against him, which was all he was entitled to under the United States Constitution. *R. Carr*, 300 Kan. at 284. Moreover, there was no substantive claim left unreviewable because of the lack of transcript. See 300 Kan. at 283. We reached the same decision in J. Carr's case. *J. Carr*, 300 Kan. at 368.

The parties submitted no additional authority to persuade us to reconsider these holdings. Under the law of the case, no error occurred.

### E. *P5—Constitutional Challenges to K.S.A. 21-4624(c)*

R. Carr claims hearsay admitted under K.S.A. 21-4624(c)'s relaxed evidentiary standard during his penalty-phase trial violated both the Eighth Amendment's heightened reliability standard and the Confrontation Clause. See *Crawford v. Washington,* 541 U.S.

36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (testimonial out-of-court statements by witness barred under Confrontation Clause unless witness unavailable, defendant had prior opportunity to cross-examine). The statute's language and our standard of review were previously set out.

"K.S.A. 21-4624(c) provides for a relaxed evidentiary standard during the penalty phase of a capital proceeding:

'In the sentencing proceeding, evidence may be presented concerning any matter that the court deems relevant to the question of sentence and shall include matters relating to any of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto and any mitigating circumstances. Any such evidence which the court deems to have probative value may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. Only such evidence of aggravating circumstances as the state has made known to the defendant prior to the sentencing proceeding shall be admissible, and no evidence secured in violation of the constitution of the United States or of the state of Kansas shall be admissible.'

"'When the application of a statute is challenged on constitutional grounds, this court exercises an unlimited, de novo standard of review.' *State v. Cook,* 286 Kan. 766, 768, 187 P.3d 1283 (2008) (citing *State v. Myers,* 260 Kan. 669, 676, 923 P.2d 1024 [1996], *cert. denied* 521 U.S. 1118 [1997]).

"""The constitutionality of a statute is presumed. All doubts must be resolved in favor of its validity, and before the act may be stricken down it must clearly appear that the statute violates the constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it. If there is any reasonable way to construe the statute as constitutionally valid, that should be done. A statute should not be stricken down unless the infringement of the

65

superior law is clear beyond reasonable doubt. [Citations omitted.]"'
*State v. Brown,* 280 Kan. 898, 899, 127 P.3d 257 (2006)." *R. Carr*, 300
Kan. at 285.

### 1. K.S.A. 21-4624(c) Does Not Violate Heightened Reliability Requirements of the Eighth Amendment

In *R. Carr*, the court unanimously rejected the argument that K.S.A. 21-4624(c) offends the heightened reliability standard based on the court's previous denial of a due process challenge to the statute in *Scott*, 286 Kan. at 99-101. *R. Carr*, 300 Kan. at 286-87. The *Scott* court had concluded the statute was consistent with the United States Supreme Court's "'all relevant evidence' doctrine"—a doctrine that encourages jurors to have all possible relevant information about the individual defendant because heightened reliability in sentencing is achieved by including more evidence on the presence or absence of aggravating and mitigating factors. 300 Kan. at 286-87; see also *Scott*, 286 Kan. at 100 (citing *Jurek v. Texas*, 428 U.S. 262, 276, 96 S. Ct. 2950, 49 L. Ed. 2d 929 [1976]; *Gregg v. Georgia,* 428 U.S. 153, 204, 96 S. Ct. 2909, 49 L. Ed. 2d 859 [1976]; *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S. Ct. 2978, 49 L. Ed. 2d 944 [1976]).

The parties cite no new authority to question this holding. Applying the law of the case, we continue to reject R. Carr's heightened reliability challenge.

### 2. The Confrontation Clause Challenge Does Not Warrant Reversal of the Jury's Death Verdict

R. Carr also contends his Sixth Amendment confrontation rights were violated when the district court allowed prosecutors to reference out of court witness statements (recorded in police reports) during cross-examination of several defense witnesses. See *R. Carr*, 300 Kan. at 288. In its previous decision, this court did not reach a holding on the question of error or reversibility concerning this issue. See 300 Kan. at 288.

66

However, this court declared in general fashion that

"Kansas now holds that the Sixth Amendment applies in the [penalty-phase] proceeding and that out-of-court testimonial hearsay may not be placed before the jury without a prior opportunity for the defendant to cross-examine the declarant. This includes any testimonial hearsay referenced in questions posed by counsel." 300 Kan. at 288.

We apply our previous rationale to R. Carr's challenge and assume that it was constitutional error for the State to incorporate hearsay statements from police reports into its cross-examination questions propounded to defense witnesses.

However, before turning to the question of reversibility, we first qualify our previous declaration that the Sixth Amendment applies in the penalty phase of a capital murder trial. We continue to hold that the Confrontation Clause applies during the penalty phase, but its application is limited to evidence relevant to the jury's "eligibility" decision, i.e., evidence relevant to the existence of one or more statutory aggravating circumstances.

> a. *In Kansas Capital Sentencing Proceedings, the Confrontation Clause Applies Only to Evidence Relevant to the Jury's Eligibility Decision*

In *R. Carr*, this court acknowledged a split in authority from jurisdictions addressing the Confrontation Clause's application during the penalty phase of a capital trial. See 300 Kan. at 287-88. Federal circuits addressing the issue have generally rejected defendants' claims that the Confrontation Clause universally applies to all evidence admitted during the penalty phase. See, e.g., *United States v. Umana*, 750 F.3d 320, 347 (4th Cir. 2014); *Muhammad v. Secretary, Florida Dept.*, 733 F.3d 1065, 1073-77 (11th Cir. 2013); *United States v. Fields*, 483 F.3d 313, 324-338 (5th Cir. 2007). Since

our previous decision, the Eighth Circuit has also joined the list of federal circuits so holding. See *United States v. Coonce*, 932 F.3d 623, 640-41 (8th Cir. 2019), *petition for cert. filed* February 28, 2020.

Generally, these federal circuits treat *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), as controlling precedent. *Williams* held that when imposing a sentence, the Due Process Clause does not limit a trial judge's ability to consider out-of-court sources of information admitted without the opportunity for cross-examination. 337 U.S. at 251-52.

However, these federal circuits have not uniformly determined whether *Williams* applies to evidence related to both the "eligibility" and "selection" decisions Kansas juries must make during the penalty phase before imposing a sentence of death. As detailed below, the distinction between the eligibility decision and the selection decision is one with constitutional significance, and this distinction largely defines the scope of a defendant's confrontation rights under Kansas' capital sentencing scheme.

Before delving into that analysis, however, it is helpful to clarify the meaning of the "eligibility" and "selection" decisions in penalty-phase proceedings. "Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decision-making process: the eligibility decision and the selection decision. To be *eligible* for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment." (Emphasis added.) *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994). In Kansas, a defendant who has been convicted of capital murder becomes *eligible* for a sentence of death when the State establishes the existence of "one or more of the aggravating circumstances enumerated" by statute. See K.S.A. 21-4624(e), now codified as K.S.A. 2020 Supp. 21-

6617(e). The "eligibility" decision arises from the Eighth Amendment requirement to narrow the class of individuals who may be lawfully sentenced to death. 512 U.S. at 972.

In the "selection" stage, the jury decides "whether a defendant eligible for the death penalty should in fact receive that sentence." 512 U.S. at 972. Kansas juries make their selection decision by applying the statutory weighing equation that pits aggravating circumstances against mitigating circumstances. See K.S.A. 2020 Supp. 21-6617(e). The selection decision is not influenced by any constitutional narrowing requirement. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983).

Thus, the eligibility decision and the selection decision are influenced by separate constitutional objectives within the Eighth Amendment. These distinct constitutional objectives were largely created through significant developments in the United States Supreme Court's death penalty jurisprudence beginning in the 1970s, years after *Williams*. See, e.g., *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972); *Gregg*, 428 U.S. at 189; *Lockett v. Ohio*, 438 U.S. 586, 601-05, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Godfrey v. Georgia*, 446 U.S. 420, 428-33, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).

Further, more recent decisions in *Apprendi*, *Ring*, and *Alleyne* have incrementally applied Sixth Amendment protections to the sentencing process, while substantially altering the framework for the eligibility decision in capital proceedings. See *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000); *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Ring*, the Court held that statutory aggravating circumstances are the functional equivalent of an element of the greater offense and concluded the Sixth Amendment required a jury to determine the presence or absence of such aggravators. *Ring*, 536 U.S. at 609. In *Alleyne*, the Court extended the *Apprendi* rule to facts that increase mandatory minimum sentences. *Alleyne*, 570 U.S. at 116.

The development of this precedent subsequent to *Williams* strongly suggests the Confrontation Clause applies to the "eligibility" decision in Kansas penalty phase proceedings. As noted above, under Kansas' capital sentencing scheme, the State must establish a defendant's "eligibility" for a sentence of death in the penalty phase by proving beyond a reasonable doubt that one or more statutory aggravating circumstances exist. These statutory factors restrict the class of death-eligible defendants in our state. In *Ring*, the Court held that these types of statutory aggravators are effectively elements of a greater offense for federal constitutional purposes and "subject to the procedural requirements the Constitution attaches to trial of elements." *Schriro v. Summerlin*, 542 U.S. 348, 354, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004); see *United States v. Fell*, 531 F.3d 197, 239 (2d Cir. 2008) (*Ring* and its progeny suggest statutory aggravating factors should be proven to a jury in the same manner as the other elements of the crime.). At the time *Williams* was decided, "capital-sentencing proceedings were understood to be just that: sentencing proceedings." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 110, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003). But with the developments in *Apprendi/Ring/Alleyne,* the statutory factors that make a defendant eligible for a death sentence are now deemed the "'functional equivalent of an element of a *greater offense*.'" 537 U.S. at 111.

The logical corollary of the *Apprendi/Ring/Alleyne* rule is that the defendant should also be afforded the Sixth Amendment's confrontation rights as well—at least to

the extent evidence is relevant to the jury's determination of aggravating circumstances, i.e., the eligibility decision. Even amongst those federal circuits that have applied *Williams* to foreclose a defendant's Confrontation Clause challenge, several have suggested *Williams* does not extend to evidence offered in connection with the jury's eligibility decision.

For example, in *Fields*, the Fifth Circuit acknowledged that after *Apprendi* and *Ring*, "there is a stronger argument to be made for the attachment of the confrontation right where the government is attempting to establish eligibility-triggering factors: Though labeled as 'sentencing factors,' those factors are more appropriately considered as elements of a capital offense." *Fields*, 483 F.3d at 331 n.18. But in *Fields*, the defendant had challenged only "evidence that the government introduced relevant to the jury's ultimate selection decision," and the court declined to resolve whether the Confrontation Clause applies to "eligibility-triggering factors." 483 F.3d at 331 n.18.

Likewise, in *Umana*, the Fourth Circuit held that the "Confrontation Clause does not preclude the introduction of hearsay statements during the *sentence selection phase* of capital sentencing." (Emphasis added.) 750 F.3d at 348. It rejected the defendant's contention that the *Apprendi/Ring/Alleyne* rule compelled the extension of the Confrontation Clause "to *every fact* that the jury finds, even during the *sentence selection phase*." (Emphases added.) 750 F.3d at 347. The Fourth Circuit explained that under the Federal Death Penalty Act (FDPA), "the jury finds the facts necessary to support the imposition of the death penalty in the guilt and *eligibility* phases of trial. . . . It is only during these phases that the jury makes 'constitutionally significant' factual findings." 750 F.3d at 347-48. However, the defendant in *Umana* had challenged hearsay evidence introduced only in the selection phase. As such, the jury considered this evidence "to assist it in exercising its discretion to select the appropriate sentence" only after finding defendant was eligible to receive the death penalty. 750 F.3d at 348.

71

Interestingly, in FDPA proceedings, federal courts commonly bifurcate the sentencing phase

> "(or, as some have phrased it, 'trifurcate' the entire trial) into an 'eligibility phase,' limited to evidence relevant to mental state and to the existence of one or more statutory aggravating factors, and, if the defendant is found eligible, a 'selection phase,' at which evidence relevant to mitigating factors and non-statutory aggravating factors such as victim impact and other crimes is received and weighed by the jury." *United States v. Bolden*, 545 F.3d 609, 618 (8th Cir. 2008).

See *Fell*, 531 F.3d at 239 ("[A] number of district courts have 'trifurcated' capital proceedings by splitting the sentencing phase into two separate hearings: one for the eligibility phase and one for the selection phase."). The Second Circuit has explained this procedure enables the court to "delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases." *Fell*, 531 F.3d at 239. This rationale implicitly acknowledges that the Confrontation Clause extends to evidence relevant to the eligibility determination (i.e., the existence of one or more statutory aggravating circumstances) but not the selection decision.

Utilizing this procedure, many federal courts since *Crawford* have held that "confrontation rights persist through the eligibility phase." *United States v. Fackrell*, No. 1:16-CR-26(2), 2018 WL 7822173, at *2 (E.D. Tex. 2018) (unpublished opinion); see also *United States v. Mills*, 446 F. Supp. 2d 1115, 1125 (C.D. Cal. 2006) ("a defendant's Sixth Amendment trial rights extend at least to the eligibility phase of capital sentencing, where a jury is required to find facts that make the defendant eligible for the death penalty"); *United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005) (Confrontation Clause applies "at least in the eligibility stage"); *United States v. Con-ui*, No. 3:13-CR-123, 2017 WL 783437, at *26-27 (M.D. Pa. 2017) (unpublished opinion)

("[the Confrontation] Clause is fully operative at the eligibility phase" and "is inapplicable only at the selection phase"); *United States v. Lujan*, No. CR 05-0924RB, 2011 WL 13210246, at *8 (D.N.M. 2011) (unpublished opinion) ("If the penalty phase is reached, the Confrontation Clause would apply in the eligibility stage due to *Ring* [*v. Arizona's*, 536 U.S. 584,] requirement that facts necessary to expose [the defendant] to a death sentence must be found by a jury"; however, "[i]f [the defendant] is found eligible for death, the trial would proceed to the selection stage and the general rule allowing hearsay at sentencing would apply.").

With the foregoing in mind, we qualify this court's general pronouncement in *R. Carr* (that the Confrontation Clause applies during the penalty phase) by clarifying that in Kansas capital sentencing proceedings, the Confrontation Clause applies only to evidence relevant to the jury's eligibility decision. A defendant's confrontation rights do not extend to evidence relevant to the jury's selection decision.

While Kansas' capital sentencing scheme does not contemplate bifurcated *penalty-phase* proceedings (only the guilt phase and penalty phase are bifurcated), district court judges are still well-positioned to delineate between evidence relevant to eligibility and other evidence relevant to selection. Going forward, trial courts in Kansas should apply the Confrontation Clause when the State introduces evidence relevant to the existence of one or more statutory aggravating circumstances. However, when the State introduces or relies on testimonial hearsay during its rebuttal and cross-examination for purposes of controverting or impeaching the testimony of a capital defendant's mitigation witnesses— provided such evidence does not bolster an aggravating circumstance—the Confrontation Clause shall not apply to such evidence. See *State v. McGill*, 213 Ariz. 147, 159, 140 P.3d 930 (2006) (recognizing a distinction between "hearsay used to *establish an aggravating factor*, to which the Confrontation Clause applies, and hearsay used to *rebut mitigation*, to which the Confrontation Clause does not apply").

73

*b. Any Confrontation Clause Violation Was Harmless*

Despite the foregoing qualification, we will assume the contested evidence in this case is subject to the Confrontation Clause based on the statements and rationale set forth in the court's prior decision. On the facts of the case, however, we hold any Confrontation Clause violation was harmless because there is no reasonable possibility the assumed error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Ward*, 292 Kan. at 565 (providing degree of certainty in outcome required to hold an error that implicates federal constitutional rights was harmless).

In its petitions for writ of certiorari filed with the United States Supreme Court, the State sought a ruling on this issue, but the Court declined review. See *Carr*, 575 U.S. 934 (2015) (No. 14-450) (grant of petition for certiorari limited to questions 1 and 3); 575 U.S. 934 (2015) (No. 14-449) (same); Petition for Writ of Certiorari, *Kansas v. Carr*, 2014 WL 5337864, at *i (2014) (No. 14-450) ("Whether the Confrontation Clause, as interpreted in *Crawford v. Washington*, 541 U.S. 36 [2004], and *Davis v. Washington*, 547 U.S. 813 [2006], applies to the 'selection' phase of capital *sentencing* proceedings, as the Kansas Supreme Court held here . . . . "); Petition for Writ of Certiorari, *Kansas v. Carr*, 2014 WL 5337863, at *i (2014) (No. 14-449) (same). Nevertheless, the Court opined that any cross-examination regarding such hearsay statements "would not have had the slightest effect upon the sentences." *Carr*, 577 U.S. at 126.

We agree the hearsay statements forming the basis of the prosecutor's cross-examination questions were innocuous, and the same or similar information was first introduced by defendants in their mitigation cases. Therefore, even if we assume error because R. Carr did not have a prior opportunity to cross-examine the declarants, such

74

error alone does not require us to vacate the death sentence. The jury learned little, if anything, it did not already know about R. Carr from the challenged declarations.

## F. P6—Exclusion of Mitigating Evidence

Under the law of the case, we reiterate our previous conclusion that the district judge did not abuse his discretion by excluding R. Carr's evidence about the likelihood of being paroled, if not sentenced to death. As more fully explained in *R. Carr*, that evidence lacked probative value. The district court correctly ruled it was irrelevant. *R. Carr*, 300 Kan. at 291-92; see *State v. Prine*, 287 Kan. 713, 725, 200 P.3d 1 (2009) (evidence failing to meet probative value or materiality element of relevance test is inadmissible).

R. Carr also complained about the district court's decision to exclude as irrelevant his sister's testimony about what she wanted the jury to do regarding his sentence and how she would be affected if he were executed. R. Carr did not proffer the excluded testimony. In its previous decision, the court said, "[A]ny admitted testimony of this nature needs to have some bearing on the material question of the defendant's character, *i.e.*, be probative on that material fact." 300 Kan. at 292.

The failure to proffer leaves behind a record devoid of the information necessary to conduct a meaningful review of the relevancy determination. See *State v. Hudgins*, 301 Kan. 629, 651, 346 P.3d 1062 (2015) (failure to proffer excluded evidence precludes appellate review); *R. Carr*, 300 Kan. at 292-93 (holding that failure to proffer excluded testimony precluded meaningful review of admissibility). Under the law of the case, we find no error.

## G. P7—Agreement of Other Experts

R. Carr next contends the State elicited expert opinion testimony that violated the Confrontation Clause. To fully analyze R. Carr's various challenges to the expert witness testimony and to promote clarity in our discussion, it is helpful to first highlight additional factual background relevant to these issues. See Issues P8 (surrebuttal testimony); P18 (prosecutorial error); P22 (cumulative error).

*"Dueling PET Scan Experts and Denial of Continuance for Surrebuttal*

"The defense presented testimony from Dr. David Preston, a specialist in nuclear medicine who was qualified as an expert for the defense at the penalty phase regarding PET imaging and its use as a diagnostic technique. Preston said that a PET scan of a person's brain is not accepted to predict or explain criminal behavior, but he did identify what he said were abnormalities in both R. Carr's and J. Carr's scans. Specifically, he said images of their temporal lobes demonstrated marked deficits in metabolism in the regions of the hippocampus and amygdala.

"Preston testified that Exhibit A-39, an image of R. Carr's brain, and Exhibit JC-2, an image of J. Carr's brain, displayed images that were higher in back and lower in front to give a larger view of their temporal lobes. He also admitted on direct examination that he had mistakenly classified Exhibit A-40 as a PET scan of a normal young male for comparison purposes. In fact, it was an image of a 50-year old male with a memory problem.

"Preston further testified that, in patients he has seen in the past, a closed head injury would be the first thing he would suspect as a cause of the type of deficits he observed in the defendants' scans. But he said that no history of closed head injuries was provided to him in this case.

"The State called Dr. Norman Pay, a neuroradiologist, in rebuttal to Preston. On direct examination, Pay testified that he consulted with the person at Via Christi Medical Center who performed the PET scans on the defendants, the doctor in charge of PET scans at Via Christi, and a neurologist at Via Christi. The State had Pay identify these colleagues, who were in the courtroom, and asked each of them to raise a hand, which they did. Pay said all three were in agreement with him that Exhibits A-39 and JC-2 were skewed in color and were manipulated so that the anterior portion of the temporal lobe, which includes the amygdala, would not appear in the images. When the prosecutor asked Pay if the manipulated images were 'by design,' he responded, 'We were told.'

"Pay further testified that, looking at all of the PET images, he and the others he consulted had reached the opinion that the scans showed normal metabolism in both defendants' brains.

"J. Carr's counsel objected to admission of opinions from Pay's colleagues in the courtroom, but the objection was overruled.

"On cross-examination, Pay admitted that he normally does not read PET scans, despite being asked to do so in this case. He said that the difference between JC-2 and State's Exhibit 912, another of J. Carr's PET scan images on which he was relying to give his opinion, might be the presence of 'scatter' in 912. Scatter can produce a halo effect that can be eliminated by reducing the background color.

"When asked if he could tell whether Preston had manipulated the images so that they would be higher in back and lower in front, Pay responded, 'You know, we have to have Dr. Preston here to testify because I don't really know what he did.' Pay agreed that if two dots in one of the images were indicative of J. Carr's eyes, it might necessarily involve the area of the hippocampus and amygdala. He also testified on cross-examination that he did not attempt to contact Preston to ask him how he arrived at his conclusions and that he was not there to cast any aspersions on Preston's integrity or competence.

77

"The defense requested a continuance to confer with Preston and recall him as a witness in surrebuttal. Counsel argued that he must be permitted to address the State's allegation that he manipulated the PET images 'by design.'

"Judge Clark characterized the disagreement between Preston and Pay as 'a fact question for the jury . . . between experts' and said that Preston 'would be repeating what he had said in direct.' He denied the motion for continuance.

"In closing argument, one of the prosecutors argued that the 'truth' as revealed by the 'doctors' showed that Preston's 'slick' PET scan images and related testimony were 'hocus pocus.' The prosecutor said that the 'foundation of the [defendants'] sympathy and abuse excuse and blame' had come 'crashing down' and that they were simply dragging their 'laundry' into court." *R. Carr*, 300 Kan. at 272-75.

R. Carr complains the State's rebuttal expert (Dr. Norman Pay) should not have been allowed to testify that other experts agreed with his opinions about the positron emission tomography (PET) scans. We set out this challenged testimony in our earlier decision. 300 Kan. at 293-95. Considering the question only for guidance on remand, we concluded the controlling question was whether the out-of-court statements qualified as testimonial hearsay under the Sixth Amendment and *Crawford*. Our clarification today concerning the application of the Confrontation Clause to Kansas penalty phase proceedings—that confrontation rights apply only to evidence relevant to the jury's eligibility determination, i.e., the existence of one or more aggravating circumstances—potentially calls into question the framing of this issue prospectively. But for today's purposes, in the spirit of the doctrine of the law of the case, we will continue to frame the issue in this fashion.

Now, presented with this question, we must first examine whether the statements made by Pay's colleagues were testimonial. We have previously noted that the inquiry into what constitutes testimonial hearsay "should generally seek to identify statements

78

that are by nature substituting for trial testimony." *State v. Williams*, 306 Kan. 175, 197, 392 P.3d 1267 (2017); see also *United States v. Katso*, 74 M.J. 273, 279 (C.A.A.F. 2015) ("'[A] statement is testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."'"), *cert. denied* 136 S. Ct. 1512 (2016).

In this case, the statements made by Pay's colleagues were testimonial in nature in that they were made specifically in preparing for trial testimony. But that does not end the inquiry. An expert's reliance on testimonial hearsay is not a per se Confrontation Clause violation. Cf. *Katso*, 74 M.J. at 282 ("[T]he admissibility of the expert's opinion hinges on the degree of independent analysis the expert undertook in order to arrive at that opinion."). The question becomes whether the expert is testifying as a witness in his or her own right or testifying as a mere "conduit" for the testimonial hearsay. See *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012) (if expert "simply parrots" another person's out-of-court statements rather than conveying independent judgment, expert effectively disclosing statement for substantive truth; "the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement"). The Confrontation Clause forecloses the expert's opinion testimony only in the latter instance. *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) ("An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.").

The expert-as-conduit problem may become especially problematic in federal gang-related cases in which the nature or existence of a gang is a material issue. See, e.g., *United States v. Vera*, 770 F.3d 1232, 1238 (9th Cir. 2014) ("This testimony was directly relevant to several material issues in the case, including whether MS13 was an enterprise,

79

had an effect on interstate or foreign commerce or engaged in narcotics trafficking."). In such cases, a gang expert's testimony may just be a recitation of otherwise inadmissible evidence to establish material facts rather than a presentation of "information to explain a bona fide expert opinion." 770 F.3d at 1238.

The Ninth Circuit illustrated the characteristics common to this expert-as-conduit problem in *Vera*:

> "Most problematically, the agent's drug tax testimony 'was based directly on statements made by an MS-13 member in custody (during the course of this very investigation).' *Id.* (emphasis omitted). To form his drug tax opinion, therefore, the agent did not have to conduct a 'synthesis of various source materials' or apply any of 'his extensive experience [or] a reliable methodology.' *Id.* at 197 (quoting *Dukagjini,* 326 F.3d at 58) (internal quotation marks omitted). Instead, the agent 'communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion.'" 770 F.3d at 1238.

Similar issues may arise in the context of expert testimony related to laboratory testing or autopsies. See, e.g., *Williams v. Illinois*, 567 U.S. 50, 78, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (plurality opinion) (discussing "legitimate nonhearsay purpose of illuminating the expert's thought process").

These decisions illustrate "that the extent to which an expert witness may disclose to a jury an otherwise inadmissible out-of-court statement without implicating a defendant's confrontation rights is a question of degree." *Pablo*, 696 F.3d at 1288 (citing *Johnson*, 587 F.3d at 635). We note that in situations such as those described in *Vera*, the problem of expert-as-conduit is not the amplification of multiple experts' opinions but the fact that the so-called expert is not actually giving expert testimony.

Thus, the question of whether Pay's testimony violated the Confrontation Clause turns on whether Pay was testifying as a witness himself based on an independent analysis of the evidence or merely as a conduit for the opinions of his colleagues. The record confirms that Pay was not merely regurgitating the opinion of others. He formed an independent opinion by synthesizing the scans Dr. David Preston had relied on and analyzing that information based on his expertise in the field.

Pay's initial testimony identifying his colleagues coincided with the prosecutors asking various persons in the courtroom to stand and raise their hands. Pay's testimony at that point was that he had conferred with these people in reaching a conclusion, and that these individuals had also reviewed the images. Merely informing the jury that he had consulted with colleagues in reaching *his* opinion does not violate the Confrontation Clause, as Pay did not relate any of his colleagues' conclusions. Cf. K.S.A. 2020 Supp. 60-458 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible into evidence in order for the opinion or inference to be admitted."); *State v. Sauerbry*, 447 S.W.3d 780, 785 (Mo. App. 2014) (testifying medical examiner may properly testify to his or her own opinions and conclusions, even if relying upon absent examiner's report, without violating Confrontation Clause, so long as testifying examiner does not discuss the absent examiner's opinions or conclusions, and absent examiner's report is not admitted into evidence).

Thereafter, the State asked Pay specific questions about the scans and how *he* interpreted them. In other words, Pay's personal conclusions were based on his synthesis of the available information, utilizing his expertise in the field.

The more problematic statements occur later in Pay's testimony. Specifically, the State's compound question asking whether Pay had conferred with colleagues and then whether "there [is] a conclusion as to the function of Jonathan Carr's brain." At that point, there was an objection to the introduction of other's opinions, but the objection was overruled. Pay was then asked if the "consensus" was that the brain in the scans was "normal." Pay agreed with that conclusion. He then confirmed that neither he nor any of his colleagues had a "quarrel" with that conclusion. Pay answered similar questions in a similar manner for R. Carr's scans.

But this testimony added nothing substantive to what the jury already heard. It merely added weight to that evidence. It is speculative to suggest this testimony added substantial weight to his opinion given the extraordinarily vague reference to the other experts Pay consulted. And such speculation is unrealistic given that the defense's own expert conceded the PET scans were not reliable tools to predict or explain criminal behavior.

Although hearsay testimony about a colleague's opinion and conclusion may violate the Confrontation Clause in some instances, here Pay offered an independent opinion and interpretation of the PET scans based on his synthesis of the evidence. Accordingly, Pay was not merely a conduit for the expert opinions of others. See *Rector v. State*, 285 Ga. 714, 715, 681 S.E.2d 157 (2009) (holding Confrontation Clause not violated when toxicologist who testified at trial had reviewed the work of the doctor who had originally prepared the report and reached the same conclusion that the victim's blood sample tested negative for cocaine; "[r]ather than being a mere conduit for [the doctor's] findings, [the toxicologist] reviewed the data and testing procedures to determine the accuracy of [the] report. An expert may base [his] opinions on data gathered by others."); *People v. McAdams*, 170 A.D.3d 549, 550, 94 N.Y.S.3d 841 (expert was not merely a conduit for conclusions of other experts where testimony demonstrated she conducted her

own independent analysis of the raw data to make DNA comparison opinion), *leave to appeal denied* 33 N.Y.3d 1033 (2019); *State v. Griep*, 361 Wis. 2d 657, 682, 863 N.W.2d 567 (2015) (If the expert witness reviewed data created by the nontestifying analyst and formed an independent opinion, the expert's testimony does not violate the Confrontation Clause.).

In sum, although we assume the Confrontation Clause applied to Pay's testimony, his vague assertions that other experts agreed with him did not transform Pay into a mere conduit for the opinions of others. Thus, his testimony did not violate defendants' rights under the Confrontation Clause.

## *H. P8—Denial of Surrebuttal Testimony*

In its earlier decision, this court determined the district judge abused his discretion in denying a continuance so that the defense's mitigation expert witness, Preston, could be present during Pay's rebuttal testimony and then testify in surrebuttal. We held the district court relied on a mistaken view that Preston could testify in surrebuttal only if he had something new to say in response to Pay's critique of his work. *R. Carr*, 300 Kan. at 296-98. We said:

> "It is hard to imagine a situation in which the allowance of surrebuttal would be more
> sensible and its denial more arbitrary. Judge Clark also abused his discretion because no
> reasonable person presiding over a death penalty case that had been in court for more
> than 2 months would have agreed with his decision to disallow surrebuttal requiring a
> delay of, at most, a couple of hours." 300 Kan. at 298.

Under the law of the case, the question of error is settled, so we must now consider whether it was harmless.

J. Carr argues the State, through Pay's testimony, was allowed to gut a major component of his mitigation case immediately before the penalty phase closed, and the district court deprived him of the right to rehabilitate his expert, Preston. He claims this significantly impaired his right to a fair trial. Therefore, J. Carr argues, the constitutional harmless error test applies. We are unpersuaded by this argument.

The error—Judge Clark's abuse of discretion—arose out of his misunderstanding of state evidentiary law, and it was labeled arbitrary under our state law standard for analyzing abuse of discretion claims. See *Ward*, 292 Kan. at 550 (setting out three ways discretion may be abused [citing *State v. Gonzalez,* 290 Kan. 747, 755-56, 234 P.3d 1 (2010)]); *State v. Martin*, 237 Kan. 285, 291-92, 699 P.2d 486 (1985) (setting out state law governing rebuttal). That said, we recognize an error arising out of state law may nevertheless implicate a criminal defendant's federal due process right to a fair trial. See *State v. Sherman*, 305 Kan. 88, 98, 378 P.3d 1060 (2016) (recognizing prosecutorial error may violate federal constitutional due process right).

Regardless, we conclude the district court's refusal to let Preston testify in surrebuttal was harmless under either standard. The district court gave defense counsel an opportunity to interview Pay before cross-examination, and defense counsel effectively cross-examined Pay on issues relevant to Preston's credibility. Moreover, Preston's opinion was limited to his interpretation of the PET scans, and he readily acknowledged these scans were not reliable tools to predict criminal behavior. In the end, the defendants' mitigation cases were not materially impacted by Pay's testimony and the district court's error was harmless beyond reasonable doubt.

## I.  P9—Sentencing on Noncapital Convictions

Defendants requested the district court instruct the jury on the number of years defendants would be required to serve in prison if not sentenced to death. The court informed the jury the defendants would not be eligible for parole for between 50 and 268 years. On appeal, R. Carr argued the district court's failure to communicate the specific term of incarceration under an alternative sentence violated his Eighth and Fourteenth Amendment rights and section 9 of the Kansas Constitution Bill of Rights. *R. Carr*, 300 Kan. at 298-99.

In its previous decision, our court unanimously concluded the Constitution did not demand more precision in the district court's instruction. 300 Kan. at 301. We adopt this holding under the law of the case.

However, the court also acknowledged that *Kleypas I* required the district court, upon request, to instruct a jury on the number of years a defendant would be required to serve in prison if not sentenced to death, including the possible prison terms for each noncapital charge and the possibility the sentences could be served either consecutively or concurrently. In R. Carr's case, we concluded the instruction deviated from the *Kleypas I* requirements in failing to specify the possible prison terms for *each* noncapital charge and failing to inform jurors that the judge would decide whether such sentences would run consecutive or concurrent. But we did not regard this technical error as particularly serious. 300 Kan. at 302. The parties have not submitted additional argument on this issue.

To the extent these deviations constitute error, it was error under state law. Accordingly, to hold the error harmless we must be persuaded there is no reasonable probability the error affected the jury's ultimate conclusion regarding the weight of the

aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Ward*, 292 Kan. at 565.

As explained in our earlier decision, the court informed the jury about the shortest sentence possible in lieu of death, and R. Carr's counsel was able to argue a term of imprisonment was sufficient to protect the public. R. Carr was not deprived of the opportunity to argue this mitigating factor. *R. Carr*, 300 Kan. at 300-01. To the extent the district court erred, there is no reasonable probability such error alone affected the jury's verdict.

J.    *P11—"The Crime" in Aggravating Circumstances Instruction*

Penalty phase Instruction No. 5 told the jury it could find aggravating circumstances existed if defendants committed "the crime" for monetary gain, to evade arrest, or in a heinous, atrocious, or cruel manner. R. Carr argues the phrase "the crime" allowed the jury to rely on his conviction of a crime other than capital murder to find the existence of an aggravating circumstance. This claim of jury instruction error was raised for the first time on appeal. In its earlier decision, this court addressed the claim for purposes of providing direction on remand but did not resolve the challenge. See 300 Kan. at 306.

As previously noted, we apply a four-step analysis to review jury instruction challenges. We first consider the reviewability of the issue and then determine whether the instruction was legally and factually appropriate. If we conclude there is error, we turn to reversibility in the final step. *Plummer*, 295 Kan. at 163. Where, as here, the defendant fails to raise the instruction issue at the penalty phase trial, the clearly erroneous standard applies to the reversibility inquiry. *State v. Kleypas,* 305 Kan. 224, 306, 382 P.3d 373 (2016) (*Kleypas II*).

86

J. Carr claims this court, in its previous decision, determined the instruction was erroneous. We do not agree. While this court suggested it may be inadvisable to use the phrase "the crime" in lieu of "capital murder" when examining the instruction in isolation, it did not squarely address and reach a holding on the question of error. *R. Carr*, 300 Kan. at 306.

To the contrary, we hold the instructions, read together as a whole, were legally appropriate. Instruction No. 5 defined the four aggravating circumstances advanced by the State in the penalty phase, including that "the crime" was committed for monetary gain, to evade arrest, or in a heinous, atrocious, or cruel manner. This instruction is patterned after language the Legislature used to define aggravating circumstances under K.S.A. 21-4636. See *State v. Robinson*, 303 Kan. 11, 332-33, 363 P.3d 875 (2015) (finding penalty phase instruction based on the language of the statute was legally appropriate), *disapproved of on other grounds by Cheever II*, 306 Kan. 760.

Additionally, in his remarks introducing these instructions to the jury, the district judge clarified:

> "As you know, our focus here is on the first four counts, those are the capital murder counts.
>
> "It is the responsibility of the jury to decide the proper sentence for the individual defendants in those four counts. . . . It is my responsibility to decide on the proper sentence for the individual defendant on all other counts in which you returned a verdict of guilty."

Consistent with these remarks, Instruction No. 1 informed jurors that the sentencing proceeding was being conducted because the defendants had been found "guilty of capital murder." In Instruction No. 9, the trial judge instructed the jury to sign the appropriate

87

verdict form that coincided with its sentencing decision. This instruction clarified that jurors had "been provided verdict forms which provide for three alternative verdicts in each of the four counts of *Capital Murder*." (Emphasis added.) In turn, each verdict form explicitly referenced the capital murder counts and made no mention of any other charged offenses.

Viewed together, the jury instructions made clear "the crime" in question was capital murder. See *State v. Williams*, 308 Kan. 1439, 1453, 430 P.3d 448 (2018) (stating general rule that jury instructions must be considered as a whole, with no instruction considered in isolation). Accordingly, we find no error.

### K. P12—Instruction on the Role of Mercy

R. Carr argued the district court erroneously instructed the jury that "'[t]he appropriateness of exercising mercy can itself be a mitigating factor in determining whether the State has proved beyond a reasonable doubt that the death penalty should be imposed.'" *R. Carr*, 300 Kan. at 307. In its earlier decision, the court "adhere[d] to [its] precedent rejecting the argument that equating mercy to a mitigating factor is error at all." 300 Kan. at 307.

The parties offer no basis to revisit this previous determination or the underlying precedent supporting it. Under the law of the case, we find no error.

### L. P13—Verdict Forms Instruction

The district court provided the jury with three verdict forms, each encompassing one of three possible verdicts: unanimously recommending death; unanimously finding no aggravators existed; or failing to unanimously agree either that aggravators existed or

upon a death verdict. Instruction No. 10 explained how to use those forms. The third paragraph of Instruction No. 10 was intended to correspond to Verdict Form (3) if jurors arrived at the third possible verdict option, but a disparity existed between the instruction and the verdict form. Neither defendant objected to the instruction at trial.

J. Carr raised this issue in his separate appeal, and we noticed it in our earlier decision as an unassigned error for R. Carr under K.S.A. 2020 Supp. 21-6619(b). We follow that route to the merits here as well.

As the court decided in its previous opinion, the verdict forms provided the proper standard under the controlling law at the time. See *Kleypas II*, 305 Kan. at 293-94 (discussing interpretation history of K.S.A. 21-4624). But Instruction No. 10 garbled this standard by introducing an extra "not" into the sentence: it instructed the jury to reject the death penalty if "one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances . . . *do not outweigh mitigating circumstances . . . .*" *R. Carr*, 300 Kan. at 310-11. Because the instruction's language conflicted with the law, as correctly stated in the verdict form, there was error. 300 Kan. at 311.

As previously noted, the court applies the clearly erroneous standard to unpreserved instructional error in capital sentencing proceedings. *Kleypas II*, 305 Kan. at 302. We now consider whether this instructional error standing alone is clearly erroneous.

The State cites no additional authority but characterizes the error as "nuanced" and one "not readily noticeable." The State contends the error was "harmless under any test," yet asserts there was "no reasonable likelihood that the jury applied Instruction 10 in a way that prevented consideration of constitutionally relevant evidence." J. Carr asserts the discrepancy within the instruction is akin to structural error that compels the vacation of his capital sentence.

We reject J. Carr's characterization of the error and hold that the clearly erroneous standard applies but is unmet. The jury used Verdict Form (1) on all counts, meaning it unanimously determined beyond reasonable doubt that aggravating circumstances existed and outweighed mitigating circumstances. On this record, we are not firmly convinced the error in Instruction No. 10 played any role in the jury's sentencing determination— much less that it "would have reached a different verdict had the instruction error not occurred." 305 Kan. at 302.

### M. P14—Defendant's Age at the Time of the Capital Crime

The district court did not instruct the jury to find R. Carr and J. Carr were at least 18 years old at the time of the murders. This was error. See *State v. Cheever*, 295 Kan. 229, 265, 284 P.3d 1007 (2012) (*Cheever I*) (fact defendant was at least 18 years old at time of capital crime necessary to subject defendant to death penalty, within scope of Sixth Amendment protection), *vacated and remanded* 571 U.S. 87, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013). Such error is subject to harmless error analysis. See *Cheever II*, 306 Kan. at 796. "When a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *State v. Reyna*, 290 Kan. 666, Syl. ¶ 10, 234 P.3d 761 (2010).

The undisputed evidence at trial established that R. Carr was 23 years old when the capital crimes occurred. A Wichita police officer, R. Carr's family members, and his expert witnesses provided testimony from which his age at the time of the crimes could be determined. Likewise, testimony concerning J. Carr from his mother and sister, as well as an expert witness, established he was over the age of 18 when the crime occurred.

90

The omitted element was uncontested and supported by overwhelming evidence. We conclude beyond a reasonable doubt the jury verdict would have been the same absent the error. See *Cheever II*, 306 Kan. at 796 ("Because the record did not contain evidence that could rationally lead a jury to find that Cheever was under the age of 18 at the time of the offense, any error in failing to have the jury find his age was harmless.").

### N.   P15—The Requested No-Adverse-Inference Instruction

During the penalty-phase instructions conference, R. Carr's counsel orally requested PIK Crim. 3d 52.13. It provides:  "A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference of guilt from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict." Counsel argued this instruction applied in the penalty phase because R. Carr did not testify. J. Carr's counsel objected to this instruction. The district court did not give the instruction.

Any error arising from that decision was invited by J. Carr. See *State v. Sasser*, 305 Kan. 1231, 1235, 391 P.3d 698 (2017) (defendant cannot complain on appeal about a claimed error that was invited). Therefore, this issue applies only in R. Carr's separate appeal.

In its earlier decision, our court acknowledged the United States Supreme Court has held that a rule requiring a no-adverse-inference instruction on request is not clearly established by its precedent. See *White v. Woodall,* 572 U.S. 415, 420-21, 134 S. Ct. 1697, 188 L. Ed. 2d 698 (2014) (state court's refusal to give no-adverse-inference instruction did not warrant federal habeas relief under Antiterrorism and Effective Death Penalty Act of 1996; Act requires showing of unreasonable application of Supreme Court

precedent; discussing earlier cases holding court may not draw adverse inference from defendant's silence when determining facts about crime that bear on severity of sentence). But we also recognized "[t]he giving of such an instruction, if requested in a penalty phase, has been required in at least three of our sister jurisdictions and has been described as the wisest course in a fourth." *R. Carr*, 300 Kan. at 312 (citing *State v. Storey*, 986 S.W.2d 462, 463-64 [Mo.1999] [en banc]; *State v. Munn*, 56 S.W.3d 486, 501-02 [Tenn. 2001]; *Burns v. State*, 699 So. 2d 646, 651 [Fla. 1997]; *State v. Arther*, 290 S.C. 291, 298, 350 S.E.2d 187 [1986]). But see *White v. Commonwealth*, 544 S.W.3d 125, 146-47 (Ky. 2017) (holding no error when prosecutor argued during penalty phase proceedings that jury "'never heard one word or witnessed one action of any remorse from the defendant'" because argument germane to sentencing and, in court's view, *Woodall* Court held instruction not required during penalty phase).

Our court did not reach the merits of this challenge because it was unlikely to arise on the anticipated remand. Now, the merits are squarely before us. The issue is subject to the traditional legal standard applied to preserved instructional issues, as set out in *Plummer*, 295 Kan. 156, Syl. ¶ 1 (appellate review of instructional issues first considers reviewability; next determines de novo whether instruction legally appropriate; then whether instruction supported by evidence viewed in light most favorable to defendant or requesting party; and, finally, whether any error was harmless).

Whether the Fifth Amendment to the United States Constitution compels a district court to provide a requested no-adverse-inference instruction during the penalty phase of a capital trial remains an open question that the United States Supreme Court has yet to resolve. And persuasive authority from other state and federal courts remains divided. Regardless, we need not answer this open question to resolve R. Carr's challenge because the instruction he proffered was not legally appropriate. Thus, the district court's failure to give it was not error.

R. Carr's requested instruction would have informed the jury, "You must not draw any inference of *guilt* from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict." (Emphasis added.) Although an appropriate guilt phase instruction, this language is inappropriate in the penalty phase. A defendant's guilt during the sentencing phase of a capital trial has already been established, mooting any inference—positive or negative—a juror might make about the defendant's silence during the penalty phase. In essence, such an instruction would be an oblique and confusing invocation of the notion of residual doubt.

Even those courts that have found error in the failure to give a sentencing phase no-adverse-inference instruction have endorsed a modified guilt phase instruction that removes any mention of inferences of guilt. See *Storey*, 986 S.W.2d at 463 (requested instruction: "'Under the law, a defendant has the right not to testify. No presumption may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify.'"); *Burns*, 699 So. 2d at 651 (requested instruction: "'A defendant in a criminal case has a constitutional right not to testify at any stage of the proceedings. You must not draw any inference from the fact that a defendant does not testify.'").

Having concluded that R. Carr's requested instruction was not legally appropriate, we need not address harmlessness. But we note that the absence of a no-adverse-inference instruction in any form would have been harmless error, if it was error at all.

Were we to apply the *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), harmless error standard to the facts before us, we are convinced there is no reasonable possibility the omitted instruction affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. Based on the amount and quality of guilt-phase evidence, which the

93

State relied on to support aggravating circumstances during the penalty phase, there is no reasonable possibility jurors made adverse inferences from R. Carr's silence which then contributed to the jury's finding that the aggravating circumstances were proved beyond a reasonable doubt.

Nor does the record, viewed in its entirety, lend any support to the conclusion that the jury made inferences from R. Carr's silence that adversely impacted its consideration of the mitigation evidence. During the penalty phase, both defendants were allowed to present a complete presentation of their mitigation theories. Defendants offered evidence of trauma they experienced during their childhoods, head injuries, suicide attempts, and other traumatic events in their lives. Jurors were properly instructed on the definition of mitigating circumstances and informed they could consider sympathy for a defendant and that the appropriateness of exercising mercy can itself be a mitigating factor. The district court clarified that each juror could consider as a mitigating circumstance any factor he or she found to be a basis for imposing a sentence less than death. The instructions also made clear jurors need not be unanimous as to which factors each deems to be mitigating in arriving at his or her sentencing decision. See *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011) ("We generally presume jurors follow the instructions given them in the district court."). Given this record, any claim that the jury might have drawn improper, adverse inferences from R. Carr's decision not to testify is, at best, purely speculative.

For these reasons, we hold the district court did not err in declining the instruction R. Carr proffered, and even if that decision could be construed as error, it was harmless.

O. *P16—Capital Punishment for Aider and Abettor Under K.S.A. 21-3205*

For the reasons stated in the court's previous decision, we do not reach the merits of this claim. *R. Carr*, 300 Kan. at 257, 313.

94

*P. P17—Capital Punishment for Aider and Abettor Under Section 9*

For the reasons stated in the court's previous decision, we do not reach the merits of this claim. 300 Kan. at 257, 313-14.

*Q. P18—Prosecutorial Error*

In their original appellate briefs, R. Carr and J. Carr alleged numerous instances of prosecutorial error and argued them under the framework established in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), *overruled by Sherman*, 305 Kan. 88 (2016). Since then, that framework was refashioned in *Sherman.* 305 Kan. at 107. In *Kleypas II*, this court first applied *Sherman* to a capital penalty-phase trial. *Kleypas II*, 305 Kan. at 316-24. But, because the parties in *Kleypas II* briefed the issue under *Tosh* and oral argument occurred before our *Sherman* decision, we applied both frameworks to the prosecutorial error claims. Here, the parties addressed *Sherman* in their supplemental briefs and at oral argument. Consequently, we apply only the *Sherman* analysis.

*Sherman* dictates a two-step process. Under the first step, we consider whether prosecutorial error occurred by determining "whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *Sherman*, 305 Kan. at 109; see *Kleypas II*, 305 Kan. at 316. If error is found, we advance to the second step and determine whether the error prejudiced the defendant's due process right to a fair trial. *Kleypas II*, 305 Kan. at 316; *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-7.

95

In evaluating prejudice, we apply the constitutional harmlessness test in *Chapman*, 386 U.S. at 24. Although we continue to acknowledge the K.S.A. 2020 Supp. 60-261 statutory harmlessness test also applies, when analyzing both constitutional and nonconstitutional error we need only address the more demanding federal constitutional error standard. See *Sherman*, 305 Kan. 88, Syl. ¶ 9. Under that standard, prosecutorial error is harmless if the State demonstrates beyond a reasonable doubt the error complained of did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error contributed to the verdict. 305 Kan. 88, Syl. ¶ 8.

We are also mindful of the United State Supreme Court's discussion of the "subtle difference" in the way harmlessness of prosecutorial error should be evaluated in death penalty cases. The overwhelming nature of evidence is to be considered, but its impact is limited. To the extent there was constitutional error, the question is not what effect the error might generally be expected to have upon a reasonable jury but what effect it had upon the actual verdict in the case at hand.

> "'The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error.' [*Sullivan v. Louisiana*,] 508 U.S. [275,] 279 [(1993)]." *Kleypas II*, 305 Kan. at 274.

Consistent with how we have described the specific penalty phase *Chapman* inquiry elsewhere in this decision, prosecutorial error in the penalty phase of a capital trial is harmless when there is no reasonable possibility the error affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Kleypas II*, 305 Kan. at 316. And if more than one prosecutorial error occurred, we consider the net prejudicial effect of those errors using the same *Chapman* inquiry applied to the individual errors.

96

Both R. Carr and J. Carr quote extensively from the record and categorize their challenges, sometimes placing a prosecutor's statement in more than one category. Many, but not all, of the categories overlap. In addition, J. Carr challenges the district court's failure to grant his request for a mistrial after one alleged prosecutorial error. He bases a constitutional due process complaint on another.

We have reordered and grouped these error claims for clarity. We isolate those applying only to J. Carr and address them in our separate decision in his case filed this day. The remaining claims apply to both defendants, and we consider them potential errors in both appeals regardless of who originally raised them. See K.S.A. 2020 Supp. 21-6619(b). Although we do not repeat every quote or allegation raised, we have thoroughly reviewed each.

### 1. *Arguments and Witness Examinations Addressing Mitigating Circumstances*

Both defendants allege the State misstated the law on mitigation and discouraged individualized sentencing determinations. This was accomplished, they say, by prosecutorial arguments and conduct that deterred the jury from considering mitigating evidence and suggested the defendants did not deserve mercy. They also allege the State improperly denigrated and ridiculed their mitigating evidence. Defendants further challenge a prosecutor's statement that, in their view, suggested impeachment of Preston and undermined all mitigation evidence. They also contend the prosecutor expressed personal opinions regarding the credibility of defense mitigation experts. And, finally, they argue the prosecutor improperly denigrated the concept of mercy.

*a. The Prosecutors Did Not Discourage Consideration of Mitigating Evidence or Suggest Defendants Did Not Deserve Mitigation*

In *Lockett* the United States Supreme Court held that the Eighth Amendment guarantees a capital defendant a right to an individualized sentencing determination, meaning the sentencer may not be precluded "from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604. It does not matter "'whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute,' by a trial court's evidentiary ruling, by jury instructions, or by prosecutorial argument." *Cheever I*, 295 Kan. at 269 (quoting *Mills v. Maryland*, 486 U.S. 367, 375, 108 S. Ct. 1860, 100 L. Ed. 2d 384 [1988]); see also *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007) (recognizing prosecutorial argument that prohibits a jury from considering relevant mitigating evidence can violate the Eighth Amendment).

Then, in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), the United States Supreme Court vacated a death sentence when the district judge refused to consider certain evidence in mitigation because, in the judge's view, it did not excuse the crime. The United States Supreme Court found the exclusion impermissible:

> "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 113-15.

*Eddings* established that a capital sentencing jury must consider all relevant mitigating evidence, even if the evidence did not suggest "an absence of responsibility for the crime of murder." 455 U.S. at 116; see *Skipper v. South Carolina*, 476 U.S. 1, 4-5, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986) (vacating death sentence because trial court refused to allow defendant to present testimony regarding his conduct while in jail awaiting trial, from which jury could have drawn favorable inferences about his character and probable future conduct if sentenced to life in prison; "[a]lthough it is true that any such inferences would not relate specifically to petitioner's culpability for the crime he committed, . . . there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death'").

*Kleypas I* endorsed these principles from *Lockett*, *Eddings*, and *Skipper*. It explained these decisions "make it clear that the sentencer must be allowed to consider all relevant mitigating evidence and that such evidence need not excuse or justify the crime or in fact relate to the defendant's culpability as long as it serves as a basis for a sentence less than death." *Kleypas I*, 272 Kan. at 1102. At the same time, the State has a competing interest in challenging whether a circumstance is mitigating at all and to contest the weight the jury should give to a mitigating circumstance. 272 Kan. at 1103 ("[I]t is proper for a prosecutor to argue that certain circumstances not be considered as mitigating circumstances."); cf. *Tuilaepa*, 512 U.S. at 976-77 (discussing "dilemma" posed to sentencer when considering defendant's age at time of crime; noting competing arguments from prosecution and defense "bring perspective to a problem, and thus serve to promote a more reasoned decision").

To strike an appropriate balance, *Kleypas I* identified the following standard for challenging mitigation evidence consistent with the Eighth Amendment:

> "[I]t is improper for a prosecutor to argue that certain circumstances should not be considered as mitigating circumstances because they do not excuse or justify the crime.

99

'Mitigating circumstances are those which in fairness may be considered as extenuating or reducing the degree of moral culpability or blame or which justify a sentence of less than death, even though they do not justify or excuse the offense.' A prosecutor who argues that mitigating circumstances must excuse or justify the crime improperly states the law. [Citation omitted.]" 272 Kan. at 1103.

In *Cheever I*, this court further clarified that a *Lockett*-based constitutional violation occurs only when the State ""'cut[s] off in an absolute manner"' the sentencer's consideration of mitigating evidence." 295 Kan. at 270 (citing *Kleypas I*, 272 Kan. at 1074).

With this framework in mind, we turn to the alleged errors. During closing argument, after a prosecutor referenced the district court's aggravating circumstances instruction, she began her mitigation discussion:

"And the question is what mitigates punishment? Something for the jury to decide. What is it that should lessen or alleviate or diminish or decrease the responsibility of Jonathan and Reginald Carr for the punishment that fits this crime that's set forth by the laws of the State of Kansas. This isn't something that was made up yesterday. This is the law. And when you think about mitigation, think about mitigation of the execution of [H.M.] and [A.S.] and [B.H.] and [J.B.]. Think about no PowerPoints in that field. There were no psychologists debating the issues. There weren't any brain scans that were done before they were executed. Judge Clark wasn't there. No prosecutors. No defense. There wasn't any witness chair that was set up in the snow where family members of [B.H.] and [J.B.], and [A.S.] and [H.M.] could come and say, [']Show mercy to my child. She has led a good and exemplary life.['] There was no person from [J.B.'s] family to say, [']Please, spare this punishment, show mercy.['] There wasn't any witness called for [A.S.]. There wasn't any witness called for [B.H.] or [A.S.] or [H.M.]. There was no consideration of mitigation for the execution, their punishment that occurred on that field. And there wasn't any play-by-play analysis. And the only reason that we know what we know today is because there was one survivor, certainly not by plan or design of Reginald Carr or Jonathan Carr."

100

R. Carr asserts the prosecutor was arguing he had no right to offer mitigating evidence and, rather than consider it, the jury should be angry and insulted. J. Carr argues this passage "implore[d] the jury not to consider any mitigating circumstances relating to the character and record of the defendants because the victims did not have a chance to have their characters and records considered in mitigation." The State contends this was a proper appeal for a just sentence.

Reasonable minds could probably differ on whether this rises to prosecutorial error. On the one hand, there is a theme implicit in this argument that the jury should not even consider mitigators because the defendants denied that same opportunity to their victims. So construed, that argument would be improper.

But this court has acknowledged that the State has an interest in challenging the defendant's mitigation case. *Kleypas I*, 272 Kan. at 1103. Here, in the quoted passage's first two sentences, the prosecutor properly informed the jury it ultimately would decide what, if any, circumstance, qualified as valid mitigation. The latter portion of the argument questions why the jury should show mercy or decide a circumstance is mitigating (particularly in light of the weight of the State's aggravating circumstances) when the defendants did not show mercy. As discussed below, this court has held a prosecutor may properly argue that a jury should show a perpetrator the same degree of mercy showed to a victim. The prosecutor's argument here makes a similar appeal.

Furthermore, the State cites other jurisdictions in which similar statements were considered legitimate and proper appeals to the jury for justice. For example, in *Gentry v. State*, 689 So. 2d 894 (Ala. Crim. App. 1994), *rev'd on other grounds* 689 So. 2d 916 (Ala. 1996), the court held that similar themes constituted legitimate argument:

"The appellant contends that the following comments by the prosecutor in closing argument constituted an improper appeal to the jury to have sympathy for the victim: '[n]obody went out and empaneled a jury for Kim Hill'; '[y]ou can look at Ward Gentry, but you cannot look at Kim Hill'; 'nobody went out and got a judge for Kim'; 'nobody went out and got two lawyers for Kim'; and '[h]e was her judge, and her jury, and her executioner.' He argues that these comments 'impermissibly influenced the jury to disregard [its] legal duties and render a guilty verdict because of [its] sympathy for the deceased.' We do not agree. We view the comments as a call for justice, not sympathy, and, thus conclude that they are within the latitude allowed prosecutors in their exhortation to the jury to discharge its duties. The comment that Gentry was 'her judge, and her jury, and her executioner' was the prosecutor's impression and opinion derived from the evidence in the case, which he could legitimately argue. [Citations omitted.]" 689 So. 2d at 906.

See also *Newton v. State*, 78 So. 3d 458, 478-79 (Ala. Crim. App. 2009) (prosecutor's argument that victim never given opportunity to make case for life is an appropriate appeal for justice).

These decisions are consistent with *Scott*, where we held that a prosecutor may properly argue a defendant is undeserving of mercy, so long as there is no contention the jury's exercise of mercy is prohibited. 286 Kan. at 116. We follow this authority here and hold this passage from the prosecution's closing was not error.

R. Carr also argues the State erroneously encouraged the jury to reject his mitigators because they did not excuse or justify the crimes. He quotes several pages of the penalty-phase transcript in which the prosecution attempted to discredit mitigation witnesses on cross-examination by illustrating that the social conditions they testified to—such as a poor home environment, familial history of mental illness, diminished brain activity, and damaging social history—did not cause either defendant to commit the crimes. R. Carr admits there were no objections to the prosecutor's questions but asserts

they set the stage for the prosecutor's later, improper argument that other people with backgrounds similar to the defendants did not commit capital murder, so the jury should reject these conditions and events as mitigating factors.

Ordinarily, we require objections to a prosecutor's questions to consider whether they constitute error on appeal. See *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). But that preservation rule is relaxed in death penalty cases. See K.S.A. 2020 Supp. 21-6619(b) (court shall consider any errors asserted in review and appeal).

R. Carr takes issue with the prosecutor's questioning of several mitigation witnesses. He highlights the cross-examination of his mother, Janice Harding, when the prosecutor asked whether any other family members who grew up with defendants in a similar environment committed murder. Then, during Preston's voir dire, the prosecutor challenged his qualification to give an opinion on predictive criminal behavior, suggesting PET scan interpretation was not a reliable or accepted methodology in the scientific community to "predict or explain criminal behavior." And, during Preston's cross-examination, the prosecutor questioned whether PET scans could predict or explain why a person commits a crime. The prosecutor also attempted to establish through another mitigation expert, Dr. Thomas Reidy, that Reidy could not reliably predict criminal behavior through his mode of analysis. And, as with Harding, the prosecutor inquired whether similarly situated individuals had committed murder. R. Carr contends this questioning suggested to the jury it could not consider the testimony of these mitigation witnesses because it did not excuse or justify the crime.

He also challenges the following passages from the State's closing argument, which, he believes, were founded on this questioning:

- "But you can't continue to blame your parents for things that go wrong in your life. Around the population of the United States, people get divorced every single day.

We try very hard to feed our kids vegetables because they are good for them. I am sure a lot of kids are holding their nose and eating broccoli but they don't turn out to be individuals who commit capital murder. Children are disciplined. All right, some people might not agree with every form of discipline. In fact, you heard Dr. Phyllis Harding say, [']You know, at my age when I grew up, there was a certain discipline that was accepted and they carry forward that kind of discipline because that's what their parents did.[']"

- "They beg one of you for sympathy. They want to get that sympathy by suggesting that their excuse is to deflect the responsibility. They want to beg you for sympathy because of that rough childhood. Because of some abuses, which are primarily based on the evidence, the requirement to eat noodles with Miracle Whip, vegetables, pasta salad. And to be spanked with a belt while their legs are held down. Is that an insult to children who have been placed in bathtubs until their whole bodies have been burned? Is that an insult to the children who have been beaten and bruised on their whole body by their parents? Is that an insult to children who wished they had a roof over their head? Is that an insult to children who feel like they are starving in all parts of the world? To suggest that gives them a license to kill?"

J. Carr also points to several remarks made in closing that he characterizes as improper for similar reasons. He asserts prosecutors not only told the jury not to consider any mitigating circumstances but also to disregard defendants' mitigation evidence as truly mitigating because it could not excuse or justify the crimes or was not causally related to them. J. Carr places the following comments in this category:

- "And I certainly ask you to reflect on the abilities of these two gentlemen here. These two individuals, their acts. These were kids who drug their laundry here in Court. Put their mother on the witness stand, criticized her. Gave her despicable commentary. . . . But you can't continue to blame your parents for things that go wrong in your life. Around the population [of the] United States, people get divorced every single day. We try very hard to feed our kids vegetables because they are good

104

for them. I am sure a lot of kids are holding their nose and eating broccoli but they don't turn out to be individuals who commit capital murder."

- "[I]t wasn't the system that failed and it wasn't Jani[ce] Harding that failed. It was the defendants who failed to abide by the law and it was by their choice. We hear all the time the comment that says guns don't kill people. People kill people. That's right. And in this case they chose the Lorcin .380 as the messenger and their message was loud and clear."

- "They want to blame you that perhaps if you follow the law that somehow you are doing something wrong. Passing blame to Mommas and Daddies, society, and taking none upon themselves."

- "If [defense counsel] had been at Birchwood, would he be pleased to represent Jonathan Carr? Sympathetic to a man who tried to kill himself three years before this, before these acts. Three years before, drank antifreeze like his dogs that somehow got it. Suggests that this isn't about sympathy. But it is because if you look—if you look at mitigation, you have to look at what mitigation is defined as, reducing culpability. Because someone attempted suicide by drinking antifreeze three years before, three years later."

And, finally, J. Carr claims it was improper for the prosecution to say: "[J. Carr's] attempted suicide[ ] that he is seeking your sympathy about, did not stop him from making that choice that day" and "[a]nything that would reduce culpability has not been presented here." J. Carr describes these statements as "squarely" arguing that mitigating evidence is limited to evidence legally justifying or excusing the defendant's participation in the crimes committed.

Our handling of similar claims in *Kleypas I*, *Scott*, and *Cheever I* informs our analysis of whether the State went too far in tying worthy mitigation to excuse or justification of the defendants' crimes.

105

In *Kleypas I*, the prosecutor crossed the line by arguing mitigating circumstances must excuse or justify the crime:

"During closing argument, the prosecutor made several references to the fact that Kleypas' claimed mitigating circumstances did not excuse or justify the crime. The prosecutor first stated that although the defendant claimed brain damage as a mitigator, the defendant's expert 'couldn't say' that the brain damage caused either C.W.'s murder or the previous murder of Bessie Lawrence. Defense counsel objected but was overruled. Next, the prosecutor noted Kleypas' claim of alcohol use as a mitigator and stated: 'A pint bottle of Canadian Mist did not cause this murder.' Defense counsel did not object to this statement. Regarding the claimed mitigator that Kleypas did well in prison, the prosecutor stated: 'Does the fact that he did well in prison make the murder of [the victim] less severe?' No objection was lodged to this statement. The prosecutor then referenced Kleypas' claim that his paraphilia was a mitigator, stating: 'The defendant's paraphilia did not kill [the victim].' There was no objection to this comment. The prosecutor went on to ask the jury that even if Kleypas had schizophrenia which he claimed to be a mitigating circumstance, 'Does that lessen what he did?' Defense counsel did not object to this statement.

"These statements by the prosecutor were clearly improper and reflect a complete lack of understanding of the concept of mitigating circumstances. By these statements, the prosecutor argued to the jury that mitigating evidence should not be considered unless it excused or justified the crime; this was an erroneous standard of law." *Kleypas I*, 272 Kan. at 1103.

In *Scott*, the defendant lodged a similar challenge, based on the following argument:

"'Several of the mitigators cite his mental illness and brain damage. Interestingly enough, remember something that Dr. Cunningham said. His congenital brain damage is consistent with other murderers. He tested like a murderer. Is it surprising then that he

106

has these problems? Could anyone who commits two premeditated murders for the purpose of obtaining things be mentally normal? Does depression or reactive attachment disorder, any of those things or their treatability reduce Scott's moral culpability for this crime?

"'*His blame, his mental state did not prevent him from committing these two premeditated murders, did not keep him from placing those kids in danger, did not keep him from lying to the Sheriff about it.*

"'Besides, remember Dr. Cunningham. He described Gavin as a poor historian. Remember how well this poor historian described the layout of the Brittain residence for Holtz and Oliver, how he drew it out in excruciating detail. This is a man who is in command of all of his senses on September 13, 1996. He was in the Brittain home long enough to commit the layout to memory. He may have mental problems, but they weigh little compared to the weight of the aggravating circumstances.'" (Emphasis added.) *Scott*, 286 Kan. at 117.

While acknowledging some statements suggested the defendant's evidence was not mitigating because it did not excuse or justify the crimes, we held this argument was proper when viewed in its totality:

"In the case at hand, however, the prosecutor did not argue Scott's mental illness should not be considered because it did not excuse or justify the crime. Read in context, the argument was that Scott's mental illness was not as severe as he made it out to be, because it did not 'prevent' him from committing the crimes. Granted, there is some suggestion in the statement that Scott's mental illness did not excuse his culpability. However, taken in context, these statements did not contravene the 'considerable latitude' prosecutors are allowed in commenting on the evidence." 286 Kan. at 118 (citing *Kleypas I*, 272 Kan. at 1084).

Finally, in *Cheever I*, this court examined two penalty-phase closing argument statements. The first addressed the defendant's claim that drug use in the home mitigated his culpability:

> "'Now, perhaps there was marijuana use at the home. We don't contend there wasn't. But what it boils down to, ladies and gentlemen, is that a mitigator, is that a mitigator which is sufficient to outweigh the aggravating factors we put before you? Marijuana use in the home, that's a bad thing. No question about it. *But does that, as* [defense counsel] *say*[*s*], *excuse what he did*? Is that—does that outweigh the aggravating factors? *We contend it does not and it cannot.*'" *Cheever I*, 295 Kan. at 271.

The prosecutor then addressed the defendant's methamphetamine addiction as a mitigating circumstance:

> "'The defendant tells us he was addicted to methamphetamine, and that's the reason, that's a mitigator. Well, tell that to Robert Sanders 'cause he wasn't on methamphetamine that night. Now, you've already decided methamphetamine did not play a role in the capital murder of Matt Samuels. And you should reject it now, too.'" 295 Kan. at 271.

In *Cheever I*, this court explained that "[t]he difference between the outcomes in *Kleypas* [*I*] and *Scott* lies in the distinction recognized in *Eddings*:  comments that cut off in an absolute manner the jury's consideration of certain mitigating evidence run afoul of *Lockett*, but comments that the defendant's mitigating evidence is entitled to little or no weight based on the circumstances of the case are constitutionally permissible." 295 Kan. at 271 (citing *Kleypas I*, 272 Kan. at 1074). Applying this *Eddings* distinction to the challenged arguments in *Cheever I*, this court held the prosecutor's argument about drug use in the home was proper:

108

"Addressing the 'excuse' comment first, we find the comment, considered in context, was permissible. As with the comments in *Scott*, there is some suggestion in the remark that marijuana use in the home did not excuse Cheever's culpability. That remark, however, was followed with: '[D]oes that outweigh the aggravating factors? We contend it does not and it cannot.' Viewed in context, the prosecutor's comments did not tell the jury that to be considered in mitigation, evidence of the marijuana use in the home had to excuse or justify the crime as a matter of law. Instead, the remarks were directed at the weight the jury should give that evidence in deciding whether the mitigating circumstances outweigh the aggravating factors. [Citation omitted.]" *Cheever I*, 295 Kan. at 272.

We also held the second statement addressing methamphetamine addiction as a mitigator was appropriate: "Viewed in context, the comment was part of the [prosecutor's] argument addressing evidence concerning a specific mitigating circumstance: that Cheever was under the influence of methamphetamine at the time of crime." 295 Kan. at 272.

When we compare these holdings to the facts here, the prosecutor's challenged statements are more akin to those in *Scott* and *Cheever I* than *Kleypas I*. As in *Scott* and *Cheever I*, the *Eddings* distinction is determinative. The prosecutor never argued or implied the jury could not consider the mitigation evidence unless it excused or justified the murders. And while the prosecutor questioned whether that mitigation justified the defendants' conduct, this was consistently argued in the context of whether the circumstance reduced the defendants' moral culpability or blame in a way that supported a sentence less than death.

For example, the prosecutor's rhetorical inquiry whether R. Carr's and J. Carr's upbringing gave them "a license to kill" occurred during a broader argument questioning whether the defendants' evidence lessened their moral culpability in a way that justified a sentence other than death. The prosecutor explained:

109

"Mitigating circumstances under the law as you remember are those that reduce the degree of moral culpability. How has anything that they have said done that? Under the law, the Legislature said these things may be considered. That they have no significant history of prior criminal activity. Is that what you heard? That this crime was committed when the defendants were under the influence of extreme mental or emotional disturbance. The foundation of all, if any, this brain trauma. The foundation of all their experts, all the evidence that you heard . . . was based on a manipulated picture, an altered picture. A picture of a PET scan that does not accurately reflect, does not accurately reflect their brains and this picture does not accurately reflect who they are.

. . . .

"You heard the evidence regarding what was reviewed. You heard in this penalty phase much information about hearsay evidence. The bravado that was taken from each other in order to fulfill the task that allowed them to take all this property from the [victims]. Their premeditation, their intent. Did they act under the supreme duress, the stress or substantial domination of another? There's no evidence of that.

"Ask the question regarding their age. They're adult males, ages 20 and 23 when these offenses were committed. We send individuals into war at 18. Are they responsible? Are they morally culpable for their acts? In this instance, they have lived away from home. They were living away from home. They were totally emancipated. They had individuals repeatedly trying to help them, coaches, teachers, SRS workers, all this time through this rough childhood that they had, which they ignored, and made their choices to continue in the acts that they did.

"Is a term of imprisonment sufficient to defend and protect [ ] the people's safety from the defendants? There is no evidence to suggest it is. In fact, the evidence from the defense indicates that these individuals have no remorse, care not, opportunistic, remorseless. How does that defend?"

110

There is a similar theme present in all the challenged statements. Viewed in context, they reflect the prosecutor's argument that the claimed mitigating circumstances did not, in fact, lessen their moral culpability or did not do so to the extent they outweighed the aggravating circumstances, thereby warranting a sentence other than death. This argument was not error.

We also see no error in the prosecution's cross-examination questions challenging defendants' evidence. J. Carr argues that while evidence of a tumultuous childhood, parental absence, physical and sexual abuse and aberration, family history of mental illness, learning disabilities, and suicide attempts may not excuse or justify the crime, it was relevant to his moral culpability, which means it was important for the jury to consider in making an individualized sentencing decision. See *Woodson*, 428 U.S. at 304 (fundamental respect for humanity underlying Eighth Amendment requires consideration of character and record of individual offender, circumstances of particular offense as constitutionally indispensable part of process of inflicting death).

This may be true in general, but while evidence of such matters is relevant to the jury's decision, it is not mitigating as a matter of law. If a juror believes the evidence, that juror must then individually determine whether the facts proven are mitigating. Without question, it is proper for a prosecutor to argue jurors should not consider such facts to be mitigating. See *Cheever I*, 295 Kan. 229, Syl. ¶ 19 (permissible for prosecutor to argue, based on the circumstances of the case, defendant's mitigating evidence is entitled to little or no weight).

Further, defendants' arguments overlook a crucial point highlighted by the record: it was the defendants, not the prosecution, who first suggested a relationship between the crimes and the mitigation evidence by arguing a variety of medical, genetic, familial, environmental, societal, and situational circumstances correlate to violent behavior. Both

111

defendants argued during the penalty-phase proceeding that the "crime was committed while the defendant was under the influence of extreme mental or emotional disturbance" and that "[t]he defendant acted under extreme distress or under the substantial domination of another person."

Mitigation witnesses testified that numerous factors, incidents, and variables contributed to the defendants' decision to kill the Birchwood victims. For example, R. Carr's counsel argued the PET scan reviewed by Preston detected brain abnormalities and that certain brain abnormalities affect behavior. Similarly, Reidy and Cunningham testified that if certain risk factors were present, they raised the probability or likelihood of criminal behavior. And, during penalty-phase closing argument, R. Carr's counsel attempted to draw a causal connection between the evidence advanced in mitigation and the crimes:

> "But you needed to know that because something happened to these kids. Something happened to them that damaged them to cause them to act this way.
>
> "*This is what these doctors were here to tell you about. That's why Dr. Reidy was here to tell you about this. That's why Dr.* [*Mitchel*] *Woltersdorf was here to tell about that. That's why Dr. Preston came down here and did that PET scan. . . .*
>
> . . . .
>
> "We are not making excuses here. *We are telling how these kids' lives were shaped and how they came to make the decisions that resulted in this horrible crime.* The accident Reggie had when he was in West Virginia, on the bicycle, hit his head, had loss of memory, indicative of brain injury. All the fights he had that [were] too numerous to mention. Those are all important factors in the development of Reggie's brain. And if you believe what the doctors tell us, a brain even today is not completely formed. . . .
>
> . . . .

"After we have talked about all the bad things that happened in Reggie's life, I mean, you didn't see any witnesses from the State of Kansas come in here and say I grew up and I lived next to these guys, they had a wonderful home. Reginald, Sr., and Janis didn't ever get in any fights, no domestic violence, kids well cared for. You didn't see a forensic psychologist come in here and say the studies from the Department of Justice and the Surgeon General's Office and the FBI, they really apply in this particular case because those are all different. You didn't see anybody come in here and do that. *What you saw is people that really took a look at what is going on in this guy's life and try to give you some insight on how he got to the field on December 15th of the year 2000 and how he was able to perpetrate the crimes for which he has been convicted in that horrible manner.*" (Emphases added.)

Given this defense strategy, it was neither surprising nor error for the prosecution to test the extent to which the murders were acts of free will, suggesting the greatest degree of moral culpability, as opposed to acts attributable in some measure to extreme mental or emotional disturbance, brain injury, or other circumstances in defendants' upbringing. Accordingly, the prosecutors' questions and argument were within the latitude afforded the State and did not constitute error.

### b. Prosecutors Did Not Improperly Denigrate and Ridicule Mitigating Circumstances

R. Carr argues the State repeatedly denigrated and ridiculed his mitigating evidence and criticized counsel for admitting and relying on it. He points to seven statements the prosecutor made during closing.

The first comment was addressed above.

"And when you think about mitigation, think about mitigation, think about mitigation of the execution of [H.M.] and [A.S.] and [B.H.] and [J.B.]. Think about no PowerPoints in

113

that field. There were no psychologists debating the issues. There weren't any brain scans that were done before they were executed. Judge Clark wasn't there. No prosecutors. No defense. There wasn't any witness chair that was set up in the snow where family members of [B.H.] and [J.B.], and [A.S.] and [H.M.] could come and say, [']Show mercy to my child. She had led a good and exemplary life.['] There was no person from the [J.B.'s] family to say, [']Please, spare this punishment, show mercy.['] There wasn't any witness called for [A.S]. There wasn't any witness called for [B.H.] or [A.S.] or [H.M.]. There was no consideration of mitigation for the execution, their punishment that occurred on that field. And there wasn't any play-by-play analysis."

We concluded above this argument was consistent with *Scott*, in which we held a prosecutor may properly argue a defendant does not deserve mercy, so long as there is no contention the jury's exercise of mercy is prohibited. 286 Kan. at 116. Similarly, we agree the prosecutor here was within the latitude afforded the State.

The second and third comments responded to R. Carr's and J. Carr's claims that their dysfunctional home life was a mitigating circumstance and a contributing factor in their crimes.

- "And it's a tragedy, a tragedy that [their mother] tried to make them responsible by making them eat vegetables. That's a tragedy. So we have to hear about this today, to mitigate the punishment in this case. That the death penalty should not be imposed, Ladies and Gentlemen of the jury, the defendants had to eat broccoli."

- "We are not responsible or we should be given mercy and sympathy because, golly gee whillikers, look at the miserable childhood that we had."

It is obvious these passages capture sarcasm, and we have been critical of prosecutorial sarcasm in the past. See *State v. Longoria*, 301 Kan. 489, 525-26, 343 P.3d 1128 (2015) (sarcasm as rhetorical device discouraged but not disallowed). But these

114

arguments are also based on reasonable inferences that could be drawn from testimony. They fall within the wide latitude prosecutors are given to discuss the evidence.

The fourth comment alleged to be error is:

"Ladies and Gentlemen of the Jury, when you are disabled, you want to think of yourself as capable, not disabled. When you think of yourself as someone who is truly, truly emotionally disturbed, they don't want sympathy. They want to be understood for what they are trying to do. Whether it was Michael Harding who seemed to be emotionally disturbed, truly lacking the facility to make life work for him. And it is shameful to try and throw yourself in a category of individuals who are emotionally disturbed and in some way less because of this sham. And to rely on this to say excuse me, please, I have an abnormal brain and therefore, I had a lousy childhood."

Although the prosecutor was not particularly clear, it appears the intention was to draw an unflattering comparison between defendants, who wished to rely on a neurological or psychological abnormality as a mitigator, and a hypothetical disabled person who would be too proud to call attention to such a problem. Had the prosecutor more effectively communicated this idea, we would share the view this was error, not because it denigrated or ridiculed mitigation evidence but because it appears to have relied on at least one fact not in evidence, i.e., the attitudes of another disabled person. See *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2004) ("'No rule governing oral argument is more fundamental than that requiring counsel to confine remarks to matters in evidence.'"). But in this instance, lack of clarity prevents us from labeling this error.

The fifth, sixth, and seventh comments R. Carr challenges as denigrating or ridiculing his mitigation evidence were:

- "These were kids who drug their laundry here in Court. Put their mother on the witness stand, criticized her. Gave her despicable commentary. Got into her private

115

possessions. Talked about seeing naked pictures of her. Maybe they weren't meant for Reginald Carr's eyes."

- "[T]hey even stand here before you here today and of all the blame games that have been made, they want to blame you. They want to blame you that perhaps if you follow the law that somehow you are doing something wrong. Passing blame to Mommas and Daddies, society, and taking none upon themselves."

- "They beg one of you for sympathy. They want to get that sympathy by suggesting that their excuse is to deflect the responsibility. They want to beg you for sympathy because of that rough childhood. Because of some abuses, which are primarily based on the evidence, the requirement to eat noodles with Miracle Whip, vegetables, pasta salad. And to be spanked with a belt while their legs are held down. Is that an insult to children who have been placed in bathtubs until their whole bodies have been burned? Is that an insult to the children who have been beaten and bruised on their whole body by their parents? Is that an insult to children who wished they had a roof over their head? Is that an insult to children who feel like they are starving in all parts of the world? To suggest that gives them a license to kill?"

In a case with so much truly abhorrent behavior to focus upon, it is difficult to understand why the prosecutor chose to characterize as "despicable" the defendants' use of information about their mother for mitigation. Capital defendants are entitled to attempt to persuade the penalty-phase jury that something in their personal history exerted such a negative influence that they do not deserve to be put to death. This is a constitutional and statutory right. *Eddings*, 455 U.S. at 115 (sentencer may not refuse to consider relevant mitigating evidence, including turbulent family history, beatings by parent, severe emotional disturbance, as a matter of law); *Lockett*, 438 U.S. at 604; see K.S.A. 2020 Supp. 21-6617(c) (evidence in sentencing proceeding shall include matters relating to any mitigating circumstances).

116

We agree with R. Carr that seasoned prosecutors such as those who tried this case should be able to avoid expressing disgust for this common and frequently necessary defense tactic. That said, the prosecutor's one-word departure from a more clinical recitation of the evidence about potentially harmful behavior by defendants' mother does not rise to error.

Regarding the prosecutor's comments about the defendants' mitigation case attempting to shift blame for their crimes, R. Carr relies on *Urbin v. State*, 714 So. 2d 411, 422 n.14 (Fla. 1998), and *Butler v. State*, 120 Nev. 879, 898-99, 102 P.3d 71 (2004), to support his argument for reversible error.

In *Urbin*, the Florida Supreme Court observed, "The transcript reflects that the prosecutor improperly denigrated the evidence of mitigation throughout his argument and repeatedly labeled the mitigation as 'excuses,' employing the pejorative term no less than eleven times." 714 So. 2d at 422 n.14. It concluded the argument was improper, given the absence of rebutting evidence. But the court's comments were relegated to a footnote, compared to other egregious examples of improper argument that received extensive discussion. Taken together, the errors compelled the court to vacate the death sentence. 714 So. 2d at 422.

In *Butler*, the prosecutor "used many adjectives and analogies in . . . remarks that portrayed Butler's presentation of mitigating evidence and defense tactics as a dirty technique in an attempt to fool and distract the jury, implying that Butler's counsel acted unethically in his defense." 120 Nev. at 898. The Nevada Supreme Court held this approach improperly disparaged counsel. The court explained the defendant not only had a legal right to present the evidence, but his counsel had an ethical duty to present all evidence in mitigation. The court said: "[P]resentation of mitigating evidence during the penalty phase is essentially the heart of a defense," and the prosecutor committed

117

misconduct by disparaging defense counsel and defense tactics "through the use of cleverly crafted rhetoric." 120 Nev. at 898-99. When viewed in conjunction with other instructional and trial errors, the court could not conclude the prosecutorial misconduct was harmless. 120 Nev. at 900.

The State urges us to distinguish *Urbin* and *Butler*. In *Urbin*, the State notes the prosecutor used sarcastic and pejorative terms to describe the mitigating circumstances evidence continually and demeaned it without ever rebutting it. Here, the State argues, the prosecution rarely employed cynicism or insult and vigorously challenged the defendants' evidence. *Butler* is distinguishable in the State's view because the prosecutor in this case did not repeatedly challenge opposing counsel's ethics or integrity.

The State also relies on decisions which held a prosecutor committed no error by describing mitigation as merely an excuse or blame game. For example, in *People v. Rundle*, 43 Cal. 4th 76, 195, 180 P.3d 224 (2008), *disapproved of on other grounds by People v. Doolin*, 45 Cal. 4th 390, 198 P.3d 11 (2009), the defendant argued the prosecutor engaged in misconduct by claiming "'the entire defense in this case is to blame others,' by calling the [mitigation defense theory] 'penalty phase madness,' and by referring to defendant as a 'snitch' in discussing his assistance to the authorities at the jail." The court rejected the prosecutorial error claim, saying there was "nothing deceptive or reprehensible about these comments, and they did not, individually or cumulatively, improperly denigrate defendant's evidence in mitigation." 43 Cal. 4th at 195; see also *People v. Cole*, 172 Ill. 2d 85, 112, 665 N.E.2d 1275 (1996) (prosecutor's brief references to mitigation as "excuse" could not reasonably have prevented jury from considering evidence).

We are persuaded that the infrequency of the "passing blame" comments, the tone of most of the rhetoric, and the existence of evidence rebutting the mitigation prevent us from characterizing the prosecutor's arguments as error. The fact these comments did not cast aspersions on defense counsel's ethics or integrity weighs heavily in our decision.

But we caution that the prosecutor's comparison of the defendants' evidence to cases of extreme child abuse, if not ameliorated by more temperate, evidence-based context, at a minimum would have grazed the error line by needlessly injecting inflammatory material into the argument. See *Sherman*, 305 Kan. at 117 (argument may have scuffed outside edge of wide latitude afforded prosecutors); *State v. Crawford*, 300 Kan. 740, 755, 334 P.3d 311 (2014) (differences in wording can move conclusion that prosecutor scuffed line of misconduct to conclusion that prosecutor crossed line); *State v. Stevenson*, 297 Kan. 49, 55, 298 P.3d 303 (2013) (prosecutor's comments scuffed misconduct line).

### c. The State's Argument that Preston's Impeachment Undermined All Mitigation Was Properly Supported by the Record

J. Carr argues the prosecutor implied all mitigation evidence should be ignored based on the State's impeachment of defense expert Preston. During closing, the prosecutor argued the PET scans and Preston's testimony about them were "hocus pocus" and "manipulated." And, once aware of these facts, the jury should see the "foundation of this sympathy and abuse excuse and blame" came "crashing down."

Whether the phrase "hocus pocus" was improper is addressed in the next section of our prosecutorial error analysis. But the underlying argument, i.e., the State's impeachment of Preston undermined the whole mitigation case, was properly founded on reasonable inferences from testimony admitted into evidence. Several defense mitigation

experts tied or reconciled their opinions to Preston's findings. And the State's rebuttal expert, Pay, opined that the PET scans showed both R. Carr and J. Carr had sound brain function and criticized the methods Preston used to obtain the images. This gave prosecutors an evidentiary basis to argue that Pay's testimony undercut not only Preston's testimony but that of the other defense witnesses. We hold there is no error on this basis.

> ### d. Prosecutors Did Not Commit Reversible Error by Expressing Personal Opinion About the Credibility of Mitigation Experts

As discussed above, Preston concluded the defendants' PET scans evidenced abnormal, marked deficits in metabolism in the regions of the hippocampus and amygdala. Pay reviewed those PET scans and testified the images used an atypical color scale. He also said the scans did not capture the brain's anatomical regions relevant to Preston's opinion. Pay concluded the scans evidenced normal metabolic functioning, and Preston's contrary conclusions were based on the manipulated color scale and improper anatomical alignment. During closing, the prosecutor referenced the competing expert testimony:

> "Yeah, these colored picture[s] are pretty slick. They are. They are really slick. Better than those old X-ray kinds of things, you know, just black and white. But, you know, it all depends on who is looking and it all depends on what they are doing with these documents, these digital pictures. There's no doubt these two guys had PET scans. And they presented them to you as abnormal. The foundation of their lack of culpability. We are not responsible or we should be given mercy and sympathy because, golly gee whillikers, look at the miserable childhood that we had. And look at our brain because our brains support that I got hit with a BB, or I got hit with the trash can and it may still be there, oh, look at it.

"But when the truth comes out and the doctors come and say, well, you know, these aren't right. In fact the statement was it was wrong to show you these. Because these show nothing. The hocus pocus of all of this was not right. It was manipulated. The color background. The slice where it came from. The coloration from one to the other."

R. Carr and J. Carr argue these statements—particularly the words "manipulated," "slick," "hocus pocus," "doctors," and "truth"—constituted the prosecutor's improper personal opinion on the credibility of Preston and Pay.

Generally, a prosecutor is precluded from offering personal opinions about witness credibility. *State v. Pabst*, 268 Kan. 501, 510, 996 P.2d 321 (2000) ("The point of not allowing a prosecutor to comment on the credibility of a witness *is that expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony, not commentary on the evidence of the case*."). We have applied the same rule in capital sentencing proceedings. *Kleypas I*, 272 Kan. at 1105 ("A prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.").

The prosecutor's use of "manipulated" in reference to the scans was consistent with Pay's testimony and fell within the wide latitude prosecutors have in discussing the evidence. Similarly, the use of "slick" to describe the images and the phrase "hocus pocus" to characterize Preston's methodology do not constitute error. See *State v. Pribble*, 304 Kan. 824, 835-36, 375 P.3d 966 (2016) (describing defense arguments as "red herrings," involving "rabbit holes" permissible); *State v. Albright*, 283 Kan. 418, 429-30, 153 P.3d 497 (2007) (colorful analogies, including "smoke and mirrors," permissible when discussing evidence, defense theory of case); *State v. Duke*, 256 Kan. 703, 719-20, 887 P.2d 110 (1994) (prosecutor "may use picturesque language as long as he or she introduces no facts not disclosed by the evidence"). But see *Scott*, 286 Kan. at 117 (prosecutor improperly expressed opinion when characterizing defendant's purported

remorse as "phantom"). The prosecutor's picturesque rhetoric was undergirded by evidentiary support, which kept the comment within permissible bounds.

We also hold that the use of "doctors" was not error. J. Carr highlights it but does not explain why it was objectionable. Granted, each person who reviewed the scans with Pay and to whom the prosecutor was referring may not have been a doctor, but the gist was that Pay—a doctor—and his colleagues reviewed the scans. That possible slight overgeneralization does not amount to error.

But the prosecutor's reference to the "truth" in stating "when the truth comes out" constituted an impermissible expression of opinion that attempted to bolster Pay's credibility. This was error. *Kleypas I*, 272 Kan. at 1105. But this isolated instance was not egregious and appears to be just a clumsy effort to turn a phrase rather than a definitive statement about what the "truth" of the case was. We are confident this was harmless standing alone. *Kleypas II*, 305 Kan. at 316; *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-8. In the words of the United States Supreme Court in *Sullivan*, the death penalty verdict "actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993).

> ### e. Prosecutors Did Not Improperly Denigrate the Concept of "Mercy"

R. Carr and J. Carr argue the prosecutor improperly denigrated the concept of mercy by making the following argument:

> "And, ladies and gentlemen, as [the defendants] sit there, the Court has told you[,] you can consider sympathy and you can consider mercy for these two defendants. That's in here. And, Ladies and Gentlemen of the Jury, as District Attorney of this jurisdiction, I seek the death penalty. And, ladies and gentlemen of this jury, I ask you

to show Jonathan and Reginald Carr the same mercy that they showed to [J.B.], and [H.M.], and [B.H.], and [A.S.]. No mercy."

In *Kleypas I*, we held a prosecutor may argue that a defendant deserves no mercy because he or she showed none to the victims, as long as the prosecutor does not argue the jury is precluded from considering mercy in its sentencing decision:

"In a capital case, it is important for the jury to be able to evaluate whether a defendant is deserving of mercy. As part of the same concept, however, it is clearly proper for a prosecutor to argue against the granting of mercy. We hold that it is proper for the prosecutor to argue that the defendant is not deserving of the jury's mercy because of the defendant's actions, as long as the prosecutor does not improperly state the law by arguing to the jury that it is prohibited from granting mercy to the defendant because the defendant showed none to the victim." *Kleypas I*, 272 Kan. at 1110-11.

The prosecutor's statement in *Kleypas I* did not suggest the jury could not apply mercy and was within the latitude afforded the prosecution. 272 Kan. at 1111. We reached the same conclusion in *Scott* when the prosecutor suggested the jury should show no mercy because the defendant showed none to his victims. We explained:

"At no time did the prosecutor argue the jury was prohibited from showing Scott mercy. Rather, the prosecutor explicitly told the jury that granting mercy would be an 'act of grace.' Further, the prosecutor requested that when the jurors were considering Scott's plea for mercy, they also consider moral culpability. As a result, these comments were not improper." *Scott*, 286 Kan. at 116.

R. Carr and J. Carr contend the prosecutor's closing is distinguishable from *Kleypas I* because she expressly argued they deserved no mercy rather than merely implying it. But nothing in *Kleypas I* or *Scott* suggests a reasonable basis to distinguish implicit from explicit arguments when communicating the same message. Instead, these decisions make clear the argument is proper, provided the prosecutor does not tell jurors

123

they cannot consider mercy. The prosecutor's argument here was within the latitude afforded the State.

## 2. Arguments Did Not Improperly Inflame Jury's Emotion

J. Carr contends the prosecutor improperly inflamed the jurors' emotions on two occasions. He argues the prosecutor erroneously: (1) argued the victims would never have the opportunity to form attachments with future children; and (2) shared an improper quote minimizing the concept of mitigation. The State argues these comments were invited by the defense and otherwise proper.

"Generally, a prosecutor has wide latitude in crafting arguments. Nevertheless, the arguments 'must accurately reflect the evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."'" *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014).

Regarding the victims' ability to form or maintain personal attachments with others, the prosecutor said:

"They talk to you—[R. Carr's attorney] talked to you—the audacity to talk [to you] about the victims and about how Reginald Carr will never be able to form attachments, never be able to form relationships. [A.S.], [J.B.], [H.M.], and [B.H.] will form no more attachments. They don't continue their attachment to their fathers, their mothers, or their siblings, or anyone else for that matter, any future children that they might have had."

J. Carr classifies this as an impermissible "golden rule" argument that invited jurors to step into the victims' shoes. But this misses the mark.

"A 'golden rule' argument is the suggestion by counsel that jurors should place themselves in the position of a party, a victim, or the victim's family members. Such arguments are generally improper and may constitute reversible error. See *Walters v. Hitchcock*, 237 Kan. 31, 33, 697 P.2d 847 (1985). The reason 'golden rule' arguments are not permitted is because they encourage the jury to depart from neutrality and to decide the case on the improper basis of personal interest and bias." *State v. McHenry*, 276 Kan. 513, 523, 78 P.3d 403 (2003), *disapproved of on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006).

The prosecutor did not ask the jury to assume the victims' points of view. At most, this resembled victim impact argument, which is relevant to the jury's sentencing determination. See *Scott*, 286 Kan. at 118-19 (no constitutional bar to victim impact evidence; evidence admissible under K.S.A. 21-4624[c] if relevant to question of sentence).

Moreover, as the State observes, the statements mirrored and were intended to respond directly to R. Carr's closing argument, during which defense counsel discussed what impact a life sentence would have on R. Carr's relationships:

"We are talking about things you need to consider. Reggie is going to be incarcerated. He will be put in prison basically forever. . . . Any attachment that he gets with any guards who are going to be supervising him [is] necessarily going to fade away because nobody works for 50 years. The people he is going to develop his attachment with will be transferred, will retire, will quit, will go someplace else. His mother will die while he is in the penitentiary. His father will die while he is in the penitentiary. By the time he is first eligible to see the parole board, if he gets the minimum sentence he can possibly get, his oldest son will be older than [defense counsel] over there. That's how long he is going to be in the penitentiary. He is actually going to be in there forever. He is never going to be able to walk out and get in his car and drive off somewhere and go visit friends. Never going to do any of that stuff that he enjoyed for the brief time that he wasn't incarcerated."

In context, the prosecutor's argument merely urged the jury to give little weight to R. Carr's assertion that he would never form relationships or attachments with others if sentenced to life imprisonment instead of death. See *Scott*, 286 Kan. at 120 (statement that capital murder defendant "destroyed the [victim's] family" permissible in response to defendant's asserted mitigating circumstance regarding relationships with his family). We conclude there was no error in this passage.

Second, J. Carr challenges the prosecutor's commentary attributed to a quote from Dr. Willard Gatlin, who was not a witness. The prosecutor stated:

"I want to read to you something that was said by a doctor in New York. Dr. Willard Gatlin is a medical doctor, about a murder in New York. And he says this. When one person kills another, there is an immediate revulsion at the nature of the crime. But in a time so short as to seem indecent to the members of the personal family, the dead person ceases to exist as an identifiable person. To those individuals and in the community who have good will, who have sympathy and empathy and warmth and compassion, only one of the characters in the drama remains with whom they can commiserate and that is the defendants. The dead person ceases to exist in our everyday reality and become part of a historic event. So we turn away from the past toward the reality because of our natures. And we look at the defendant and sympathize with him. And when that happens, the defendant usurps the compassion that is justly the victims'. And they will steal their victim[s'] moral constituency today with you in the same way that they stole their lives.

"Ladies and gentlemen, don't let that happen."

J. Carr argues the prosecutor's Gatlin quote was improper for three reasons. First, he contends it was inflammatory and distracted the jury from its sentencing responsibility. Second, he asserts the comment implied any defendant convicted of murder usurps the compassion belonging to victims and "improperly told the jury there was no need to treat Jonathan Carr as a 'uniquely individual human being' in determining

126

the appropriate punishment, because he is part of a 'faceless, undifferentiated mass' of murderers who have . . . usurped the compassion that should belong to the victims." Third, he argues it diverted the jury from deciding the case based only on the evidence and controlling law. The State contends the commentary was an appropriate appeal to remember the victims, arguing the prosecutor tied it to the defendants in a way that did not prevent the jury from giving individualized consideration.

The State is correct that the prosecutor tied this commentary to J. Carr and R. Carr. Immediately after quoting Gatlin, the prosecutor closed her argument, stating:

> "Reginald Carr and Jonathan Carr, they do not deserve your sympathy. They don't deserve your pity, and they don't deserve your warmth. They don't deserve your mercy because they gave no mercy. Not even on, as you remember, the request, the verbal request of [A.S.], did not cause them to give mercy. It did not cause whichever brother was not the shooter to jump on the other's back to help stop this horrific murder. They don't deserve your mercy and they don't deserve your leniency. Deliver a verdict that the law requires under the evidence that you have heard."

We previously acknowledged the prosecutor's right to employ dramatic delivery during closing argument in the guilt phase. *R. Carr*, 300 Kan. at 249. On that topic we said:

> "The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle. It is not opening statement; it is not confined to a dry recitation of the evidence presented. Compare *State v. Hilt*, 299 Kan. 176, Syl. ¶ 9, 322 P.3d 367 (2014) ('A prosecutor may use analogies, similes, allusions, and other rhetorical devices in an attempt to bring order to the facts presented at trial, place them in a meaningful context, and construct the whole of a case. Within sensible limits set by similarity and dissimilarity to the facts of a case, a prosecutor's appropriate

127

rhetorical devices may include film allusions and comparisons or be otherwise theatrical.').'" 300 Kan. at 250.

Consistent with this holding, we conclude the commentary in the penalty-phase closing was within the latitude afforded to prosecutors.

### 3. *Argument Regarding Prison Conditions Fell Within Wide Latitude Afforded*

R. Carr claims the prosecutor improperly suggested life in prison would be pleasant. The State contends the prosecutor instead properly rebutted R. Carr's counsel, who argued:

> "We are talking about things you need to consider. Reggie is going to be incarcerated. He will be put in prison basically forever. He is going to be caged up. And Reggie needs to be caged up with the lions in the penitentiary, so all of us rabbits will be safe. That's not going to be a problem with us. Reggie is not going to have a good time in prison. Reggie is never going to be able to determine again when he gets up in the morning or when he gets to go to bed at night. He is never going to be able to determine the food he gets to eat or clothes he is going to wear. He is never going to be able to determine who . . . he is going to see and when he gets to see them or the circumstances of those visitations, if they occur."

The prosecutor responded to these remarks, stating: "They talked to you about, well, they will be locked up for a long time in a cage. A cage with access to books, library, basketball, daily exercise, TV."

R. Carr relies on *Kleypas I* to challenge this remark on prison conditions. In *Kleypas I* this court concluded a prosecutor's questions eliciting privileges enjoyed by prisoners constituted error. 272 Kan. at 1098-99. The district court granted a defense motion in limine and ordered the parties not to introduce evidence regarding prison

128

conditions. 272 Kan. 1097. Yet, during a prison official's cross-examination, the prosecutor inquired about the forbidden subject.

"The prosecutor's cross-examination of Haggard was a violation of the trial court's order and constituted prosecutorial misconduct. The cross-examination was an attempt to prejudice the jury by improperly suggesting to them that prison was an easy environment, and the prosecutor admitted as much. Such evidence was clearly irrelevant, inadmissible, and prejudicial to the defendant. We are greatly disturbed by the prosecutor's conduct, especially considering the nature of this case." 272 Kan. at 1099.

Here, there was no order preventing counsel from exploring this topic. And the prosecutor's remark responded to R. Carr's closing that had alluded to the harsh reality of life imprisonment. Other courts examining similar statements have recognized that "living conditions at prisons are to some extent common knowledge" and a prosecutor's reference to privileges such as regular meals, clean clothes, television, visitation, and other conditions incident to incarceration are unlikely to be prejudicial. See, e.g., *State v. Scales*, 655 So. 2d 1326, 1334 (La. 1995). In this case, this brief reference was within the prosecutor's wide latitude.

### 4. *The Prosecutors Did Not Misstate Parental Neglect Evidence*

R. Carr argues the prosecutor mischaracterized the defendants' parental neglect evidence offered to support mitigation. Specifically, he asserts this evidence demonstrated his mother punished him and his siblings on one occasion by refusing to cook or feed them for weeks on end. During closing, the prosecutor minimized this incident as one in which the mother forced her children to eat their vegetables.

There was conflicting testimony regarding the nature, extent, and duration of this event. In cross-examination, the mother testified she made her three children cook their

own meals for a couple of weeks, using food available in the home, as punishment for their wasteful consumption. She testified there was plenty of food in the house and, when the supplies dwindled, she purchased more.

R. Carr's argument is based on the prosecutor's refusal to adopt the defense's more disturbing version of this event. But the prosecutor's description was reasonably founded on the mother's testimony and within the prosecutor's wide latitude.

> 5. *The Prosecutor Did Not Improperly Argue the Law Required a Death Verdict and Statements During Opening Did Not Constitute Reversible Error*

R. Carr's final prosecutorial error challenge asserts the prosecutor improperly argued the law required the jury to impose the death penalty. He points to the prosecutor's opening penalty-phase statement that "[t]here is no equivocation. The sentence shall be death. Ladies and gentlemen, *that is the law*." (Emphasis added.) He also points to other occasions when the prosecutor said, "[I]t is your job and your privilege as jurors to do this duty and to continue to bring a just penalty." The State contends there was no error when the selected statements are placed in proper context.

We agree R. Carr has not placed the challenged statements in context. Before stating the "sentence shall be death," the prosecutor argued:

> "Ladies and gentlemen of the jury, we look at the incidents of the year 2000. We look at what happened in the scope of the evidence that has been presented. You look at whether or not the State has met its burden in proving that those aggravating factors outweigh any mitigation that could be presented. And will. But you need to recall all that you know and remember to the time that you listened to this Court instruct you as to the charge to this jury, that if you should find the aggravating factors are outweighed by the mitigating factors, then the sentence shall be death.

130

"There is no equivocation. The sentence shall be death. Ladies and gentlemen, that is the law."

R. Carr considers the challenged statement to be comparable to one disapproved in *Scott,* in which the prosecutor told jurors they needed to honor their oath and return a guilty verdict, implicitly suggesting that to do otherwise would violate their duty. 286 Kan. at 79. A prosecutor's argument that implies the jury may violate its sworn oath has more force and carries greater potential for unfair prejudice than an argument that the facts and applicable law compel a death sentence. Especially when considered in combination with other statements recognizing the jury's authority and discretion to conduct the statutory weighing, the argument here is distinguishable from the "violation of sworn oath" argument in *Scott*. See *Strouth v. Colson*, 680 F.3d 596, 606 (6th Cir. 2012) (prosecutors may argue jury has duty to impose death sentence when supported by the facts and law).

We also note the "equivocation" argument, even when considered in isolation, was consistent with K.S.A. 2020 Supp. 21-6617(e), which sets out the standard for the jury's verdict.

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 2020 Supp. 21-6624, and amendments thereto, exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced to life without the possibility of parole."

But there is another problem with this passage, which no party appears to have noticed. We address this as unassigned error under K.S.A. 2020 Supp. 22-6619(b).

131

When the prosecutor said "[y]ou listened to this Court instruct you as to the charge to this jury, that if you should find the *aggravating factors* are outweighed by the mitigating factors, then the sentence shall be death," she clearly misstated the law under K.S.A. 2020 Supp. 21-6617(e). (Emphasis added.) Such a misstatement is prosecutorial error.

That said, the erroneous statement was isolated; the prosecutor's argument correctly described the weighing process elsewhere, as did the judge's instructions. There is no reasonable possibility the misstatement standing alone affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Kleypas II*, 305 Kan. at 316; *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-8.

### 6. Cumulative Prosecutorial Error

We have identified two prosecutorial errors that could potentially affect both R. Carr's and J. Carr's death sentences—the prosecutor's endorsement of Pay's credibility (referring to the "truth") and her misstatement of the K.S.A. 2020 Supp. 21-6617(e) weighing formula during opening statements. Although we held each error harmless standing alone, we consider their cumulative impact. *Kleypas II*, 305 Kan. at 315.

Given the enormity of the State's evidence supporting aggravating circumstances, the isolated nature of the comments in question, and the correcting influence of the jury instructions, we cannot see any reasonable possibility these two errors affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. *Sherman*, 305 Kan. 88, Syl. ¶¶ 6-8.

### R.   P19—Double Jeopardy

For the reasons stated in the court's previous decision, we do not reach the merits of this claim. *R. Carr*, 300 Kan. at 258, 314.

### S.   P20—Execution Protocol

For the reasons stated in the court's previous decision, we do not reach the merits of this claim. 300 Kan. at 258, 314-15.

### T.   P22—Cumulative Error

No penalty-phase error independently requires R. Carr's death sentence to be vacated. But both R. Carr and J. Carr assert they are entitled to relief because their penalty phase was infected by cumulative error. We disagree and hold that cumulative penalty-phase error does not require reversal of the death sentences.

#### 1.   Standard of Review and Legal Framework

Cumulative error analysis aggregates all errors and assesses whether their cumulative effect is such that they cannot be determined to be harmless, even though individually those errors are harmless. *State v. Tully*, 293 Kan. 176, Syl. ¶ 16, 262 P.3d 314 (2011). In assessing cumulative error in the penalty phase of a capital trial, the errors aggregated include any errors in the guilt-phase proceedings we determine must be considered in conjunction with the penalty-phase errors. See *Kleypas II*, 305 Kan. at 346. In addition, the errors aggregated include those penalty-phase errors assumed by the court. See *State v. Sean*, 306 Kan. 963, 993-94, 399 P.3d 168 (2017). And they include penalty-phase jury instruction errors not raised in the district court that are not clearly

133

erroneous. See *State v. Seba*, 305 Kan. 185, 215-16, 380 P.3d 209 (2016) (including jury instruction error in cumulative error analysis when claim of error was raised for first time on appeal and court merely assumed error occurred); *State v. Parks*, 294 Kan. 785, 804, 280 P.3d 766 (2012).

When reviewing cumulative error in a capital penalty-phase proceeding, our focus is on the errors' cumulative effect on "'the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances.'" *Cheever II*, 306 Kan. at 799 (quoting *Kleypas I*, 272 Kan. at 1087). In other words, we are looking for the errors' effect in their aggregate, recognizing errors can differ in their individual or cumulative effect. See, e.g., *Gleason II*, 305 Kan. at 816 (while identifying two instructional errors, the court did not "perceive they had the effect of intensifying one another"); *Kleypas II*, 305 Kan. at 346-47 ("As to errors in the penalty phase, we have found several but concluded none individually require us to vacate the penalty verdict. . . . Turning to the cumulative effect of these errors, none of these incidents were related, so none had the effect of intensifying another."). "This 'task is undoubtedly more subtle than simply counting up the number of errors discovered.'" *R. Carr*, 300 Kan. at 251.

Ultimately, we must determine whether the errors' cumulative effect, "viewed in the light of the record as a whole, had little, if any, likelihood of changing" the jury's conclusion. *Cheever II*, 306 Kan. at 799. The phrase "little, if any, likelihood" reflects a level of certainty akin to the *Chapman* harmless-error standard that courts apply to constitutional errors. *Ward*, 292 Kan. at 561-62; see *Kleypas II*, 305 Kan. at 272 ("[I]n using the 'little, if any, likelihood' language in our past cases we intended to apply the constitutional harmless error standard of *Chapman*."). But as we most recently said in *Cheever II*, the degree of certainty required to deem error harmless depends on whether a right guaranteed by the United States Constitution has been infringed:

134

"The degree of certainty by which we must be persuaded turns on whether any of the errors infringe upon a right guaranteed by the United States Constitution. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* [565 U.S. 1221] (2012). The overwhelming nature of the evidence is a factor to be considered, but its impact is limited. As with the prosecutorial-misconduct analysis, the question before this court is not what effect the error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual sentencing determination in the case on review. See *Kleypas* [*I*], 272 Kan. at 1088." *Cheever II*, 306 Kan. at 800.

The *Cheever II* court nonetheless framed its analysis and conclusion as whether there was "little, if any, likelihood of changing the jury's ultimate conclusion that death was the appropriate sentence." 306 Kan. at 802. But it did so expressly because two errors "implicate[d] constitutional rights . . . ." 306 Kan. at 801.

*Cheever II*'s rule that the applicable *Ward* standard guides our cumulative error analysis is consistent with our earlier holding that state-law penalty-phase errors do not automatically require *Chapman* harmless-error review. It is also consistent with our decisions applying different harmless-error standards in cumulative error review outside the death penalty context, depending on the nature of the errors accumulated. See, e.g., *State v. Solis*, 305 Kan. 55, 71, 378 P.3d 532 (2016) (concluding two unpreserved jury instruction errors did not deprive defendant of fair trial because court was "firmly convinced that, under the totality of the circumstances, the manner in which the district court instructed the jury did not affect the outcome of the trial"); *State v. Gilliland*, 294 Kan. 519, 550, 276 P.3d 165 (2012) ("Where, as here, the errors found by this court are not constitutional in nature, we examine whether there is a reasonable probability the aggregated errors would have affected the outcome of the trial. *Ward*, 292 Kan. at 569-70."). But see *State v. Smith-Parker*, 301 Kan. 132, 168, 340 P.3d 485 (2014) (holding cumulative error required reversal because "[t]he combination of the overall weakness of the evidence . . . and multiple serious procedural defects tainting the process mean[t]

135

[defendant] was substantially prejudiced under the totality of the circumstances and denied a fair trial").

Constitutional errors are present here. And we have previously said that, when any errors being aggregated in a cumulative error analysis are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt. See *Cheever II*, 306 Kan. at 800-01; *Tully*, 293 Kan. at 205 (citing *United States v. Toles*, 297 F.3d 959, 972 [10th Cir. 2002]). But see *Hagans v. United States*, 96 A.3d 1, 44 (D.C. 2014) ("This court has never addressed how to evaluate the cumulative impact of such a mixed bag of [constitutional and nonconstitutional] errors, and there is little pertinent authority elsewhere. The Supreme Court has yet to confront the issue. As for the federal appellate courts, it appears that only the Tenth Circuit has delved into the question.").

Applying this rule, we will conduct a *Chapman* harmless-error review. We clarify that when conducting a *Chapman* harmless-error review of multiple errors in a capital penalty-phase proceeding, we ask whether we are persuaded there is no reasonable possibility the errors' cumulative effect, viewed in light of the record as a whole, affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. See *Cheever II*, 306 Kan. at 800-01.

### 2. *Summary of Trial Errors*

Defendants' trial was infected with the following guilt-phase errors: (1) the severance error, which continued into the penalty phase as discussed above; (2) reverse-*Batson* error in the denial of defendants' peremptory challenge of W.B., *R. Carr*, 300 Kan. at 129; (3) erroneous admission of Linda Ann Walenta's statements through law enforcement testimony, 300 Kan. at 143-44; (4) erroneous application of Kansas' third-party evidence and hearsay rules, which prevented R. Carr from pursuing his defense to

136

the Birchwood crimes, 300 Kan. at 209-10; (5) erroneous instruction on the sex-crime-based capital murder counts, 300 Kan. at 162-63; (6) three of the multiple-homicide-based capital murder convictions were multiplicitous with the first, 300 Kan. at 165; (7) lack of subject matter jurisdiction over any sex crime charges based on coerced victim-on-victim sex acts, 300 Kan. at 171-72; (8) one conviction for rape of H.G. was multiplicitous with the other, 300 Kan. at 179; (9) erroneous exclusion of expert testimony on the reliability of eyewitness identifications, 300 Kan. at 226; (10) error in instructing the jury to consider an eyewitness' degree of certainty, 300 Kan. at 235-36; and (11) error in giving an aiding and abetting instruction that discussed foreseeable crimes, 300 Kan. at 239. See *Kleypas II,* 305 Kan. at 346. These errors are put into the same "error pot" as the penalty-phase errors when, as here, the same jury heard both the guilt and penalty phase. 305 Kan. at 346 (denying considering the error of the guilt-phase proceedings because a different jury heard the penalty phase).

We have also identified the following penalty-phase errors or assumed errors: (1) denying defendants a continuance to consult with Preston about Pay's testimony and to recall Preston for surrebuttal; (2) prosecutorial error in commenting that the "truth" about defendants' PET scans came out; (3) instructing the jury to reject the death penalty if it was *not* convinced the aggravating circumstances did *not* outweigh the mitigating circumstances; (4) prosecutorial error in telling the jury to impose the death penalty if the aggravating factors were outweighed by the mitigating factors; (5) failing to instruct the jury it had to find defendants were at least 18 years old at the time of the murders to impose the death penalty; and (6) the technical, assumed error in failing to instruct the jury on possible sentences for each noncapital crime and the district court's discretion to run the sentences concurrent or consecutive.

137

In addition, R. Carr's penalty-phase trial was affected by one error, recognized under the law of the case doctrine, we will not consider in J. Carr's appeal: the State's use of testimonial hearsay statements (taken from police reports) in its questions propounded to defendants' mitigation witnesses, where R. Carr was not afforded a prior opportunity to cross-examine the declarants.

### 3. Cumulative Error Analysis

In the penalty-phase proceeding, the State relied on its guilt-phase evidence to support the following four aggravating circumstances:

> "Defendants knowingly or purposely killed or created a great risk of death to more than one person; defendants committed the crimes for themselves or another for the purpose of receiving money or any other thing of monetary value; defendants committed the crimes in order to prevent a lawful arrest or prosecution; and defendants committed the crimes in an especially heinous, atrocious, or cruel manner." *R. Carr*, 300 Kan. at 258-59.

The guilt-phase evidence supporting each alleged aggravating circumstance was profound. This is a factor we must consider, albeit not a dispositive one. See *Kleypas II*, 305 Kan. at 347.

Although we found state-law error in the district court's failure to sever the trials during the guilt phase—an error that carried over into the penalty phase—it does not add any weight to the other errors' cumulative effect. This court previously found this error was reversible on Eighth Amendment grounds, but the United States Supreme Court's emphatic conclusion to the contrary convinces us the error, while a defect in the proceedings, was harmless. Although all penalty-phase errors occurred within the joint trial, they did not amplify the severance problem. No error tended to favor one defendant

more than the other. In other words, the fact the errors occurred in a joint trial did not make them more damaging than they would have been in separate proceedings.

Most remaining errors operated independently such that the whole of these errors was no greater than the sum of its parts. But within this group are two sub-groups related to one another. These are the PET scan errors and the errors conveying incorrect weighing equations to the jury.

The PET scan errors—prosecutorial error and denying Preston's surrebuttal— relate to one another in that they affected the defendants' mitigation claim related to those PET scans. But we conclude there is no reasonable possibility these two errors, even considered as a unit, had any effect on the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. And that unit is not intertwined with other errors in a way that magnifies their prejudicial effect.

Preston's testimony was of questionable value given his concession that PET scans are not accepted as reliable tools to predict or explain criminal behavior. While surrebuttal might have been used to defend against any suggestion that Preston deliberately misled the jury, whether his flawed methodology was deliberate does not bear on this evidence's underlying lack of persuasive force.

As we concluded above, reasonable inferences from the evidence supported the prosecutor's claim that Preston's impeachment undermined the remaining mitigation case because other defense mitigation experts tied or reconciled their opinions to Preston's findings. Although the claim was within the bounds of permissible argument, it does not necessarily mean the claim was convincing.

139

Defendants' attorneys pointed this out to the jury in closing arguments. R. Carr's attorney said "it doesn't matter" whether the jury believed Preston or Pay because the PET scan was just a confirmatory test to buttress the psychological findings. He noted, "[W]e do confirmatory tests all the time. Sometimes they do [confirm psychological findings], sometimes they don't. That's all the PET scan was . . . ." J. Carr's attorney directly addressed and dismissed the prosecutor's claim that the PET scan evidence was "the foundation of the mitigation." He noted Preston testified "a lot of people" have the same brain injury as J. Carr. He also observed Preston did not say the injury caused J. Carr to commit the crimes, and that, as something that "affects certain parts of the brain that might involve [J. Carr's] thought processes," the jury should know about it.

Our review of the record reflects Preston's testimony about the defendants' brain metabolism was only a small component of their mitigation cases, which otherwise focused on the theme that defendants' tumultuous upbringing and psychological profiles placed them on a path leading to capital murder. Two expert witnesses called by R. Carr linked these latter two mitigation components by opining R. Carr suffered from antisocial personality disorder likely stemming from childhood traumas. And an expert called by J. Carr, who conducted a comprehensive family and social history investigation, also linked those components. He opined that J. Carr's family situation involving physical and sexual abuse, emotional detachment, and a genetic predisposition to emotional instability contributed to him being emotionally disturbed from early childhood.

In short, there was ample evidence, apart from the PET scan evidence, suggesting that circumstances beyond defendants' control set them down a path toward their crimes (which was the central theme of the defendants' mitigation case). We are confident there is no reasonable possibility the errors tending to decrease the PET scan evidence's potency affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict.

140

The prosecutorial error concerning the jury's weighing equation and the error on the verdict forms instruction are related in that they both recited incorrect standards for determining how the relative weight of aggravating and mitigating circumstances impacted its verdict. The prosecutor told the jury to impose the death penalty if aggravating factors were outweighed by mitigating factors. The instruction told the jury to use a verdict form rejecting a sentence of death if one or more jurors was not convinced the aggravating circumstances did not outweigh the mitigating circumstances.

Though these errors are related, unlike the PET scan errors, they do not magnify one another because they misstated the law in different ways. Their import is that they might raise the possibility the jury did not apply the correct weighing equation. This possibility is dispelled by the verdict forms, which clearly and accurately led the jurors through the necessary findings to reach their verdict.

The remaining errors do not amplify the prejudicial effect of the errors taken as a whole. The district court's other instructional errors—the failure to instruct the jury that it had to find defendants were at least 18 years old at the time of the crime and the failure to fully instruct the jury on the possible sentences for each noncapital crime—are distinct enough they cannot possibly result in prejudice when combined with any other errors.

The remaining penalty phase error—permitting the cross-examination of mitigation witnesses using hearsay—is unique to R. Carr's case. It also does not amplify the other errors.

We must also consider the impact of the guilt phase errors the court identified in its earlier decision. They tend to not amplify or interact with any other penalty phase error. Instead, they contribute to the idea of residual doubt. See *Rompilla v. Beard*, 545

141

U.S. 374, 386-87, 390, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (discussing use of residual doubt as defense strategy in penalty phase of capital trial). Specifically, Judge Clark's error in applying the third-party evidence rule and hearsay exceptions, which may have deterred R. Carr from testifying on his own behalf, arguably lessened the chance a juror would have possessed residual doubt of R. Carr's guilt during the penalty phase. See *R. Carr*, 300 Kan. at 186-87, 209-10.

However, when addressing whether this guilt phase error required reversal of his capital conviction, we noted the "remarkable strength of the State's case against R. Carr" in concluding that "there was *no* impact on the trial's outcome from the exclusion of R. Carr's proffered testimony." (Emphasis added.) 300 Kan. at 212. In reaching that conclusion, we favorably quoted the State's summation of its case against R. Carr.

> "'[H.G.'s] identification of Reginald, both immediately following the attack and at trial, as one of the two black males responsible for the crimes perpetrated against her and her friends. [H.G.'s] identification was buttressed by multiple scientific sources, including the mitochondrial DNA analysis, which revealed that of the four hairs collected from the Birchwood scene and submitted for analysis only two were of African–American lineage and defendant could not be excluded as the donor of either one; the nuclear DNA test results, which demonstrated defendant also could not be excluded as the donor of the DNA evidence recovered from [H.G.'s] inner thigh and which identified the blood on defendant's shirt and underwear as that of [H.M.]; and the medical evidence, which demonstrated that a few short months after the attack [H.G.] developed the same sexually transmitted disease that defendant carried.'
>
> "'Additional evidence to support the identification included footwear impressions taken from a Voicestream box and tarp at the Birchwood residence and determined to match the size, shape, and character of the "B-Boots" Reginald wore. A cigar-type ash, . . . matched the diameter of the cigar recovered from Reginald's coat pocket. Both pieces of evidence supported [H.G.'s] assertion that Reginald played an active role in the commission of the offenses.

"'Further, the court heard evidence that it was Reginald who was in possession of a vast majority of the property taken from the Birchwood residence, given that it was recovered from both the apartment where he was staying and his Plymouth vehicle. That property included a big screen TV, various electronics, bedding, luggage, a vast amount of clothing, and numerous personal items belonging to each victim—including checkbooks, wallets, credit cards, drivers' licenses, sets of keys, gas cards, watches, and day planners—as well as numerous ATM receipts and just under $1000.00 in cash, a particularly notable fact given that Reginald was unemployed. Moreover, Reginald was stopped by law enforcement officers after driving by the Birchwood residence at approximately 4:00 a.m. on the morning of the killings.

"'Finally, at the time of the proffer the court was aware of the evidence that highlighted Reginald's link to the Lorcin handgun used in the commission of the murders and that, despite his efforts to dispose of the gun, it was ultimately recovered and tested, revealing that each bullet and cartridge was fired from that gun.'" *R. Carr*, 300 Kan. at 211-12.

The strength of the evidence establishing R. Carr's role and culpability in perpetrating these crimes left no room for any meaningful amount of residual doubt, even if the guilt and penalty phase errors had not occurred.

In the final analysis, the State's aggravation case—which rested entirely on its guilt-phase evidence—was formidable. This evidence overwhelmingly established that defendants knowingly killed more than one person, for the purpose of receiving money or items of monetary value and to prevent arrest or prosecution, and that they did so in an especially heinous, atrocious, or cruel manner.

Following the jury's guilt-phase verdicts, the penalty-phase proceeding consisted almost entirely of defense witnesses who testified over the course of nearly two weeks about the defendants' upbringing, psychological profiles, and other mitigating

circumstances. *R. Carr*, 300 Kan. at 259-75. After giving due consideration to this evidence, the jury unanimously found beyond reasonable doubt that all four aggravating circumstances were present and outweighed mitigating circumstances, thereby warranting a death sentence verdict.

Under these circumstances, we are convinced there is no reasonable possibility the identified errors, deemed harmless in isolation, cumulatively affected the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances, i.e., the death sentence verdict. To borrow again from the United States Supreme Court, given the State's evidence "[n]one of that mattered." 577 U.S. at 126. We are satisfied the jury correctly understood its charge and was not swayed by the aggregate impact of these identified defects.

CONCLUSION

After careful review and consideration of the entire record, we conclude that "the evidence supports the findings that" one or more aggravating circumstances "existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances." K.S.A. 2020 Supp. 21-6619(c)(2). Having confirmed that Reginald Dexter Carr Jr. received a fair trial and the jury's sentence was not "imposed under the influence of passion, prejudice or any other arbitrary factor," K.S.A. 2020 Supp. 21-6619(c)(1), we affirm Reginald Dexter Carr Jr.'s death sentence for the capital murder of H.M., J.B., B.H., and A.S.

\* \* \*

BILES, J., concurring:  I concur in the majority result and rationale with one exception because I find much of the majority's section 1 analysis unnecessary. *State v.*

*Carr*, 314 Kan. ___ (*R. Carr II*), slip op. at 20-40. My reasoning harkens back to what I wrote in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 706, 440 P.3d 461 (2019) (Biles, J., concurring) ("I hope those reviewing my colleagues' history lessons will accept the exercise for what it obviously is—hard working judges trying to honestly answer the questions presented in good faith. But for me, an originalism search gets us only so far when divining meaning for words with such obvious open-ended qualities as 'liberty' or 'inalienable natural rights.' The historical back-and-forth really just boils down to how much weight is given one selected fact over another.").

The Carr defendants contend section 1 of the Kansas Constitution Bill of Rights "protects the right to life, and Kansas' capital sentencing scheme unconstitutionally infringes upon this right." *R. Carr II*, 314 Kan. at ___, slip op. at 18. But as the majority acknowledges, that was decided more than 20 years ago. See *State v. Kleypas,* 272 Kan. 894, 1051-52, 40 P.3d 139 (2001) (*Kleypas I*) ("We conclude that Kansas' death penalty scheme does not violate the spirit or the letter of § 1."), *overruled on other grounds by Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

I appreciate the Carr defendants seized on the recent decision in *Hodes & Nauser* to animate what amounts to an old—previously decided—issue. But *Kleypas I* effectively disposed of their essential argument. So aside from some additional discussion about the historical context of section 1 from the Wyandotte Convention, I would end the analysis there, relying on *Kleypas I* and the relevant cases it recited, including *Slaughter v. State*, 950 P.2d 839, 861-62 (Okla. Crim. App. 1997) ("Surely killing a person infringes on that same right [to life]. Appellant has presented nothing to this Court showing that the Legislature's ability to establish a punishment of death for first degree murder in any way violates his 'inherent' right to life[, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry].").

145

\* \* \*

STEGALL, J., concurring: I join the majority's decision to affirm. But I do so with deep doubts and reluctance because this court's section 1 jurisprudence—begun in *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 440 P.3d 461 (2019), and continued today—is a gross constitutional error. I continue to dissent from that error. See generally *Hodes*, 309 Kan. at 707-78 (Stegall, J., dissenting).

I write to explain those doubts and to emphasize that today's decision adds both clarity and dreadful effect to the egregious consequences of the *Hodes* decision. When, in *Hodes*, we abandoned our longstanding interpretation of section 1 as a limit on state police power in favor of an ephemeral scheme of limited and judicially pronounced rights, we stripped all citizens of their "first rights of republican self-rule" including the right to be "free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to the common welfare." 309 Kan. at 753, 766 (Stegall, J., dissenting).

Indeed, having eliminated the substantive first right of a free and self-governing people, the *Hodes* court "only magnifie[d] the State and its near-limitless power." 309 Kan. at 745 (Stegall, J., dissenting). And the outcome of this fundamental change in constitutional structure is manifest anew in today's decision which reads our Constitution as giving the state nearly limitless power to punish citizens—unencumbered from any substantive check and limited only by the familiar panoply of procedural guarantees explicitly enumerated in the Kansas Constitution Bill of Rights.

It may be tempting to adopt a dismissive shrug at this outcome given the gruesome outrage of the underlying events. It would be understandable if one felt ambivalent about this magnification of state power given that the impact today falls only on two of the

146

most brutal and coldblooded killers in the history of Kansas. But if substantive guarantees are not afforded to every single citizen—and rigorously defended no matter the circumstances—the people will not long be free.

Over the course of this court's vigorous disagreements concerning the meaning of section 1, the *Hodes* majority rather breathlessly suggested that "the dissent appears to maintain that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination," and that I wanted "a constitutional prerogative to invade the autonomy of pregnant women and exclude them from our state Constitution's Bill of Rights." *Hodes*, 309 Kan. at 650.

Far from a one-off of excessive hyperbole, the *Hodes* majority made this its thematic criticism of my articulation of our longstanding and traditional view of section 1 as a restriction on state police power. Because I interpret section 1 as a substantive due process provision—that is, as a substantive limit on the power of the government rather than a discreet-rights granting provision—the majority argued I was "dismissive" of the rights of citizens. 309 Kan. at 637. My colleagues suggested my description of section 1's limits on the state's police power set "too low a bar" and would "allow[] the State to . . . intrude into all decisions." 309 Kan. at 671. According to the *Hodes* majority, I desired to leave "naked and defenseless" citizens with no recourse against the "unrestrained" power of the state which had "no practical limits" and would "intrude with impunity" against the individual. 309 Kan. at 679-80.

Of course this was a "fabrication so flimsy it makes run-of-the-mill straw men appear as fairy tale knights by comparison." 309 Kan. at 768 (Stegall, J., dissenting). At the time *Hodes* was decided, however, the majority could get away with this faulty-but-effective rhetoric because it viewed itself as standing nobly between an aggressively paternalist government and the rights of women. It has taken today's case—and likely

future cases as well—to clarify what was really going on. So, I resurrect this old squabble not to pick at closed wounds, but because today's decision shines the disinfectant of sunlight on the rhetorical posture of the *Hodes* majority.

Without the benefit of that rhetorical posture, the essential effect of the *Hodes* decision is revealed to be what I explained it to be at the time—that "it fundamentally alters the structure of our government to magnify the power of the state." 309 Kan. at 707 (Stegall, J., dissenting). That shift—the magnification of state power—is enacted today as we hold that a citizen's limited section 1 rights are "forfeited when a person's criminal conduct necessitates punishment." *State v. Carr*, 314 Kan. ___ (*R. Carr II*), slip op. at 34. Thus, the majority makes it explicit that a criminal defendant has no section 1 protections at all. Indeed, according to the majority, "the state's power to punish" is limited only by "due process" and "cruel or unusual" provisions which "do not arise under section 1." *R. Carr II*, 314 Kan. at ___, slip op. at 40.

It turns out that in reality, it is the majority's interpretation of section 1 (not mine) that ends up with some citizens "relinquish[ing] virtually all rights of personal sovereignty in favor of the Legislature's determination," and "exclude[d]" from substantive constitutional protections against state exercises of power. *Hodes*, 309 Kan. at 650. If, however, section 1 is a substantive check on state power rather than a fundamental-rights-that-might-be-forfeited provision, it will always and everywhere provide the same protection to all people regardless of circumstances. And that is exactly the test I proposed in my *Hodes* dissent—a test demanded by the overwhelming weight of text, history, and longstanding judicial precedent.

I articulated that test like this:

> "In sum, section 1 demands this 'rational basis with bite' judicial inquiry. In order
> to be a constitutional exercise of power, *every* act of our Legislature must be rationally

148

related to the furtherance or protection of the commonwealth. The lodestar of this test is, "'*what have* [the people] *authorized to be done?*'" *Nemaha*, 7 Kan. at 557 (Brewer, J., dissenting). The people have not authorized the State to act in arbitrary, irrational, or discriminatory ways. Applying the necessary deference, a court must examine the *actual* legislative record to determine the *real* purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State." *Hodes*, 309 Kan. at 767 (Stegall, J., dissenting).

This is the test we should now apply to the death penalty as enacted by the Kansas Legislature. I have no preconceived idea about how such an inquiry would play out. And it is one of the great misfortunes of the *Hodes* decision that we now will never know. The lower courts have not inquired into the subject, the parties have not briefed the issue, and this court has declined to take it up.

Given this uncertainty, and the monumental consequences of the State's exercise of this most final, most irreversible, and most grave use of power—killing a human person—I am left with a profound and unshakable disquiet about our court's blessing upon these procedures. As a consequence, if the issue had been joined, I would be inclined, as in *Hodes*, to remand this matter for a review of

> "whether the legislative act is reasonably related to the furtherance or protection of the common welfare. The Legislature has wide latitude to define for itself the substantive content of the common good, circumscribed by the traditional police power limit that a law cannot be arbitrary, irrational, or involve a class-based form of discrimination." *Hodes*, 309 Kan. at 769 (Stegall, J., dissenting).

But this review would demand a real judicial inquiry into "the legislative record" to determine whether it "reveals evidence of a discriminatory intent or some other arbitrary or irrational purpose behind the law" and a consideration of "the possibility that the act

149

was not *actually* intended to further the common welfare." 309 Kan. at 770 (Stegall, J., dissenting).

I have previously explained why our constitutional structure, properly understood, does not permit a "presumption of constitutionality" to attach to legislative acts. *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1158, 442 P.3d 509 (2019) (Stegall, J., concurring in part and concurring in judgment). But neither may a court presume unconstitutionality, and I will not presume our death penalty is not reasonably related to the furtherance or protection of the common good—or that it is otherwise arbitrary, irrational, or discriminatory. A party challenging an exercise of state power as exceeding the proper bounds of the police power has the burden to present that claim for adjudication. Because that has not happened here, I am left with no option other than to concur in the judgment.

\* \* \*

LUCKERT, C.J., concurring in part and dissenting in part:  In this appeal, we review a trial riddled by error that led to a verdict imposing the death penalty. The ultimate question before us is whether there is a reasonable *possibility* the cumulative effect of all errors might have affected *even one juror's* decision to impose the death penalty. See *R. Carr II*, 314 Kan. at ___, slip op. at 136 (citing *State v. Cheever*, 306 Kan. 760, 799-801, 402 P.3d 1126 [2017]). Given the nature and volume of errors, I cannot eliminate the possibility that at least one juror would have decided mitigating factors or mercy outweighed the aggravating factors put forward as reasons to sentence Reginald Carr (R. Carr) to death. I therefore dissent from the majority's determination that these many errors did not affect the jury verdict. I also dissent from some of the majority's holdings about error. I have listed and discussed these points below. I otherwise agree with most other holdings and the rationales supporting them discussed by the majority including those relating to section 1 of the Kansas Constitution Bill of Rights.

150

My research reveals no other Kansas appellate case affirming a verdict in the face of so many mostly interlocking errors. In *State v. Carr*, 300 Kan. 1, 331 P.3d 544 (2014) (*R. Carr I*), *rev'd and remanded on other grounds sub nom. Kansas v. Carr*, 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016) (*Carr*), this court found 11 errors in the guilt phase of R. Carr's trial. 300 Kan. at 44-48, 251-52 (summarizing holdings). I joined a concurring and dissenting opinion that found two additional errors and that would have held cumulative error required reversing the jury verdicts. See 300 Kan. at 315-21. The errors found by a majority of the court included:

1. The trial judge erred in refusing to allow R. Carr to exercise a peremptory challenge;

2. The trial judge erred in refusing to sever R. Carr's trial from Jonathan Carr's (J. Carr's) trial;

3. The trial judge erred in admitting Linda Ann Walenta's statements through law enforcement testimony;

4. The trial judge erred in interpreting and applying the third-party evidence rule and the hearsay rule, preventing R. Carr from pursuing his defense to some of the charged crimes;

5. The trial judge gave a faulty instruction on the sex-crime-based capital murders;

6. Three of the multiple-homicide-based capital murder convictions were multiplicitous with the first;

7. The district court lacked subject matter jurisdiction over any sex crime charges based on coerced victim-on-victim sex acts;

8. One of R. Carr's convictions for rape of one victim was multiplicitous with his other rape conviction relating to the same victim;

151

9. The trial judge erred by automatically excluding testimony from an expert on the reliability of eyewitness identifications;

10. The trial judge erred in instructing the jury to consider an eyewitness' degree of certainty; and

11. The trial judge erred by giving an aiding and abetting instruction that discussed foreseeable crimes. 300 Kan. at 251-52.

The two additional errors I would have found were:

12. The evidence was insufficient to support R. Carr's conviction of attempted aggravated robbery underlying his felony-murder conviction of Walenta; and

13. The evidence was insufficient to support R. Carr's conviction of aiding and abetting J. Carr's rape of one victim through digital self-penetration. See 300 Kan. at 320-21.

Considering the cumulative effect of these errors, I joined others in saying:

"I readily acknowledge that the evidence against R. Carr on the Andrew Schreiber and Birchwood incidents was unusually strong. But it was not inevitably invincible, particularly if the governing rules had shifted in the directions the majority holds that they should have. My colleagues and I simply cannot know with the degree of comfort generally required in a death penalty case, see *State v. Marsh*, 278 Kan. 520, 525, 102 P.3d 445 (2004), *rev'd and remanded*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), *and vacated in part*, 282 Kan. 38, 144 P.3d 48 (2006) (heightened scrutiny applies to review of capital trial proceedings) (citing *Beck v. Alabama*, 447 U.S. 625, 637-38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 [1980]), that the contours of a severed guilt phase with no reverse *Batson* error and in which R. Carr was permitted to defend himself under a correct application of the third-party evidence and hearsay rules would have differed so little as to be insignificant. Any anticipated change in perspective could have intensified, had expert testimony on modern research on eyewitness identification been permitted, or had the aiding and abetting and eyewitness instructions contained no

error." *R. Carr I*, 300 Kan. at 319-20 (Beier, J., concurring in part and dissenting in part).

Nothing has changed that conclusion about the cumulative impact of those errors. While the United States Supreme Court rejected the constitutional basis for finding some errors, it did not consider the state law basis for those same errors. Plus, it considered only a small fraction of many errors we must consider, and it thus did not consider the effect of the multiple, interlocking errors.

As, the majority observes, we must put all these errors "into the same 'error pot' as the penalty phase errors when, as here, the same jury heard both the guilt and penalty phase." *R. Carr II*, 314 Kan. at ___, slip op. at 137.

Two of these errors heavily tainted the penalty phase of the trial, which is the focus of today's majority decision.

As to one of those errors, this court unanimously held that the trial judge committed error by seating a juror after defendants exercised a peremptory challenge to the juror—that is, after R. Carr asked to strike a juror from the jury panel using a challenge allowed under Kansas law. See *R. Carr*, 300 Kan. at 45, 124-39. The State objected, and the trial judge sustained the objection and did not allow R. Carr to exercise his peremptory challenge. On appeal from that holding, the United States Supreme Court did not address this error, and it stands as the law of this case. *R. Carr II*, 314 Kan. at ___, slip op. at 136.

The trial judge's error in refusing R. Carr's request to strike a juror permeates and taints all aspects of the trial because "[t]he proper use of the peremptory challenge is vital to the conduct of a criminal defendant's defense. . . . Although it may seem minimal, the deprivation of even one valid peremptory challenge is prejudicial to a defendant and may

153

skew the jury process." *State v. Foust*, 18 Kan. App. 2d 617, 624, 857 P.2d 1368 (1993). When this court first decided R. Carr's guilt phase issues, 16 of our sister states had held such an error demands automatic reversal. See *R. Carr I*, 300 Kan. at 135-36 (discussing cases); 300 Kan. at 318 (Beier, J., concurring in part, dissenting in part) (same). I need not decide whether I would join the reasoning of those courts. Even applying our traditional tests to determine whether an error requires reversal, I cannot say the trial court's error did not impact the jury's verdict. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (stating harmless error standards for constitutional and statutory errors).

The trial judge often "provided venire persons with the magic words" that led to a challenge for cause of those with misgivings about the death penalty and "passing for cause those jurors who were predisposed to finding the defendant guilty and/or were mitigation-impaired with respect to the death penalty." *R. Carr I*, 300 Kan. at 325-26 (Johnson, J., concurring in part and dissenting in part). "Instead of uncovering disqualifying bias and prejudice, the voir dire questioning in this case too often served to camouflage it." 300 Kan. at 326 (Johnson, J., concurring in part, dissenting in part). Given this record, denying R. Carr the ability to use a peremptory strike deprived him of "one of the very purposes of peremptory challenges[, which is] to enable the defendant to correct judicial error." *United States v. Martinez-Salazar*, 528 U.S. 304, 319, 120 S. Ct. 774, 145 L. Ed. 2d 792 (2000) (2000) (Scalia, J., concurring). Plus, "[p]eremptory challenges, by enabling each side to exclude those jurors it believes will be most partial toward the other side, are a means of 'eliminat[ing] extremes of partiality on both sides,' . . . thereby 'assuring the selection of a qualified and unbiased jury.'" *Holland v. Illinois*, 493 U.S. 474, 484, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990) (quoting *Batson v. Kentucky*, 476 U.S. 79, 91, 98, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986]). Here, we have no such assurance.

154

Simply put, denying fair use of R. Carr's right to exercise a peremptory challenge creates a reasonable possibility, and even a reasonable probability, that a properly selected juror untainted by an erroneous voir dire process could have decided not to impose the death penalty. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (stating harmlessness tests in terms of reasonable possibilities for constitutional harmless error and probabilities for other errors).

As to the second error with a significant effect on the penalty phase, this court held the trial judge erred in refusing to grant R. Carr and J. Carr separate trials. *R. Carr I*, 300 Kan. at 45, 97. On appeal, the United States Supreme Court held the failure to sever the trial did not implicate the Eighth Amendment to the United States Constitution or offend the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Carr*, 577 U.S. at 122-26. But that holding did not directly disturb this court's ruling that the trial judge committed error under Kansas law when he refused to grant the request for separate trials. *R. Carr II*, 314 Kan. ___, slip op. at 58-59. Today, the majority recognizes the state law holding remains the law of the case, and it holds that "[t]he improper joinder of the defendants did not cease to be error at the commencement of the penalty phase." 314 Kan. at ___, slip op. at 59.

Indeed, it did not. The attorneys for J. Carr warned the trial court they would be a second prosecutor against R. Carr. While this was evident at many points during the guilt phase when J. Carr introduced evidence prejudicial to R. Carr as he pursued a defense antagonistic to R. Carr's, the antagonistic nature of the codefendants' cases became even more prejudicial during the penalty phase of the trial. For example, J. Carr's attorney elicited testimony that R. Carr confessed to shooting the victims. J. Carr thus joined the State in presenting evidence that pointed the finger directly at R. Carr as the actual shooter. This finger pointing dominated J. Carr's mitigation defense which consisted of evidence, supported by expert testimony, that R. Carr badgered and pushed his brother to

155

commit criminal acts. Kansas law protects a defendant from having to counter the case of a codefendant as well as that of the State. *State v. Martin,* 234 Kan. 548, 673 P.2d 104 (1983); I agree with the result of *Martin* and other cases that have found this type of antagonistic finger pointing to be prejudicial error. See, e.g., *United States v. Breinig*, 70 F.3d 850 (6th Cir. 1995); *Foster v. Commonwealth*, 827 S.W.2d 670 (Ky. 1992).

While I find these two errors, along with the cumulative effect of the other guilt phase issues, to be sufficient for reversal, today, focusing on the penalty phase of the trial, this court unanimously held six more errors occurred or would be assumed:

1. The trial judge erred in denying the defendants a continuance to consult with Dr. David Preston about Dr. Norman Pay's testimony and to recall Preston for surrebuttal;

2. The prosecutor committed error in commenting that the "truth" about defendants' PET scans came out;

3. The trial judge erred in instructing the jury to reject the death penalty if it was not convinced the aggravating circumstances did not outweigh the mitigating circumstances;

4. The prosecutor erred in telling the jury to impose the death penalty if the aggravating factors were outweighed by the mitigating factors;

5. The trial judge erred in failing to instruct the jury it had to find defendants were at least 18 years old at the time of the murders to impose the death penalty; and

6. Assumed error occurred as a result of the trial judge failing to instruct the jury on possible sentences for each noncapital crime and the judge's discretion to run the sentences concurrent or consecutive. *R. Carr II*, 314 Kan. at ___, slip op. at 137.

156

I would add a seventh error to the list. Under the law that existed at the time of R. Carr's trial, the trial judge should have informed the jury that mitigating factors need not be proved beyond a reasonable doubt. In 2001, this court directed trial judges to tell the jury that mitigating circumstances

> "(1) . . . need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision." *State v. Kleypas*, 272 Kan. 894, 1078, 40 P.3d 139 (2001).

R. Carr asked the trial judge to comply with this direction, but the judge failed to do so.

In part, the *Kleypas* rationale for requiring this instruction depended on constitutional interpretation rejected by the United States Supreme Court in *Carr*, 577 U.S. at 122. But the *Kleypas* rationale also depended on state law. As this court explained in *State v. Scott*, 286 Kan. 54, 106-07, 183 P.3d 801 (2008), without an instruction as directed by the *Kleypas* court, the instructions could have confused the jury. That confusion, the *Scott* court held, required reversal. In reversing, this court applied the standard we use when an error does not implicate the Constitution:

> "Read together, the instructions repeatedly emphasize the need for unanimity as to any aggravating circumstances found to exist. Conversely, the trial court's instructions do not inform the jury as to a contrary standard for determining mitigating circumstances. The jury is left to speculate as to the correct standard. Under these circumstances, we conclude there is a substantial probability reasonable jurors could have believed unanimity was required to find mitigating circumstances." 286 Kan. at 107.

The *Scott* court's application of the substantial probability standard for harmless error suggests that it was not finding constitutional error. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (stating constitutional harmless error test); see also 292 Kan. at 564 (noting that cases before *Ward* inconsistently stated the standard). Rather, the court looked at the potential for juror confusion. Although today's majority does not discuss *Scott*, it notes that this court explicitly recognized that *Kleypas*' directive rested, in part, on state law and thus remained the law despite the Supreme Court clarifying the holding could not rest on Eighth Amendment grounds. See *R. Carr II*, 314 Kan. at ___, slip op. at 51-52 (discussing *State v. Gleason*, 305 Kan. 794, 798-806, 388 P.3d 101 [2017]; *State v. Cheever*, 306 Kan. 760, 784, 402 P.3d 1126 [2017]). But the majority abandons the *Kleypas* directive and holds that the trial judge did not err when he refused to give an instruction directed by this court. *R. Carr II*, 314 Kan. at ___, slip op. at 56.

To the contrary, in my view, for a trial court to simply ignore that a directive of this court is itself error. See *State v. Clark*, 313 Kan. 556, 565, 486 P.3d 591 (2021) ("'[P]oints of law established by a court are generally followed by the same court and courts of lower rank in later cases in which the same legal issue is raised.'"). And the majority does not hold the directed instruction would misstate the law. Instead, it determines "[t]he instructions viewed together as a whole correctly and clearly informed the jurors of the law governing their consideration of mitigating circumstances." *R. Carr II*, 314 Kan. at ___, slip op. at 56. Granted, we often hold a court does not err when it refuses to give a requested instruction that provides additional information to a jury even if the instruction would properly explain the law. But we often tell trial judges that giving the jury added information would be a better practice. See, e.g., *State v. Barlett*, 308 Kan. 78, 86, 418 P.3d 1253 (2018). And in *Kleypas*, 272 Kan. at 1078, this court took the added step of directing judges to give the instruction.

Those with legal training may find the jury instructions clear. But jurors usually lack legal training and familiarity with concepts like burden of proof and weighing equations. I, like the many justices of the Kansas Supreme Court who have considered these instructions many times over the last several decades, discern ambiguity that could confuse and mislead jurors as they perform the important task of weighing aggravating and mitigating circumstances. That confusion was rampant in this trial, including among the law trained. The majority agrees the trial judge erred in instructing the jury to reject the death penalty if it was not convinced the aggravating circumstances did not outweigh the mitigating circumstances. It also held the prosecutor erred in telling the jury to impose the death penalty if the aggravating circumstances were outweighed by the mitigating circumstances. The weighing equation and the way it is to be applied can be confusing. We should recognize that reality and direct our trial courts to provide as much clarity as possible rather than to cloak decisions about death in ambiguity.

Yet the majority quickly dismisses the effect of these errors. Although it notes "these errors are related," it concludes "they do not magnify one another because they misstated the law in different ways." *R. Carr II*, 314 Kan. at ___, slip op. at 141. But differing statements simply magnify the potential confusion. Which of all the options is correct? The majority defaults to the written word found on the verdict form. *R. Carr II*, 314 Kan. at ___, slip op. at 141. But we have another written instruction that is wrong. Which written word controls? We should not tolerate this level of confusion when sentencing someone to death.

When I consider the penalty phase errors together with the guilt phase errors, I am convinced the threshold for vacation of the defendant's capital sentence has been reached under the cumulative error doctrine. We consider here horrible and tragic criminal acts. And the evidence against R. Carr was strong. But as said in Justice Beier's prior concurrence and dissent, which I joined, "it was not inevitably invincible." *R. Carr I*, 300

Kan. at 319. And, especially as to the penalty phase, I cannot ignore the reasonable possibility a properly selected jury—actually two properly selected juries—might have reached a different verdict.

For these reasons, I respectfully dissent from the outcome reached by a majority of this court.